# EXHIBIT B

```
 1

 2                 UNITED STATES DISTRICT COURT

 3           FOR THE NORTHERN DISTRICT OF CALIFORNIA

 4

 5                          --oOo--

 6   AF HOLDINGS, LLC,                    )
                                          )
 7                      Plaintiff,        )
                                          )CASE NO
 8           vs.                          )3:12-CV-02396-EMC
                                          )
 9   JOE NAVASCA,                         )
                                          )
10                      Defendant.        )
     ─────────────────────────────────────)
11

12

13

14   DEPOSITION OF:      PAUL HANSMEIER
     TAKEN BY     :      NICHOLAS RANALLO, ESQ.
15                       MORGAN PIETZ, ESQ.
     COMMENCING   :      10:00 – 6:15 P.M.
16   LOCATION     :      PREMIER BUSINESS CENTER
                         225 BUSH STREET, 16TH FLOOR
17                       SAN FRANCISCO, CALIFORNIA 94104
     DAY, DATE    :      TUESDAY, FEBRUARY, 19TH, 2013
18   REPORTED BY  :      ANGIE M. MATERAZZI, CSR NO. 13116
     PURSUANT TO  :      NOTICE OF DEPOSITION
19   ORIGINAL TO  :      BRETT L. GIBBS, ESQ.

20

21   PAGES 1 – 290

22   JOB NO. 131194

23

24

25
```

```
 1                    APPEARANCES OF COUNSEL

 2


 3


 4   FOR THE PLAINTIFF:

 5
             BRETT L. GIBBS, ESQ.
 6           PRENDA LAW, INC.
             38 MILLER AVENUE, #263
 7           MILL VALLEY, CALIFORNIA 94941
             415-325-5990
 8           BLGIBBS@WEFIGHTPIRACY.COM

 9


10   FOR THE DEFENDANT:

11           NICHOLAS RANALLO, ESQ.
             LAW OFFICE OF NICHOLAS RANALLO
12           371 DOGWOOD WAY
             BOULDER CREEK, CALIFORNIA 95006
13           831-703-4011
             NICK@RANALLOLAWOFFICE.COM
14


15


16   FOR THE DEFENDANT:

17           MORGAN E. PIETZ, ESQ., CO-COUNSEL
18           THE PIETZ LAW FIRM
             3779 HIGHLAND AVENUE, SUITE 206
19           MANHATTAN BEACH, CALIFORNIA 90266
             310-424-5557
20           MPIETZ@PIETZLAWFIRM.COM

21


22


23                     ---O0O---

24


25
```

```
1
2                          I N D E X
3                    INDEX OF EXAMINATIONS
4
```

```
5  Examination by Mr. Ranallo  .......................6
6  Examination by Mr. Pietz  ........................25
7  Further Examination by Mr. Ranallo  ..............36
8  Examination by Mr. Pietz  ........................37
9  Further Examination by Mr. Ranallo  ..............41
10 Further Examination by Mr. Pietz  ................41
11 Further Examination by Mr. Ranallo  ..............46
12 Further Examination by Mr. Pietz  ................52
13 Further Examination by Mr. Pietz  ................54
14 Further Examination by Mr. Ranallo  ..............66
15 Further Examination by Mr. Pietz  ................68
16 Further Examination by Mr. Ranallo  ..............79
17 Further Examination by Mr. Pietz  ................80
18 Further Examination by Mr. Ranallo  ..............85
19 Further Examination by Mr. Pietz  ................88
20 Further Examination by Mr. Ranallo  .............104
21 Further Examination by Mr. Pietz  ...............106
22 Further Examination by Mr. Ranallo  .............137
23 Further Examination by Mr. Pietz  ...............139
24 Further Examination by Mr. Ranallo  .............147
25 Further Examination by Mr. Pietz  ...............148
```

1    Further Examination by Mr. Ranallo  .............151

2    Further Examination by Mr. Pietz  ...............155

3    Futher Examination by Mr. Ranallo  ..............156

4    Futher Examination by Mr. Pietz  ................161

5    Futher Examination by Mr. Ranallo  ..............165

6    Futher Examination by Mr. Pietz  ................165

7    Further Examination by Mr. Ranallo  .............170

8    Futher Examination by Mr. Pietz  ................171

9    Futher Examination by Mr. Ranallo  ..............173

10   Futher Examination by Mr. Pietz  ................174

11   Futher Examination by Mr. Ranallo  ..............183

12   Futher Examination by Mr. Pietz  ................189

13   Futher Examination by Mr. Ranallo  ..............193

14   Futher Examination by Mr. Pietz  ................193

15   Further Examination by Mr. Ranallo  .............194

16   Futher Examination by Mr. Pietz  ................196

17   Futher Examination by Mr. Ranallo  ..............263

18   Futher Examination by Mr. Pietz  ................270

19   Futher Examination by Mr. Ranallo  ..............275

20   Futher Examination by Mr. Pietz  ................276

21   Futher Examination by Mr. Ranallo  ..............284

22   Futher Examination by Mr. Pietz  ................284

23                        ---o0o---

24

25

```
 1              EXHIBITS MARKED FOR IDENTIFICATION

 2    No.           Description                      Page

 3

 4    101     ADR Certification by Parties and ..........52
              Counsel
 5
      102     ADR Certification by Paries and Counsel  ...78
 6
      103     Notice for Withdrawal and Substitution ....132
 7            of Counsel

 8    104     Plaintiff's Notice of Dismissal Without ...150
              Prejudice of Remaining Doe Defendants
 9
      105     1 page AVN - Exile Distribution Adds ......156
10            Heartbreaker Films to Roster

11    106     Nina Mercedez: Popular Demand, Coming .....157
              From Exile - XBIZ.com
12
      107     Plaintiff AF Holdings LLC's Response to ...235
13            Defendant Joe Navasca's Motion to Post
              Undertaking
14
      108     Paul Hansmeier's signature on a blank .....235
15            piece of paper

16    109     1-page of signature exemplars for Paul ....236
              & Peter Hansmeier
17
      110     Petition for Discovery Before Suit to .....238
18            Identify Responsible Persons and
              Entities
19
      111     Business Record Detail, MCGIP, LLC  .......249
20

21

22    ** DELINEATES MARKED TESTIMONY.

23

24

25
```

Case 2:13-cv-03369-DWA Document 55-6 Filed 04/06/2016 Page 7 of 291 Page ID #:1308

```
 1      SAN FRANCISCO, CALIFORNIA, TUESDAY, FEBRUARY 19, 2013

 2                         10:00 A.M.

 3                         ---OOO---

 4

 5                      PAUL HANSMEIER

 6   the deponent herein, after having been first duly sworn,

 7   was deposed and testified as follows:

 8

 9              EXAMINATION BY MR. RANALLO

10       Q.   Good morning.  Could you state your name for

11   the record, please.

12       A.   Paul Hansmeier.

13       Q.   And Mr. Hansmeier what is your address?

14       A.   80 South 8th Street, Minneapolis, Minnesota

15   55402.

16       Q.   Is that your home address?

17       A.   That's my business address.

18       Q.   What's your home address?

19            MR. GIBBS:  Objection.  Privacy.

20            THE WITNESS:  ████████████████████████,

21   ████████████████████████.

22   BY MR. RANALLO:

23       Q.   Mr. Hansmeier have you ever been deposed

24   before?

25       A.   I have not.
```

1      Q.   Do you know how depositions work?  You're an

2  attorney, are you not?

3           MR. GIBBS:  Compound.  Objection.

4           THE WITNESS:  I'm an attorney.

5  BY MR. RANALLO:

6      Q.   And are you familiar with the procedures for

7  depositions?

8      A.   I know what a deposition is.

9      Q.   Have you ever conducted one?

10     A.   I have not.

11     Q.   Basically, what's going to happen is I'm going

12 to ask you a bunch of questions on the subjects that you

13 were previously noticed on.  If for any reason you don't

14 understand a question, please let me know and I will

15 rephrase it for you.  If you do answer a question, I'm

16 going to assume that you understood it.  In addition, if

17 you can try to refrain from nodding, pointing,

18 gesturing, anything that the court reporter can't easily

19 pick up and sort of the same thing with uh-huh, huh-uh,

20 those kind of answers.

21          MR. GIBBS:  Is that a question?

22          MR. PIETZ:  It's an admonition.

23          MR. RANALLO:  Let's go ahead and get started

24 here.

25          MR. PIETZ:  I'd like to add an admonition.

1    Just to be clear, you'll be given the opportunity to go

2    over the transcript before we finish today.  You should

3    understand that your responses in this deposition are

4    under penalty of perjury as if you were being sworn on

5    the stand in a court of law.  You'll have an opportunity

6    to correct things that you say here today.  However, you

7    should understand that if you subsequently try and

8    correct your testimony, that an inference can be drawn

9    about your credibility and the corrections can be used

10   against you.  Do you understand?

11             THE WITNESS:  Yes.

12             MR. GIBBS:  And as to that, I would like to

13   the reserve the right to do that.

14             MR. PIETZ:  We'll put a standard stipulation

15   on the record.

16             MR. GIBBS:  Just reserving the right.

17   BY MR. RANALLO:

18        Q.   Mr. Hansmeier what is your position with AF

19   Holdings?

20        A.   I do not have a position with AF Holdings.

21        Q.   Are you a member of AF Holdings?

22        A.   I am not.

23        Q.   You have no ownership interest in the entity

24   whatsoever?

25        A.   That's correct.

```
 1        Q.    And who does have an ownership interest in the
 2  entity?
 3        A.    The ownership of AF Holdings -- can you please
 4  clarify your question?
 5        Q.    Who are the members of the AF Holdings?
 6        A.    The membership interests of AF Holdings are
 7  held in a trust.
 8        Q.    And who are the beneficial owners of AF
 9  Holdings?
10        A.    Well, the beneficial owner of AF Holdings is a
11  trust.
12        Q.    Who does that trust disburse income to?
13        A.    Well, I don't believe there is any noticed
14  topic regarding a trust and the terms of the trust.
15  That being said, I'm not aware that there are any named
16  beneficiaries of the trust.
17        Q.    So when AF Holdings get a settlement, where
18  does that money go?
19              MR. GIBBS:  Objection.  I believe this is
20  outside of the scope of the numbered --
21              MR. RANALLO:  How about AF Holdings revenues
22  derived from the authorized licensing and distribution
23  of the work, including distribution of such revenues by
24  AF Holdings and the identities of the recipients.
25              MR. GIBBS:  But it doesn't ask for who.
```

```
 1              MR. PIETZ:  Okay.  Objection duly noted.  Are

 2   you instructing him not to answer?

 3              MR. GIBBS:  No.  I'm just pointing that out

 4   for the record.

 5              MR. PIETZ:  You can answer.

 6              THE WITNESS:  Could you please restate the

 7   question?

 8   BY MR. RANALLO:

 9       Q.   When AF Holdings receive a settlement, who

10   gets that money and how is it distributed?

11       A.   Well --

12              MR. GIBBS:  Objection.  You're assuming

13   something that hasn't been stated yet.

14   BY MR. RANALLO:

15       Q.   Has AF Holdings ever accepted a settlement in

16   its copyright actions?

17       A.   Yes.

18       Q.   When it receives such settlements, where do

19   they go and who are they distributed to?

20       A.   I guess that depends on the case.

21       Q.   Could you explain that, what sort of

22   circumstances could determine that?

23       A.   For example, if AF Holdings represented by,

24   say, an attorney in Maine, for example, and if AF

25   Holdings enters into a settlement agreement with a
```

1    defendant in one of those cases, then the revenues from

2    that settlement would go into the trust account for the

3    attorney representing AF Holdings.

4        Q.   And from there where do they go?

5        A.   Well, generally speaking the revenues that AF

6    Holdings has received from settlements, AF Holdings does

7    not receive a distribution from the trust accounts of

8    the law firms.  The reason being that AF Holdings is --

9    uses the money that remains in trust to pay for the

10   expenses of the litigation.

11       Q.   So AF Holdings has not distributed any

12   settlement proceeds to any individuals in any cases?

13           MR. GIBBS:  Objection.  That's misstating the

14   record.

15           MR. RANALLO:  That's a question.

16           MR. GIBBS:  You just --

17   BY MR. RANALLO:

18       Q.   Has AF Holdings distributed any income to any

19   individuals from its settlement proceeds?

20       A.   I guess I'll give you the same answer and the

21   answer is that when AF Holdings receives a settlement,

22   the money that it receives from the settlement generally

23   goes back to pay for the expenses of litigation.

24       Q.   You say generally.  When it doesn't go there,

25   where does it go?

1     A.   Well, in that case it can remain in the trust

2  account to pay for expenses of future litigation.

3     Q.   So it remains in the lawyer's trust account

4  indefinitely?

5     A.   I don't think that's what I said.

6     Q.   Does AF Holdings settlement proceeds stay in

7  the attorney's trust account indefinitely?

8     A.   No.

9     Q.   When they are released from that account,

10  where do they go?

11     A.   To pay for the expenses of litigation.

12     Q.   And what kind of expenses are those that

13  they're used to pay for?

14     A.   What kind of expenses are involved in

15  litigation?

16     Q.   Yeah, that AF Holdings pays for.

17     A.   Well, I could give you a few examples of

18  expenses, for example, a filing fee.

19     Q.   Okay.

20     A.   Cost of taking a deposition of Mr. Navasca,

21  for example.  The cost of producing documents, the cost

22  of discovery.

23     Q.   Let me ask you this.  In how many cases has AF

24  Holdings participated in discovery as far as producing

25  documents?

1          MR. GIBBS:  Objection.  I believe that's not a

2     noticed topic.

3          THE WITNESS:  That question is well outside

4     the noticed topics, so I couldn't -- I would be only

5     speculating.

6     BY MR. RANALLO:

7          Q.   To your knowledge has AF Holdings ever

8     produced documents in response to a discovery request?

9          MR. GIBBS:  Objection.  Let's be clear.  So

10    you're asking his personal knowledge?

11         MR. RANALLO:  I'm asking the corporation's

12    knowledge if they have ever conducted discovery.  You're

13    saying the corporation has no knowledge that they have

14    ever --

15         THE WITNESS:  Mr. Ranallo, perhaps you could

16    help me out.  Which topic does this relate to that you

17    noticed?

18         MR. PIETZ:  Well, look, I'm just going to jump

19    in here.  Are you instructing him not to answer the

20    question?

21         MR. GIBBS:  No, I'm not.  I'm just pointing

22    out that it's not a noticed topic, so therefore it's

23    going to be on personal knowledge and personal

24    knowledge --

25         MR. RANALLO:  No, it's not --

1          MR. GIBBS:  He's not speaking for the

2     corporation at this point.

3     BY MR. RANALLO:

4          Q.   Okay.  Speak for yourself, Mr. Hansmeier --

5          A.   Mr. Ranallo, I'll repeat my question to you,

6     as a courtesy, please let me know which noticed topic

7     you're referring to?

8          Q.   You have the noticed topics in front of you.

9     I'm asking questions.  Could you please tell me if AF

10    Holdings has ever responded to a discovery request in

11    any of its cases?

12         A.   Mr. Ranallo, this is not a topic I prepared

13    for.  It would be complete conjecture on my part.

14         Q.   So you have no knowledge that they have ever

15    participated in discovery at any time?

16         MR. GIBBS:  That misstates the testimony.

17    Objection.

18    BY MR. RANALLO:

19         Q.   Let me ask you this.  You previously said that

20    AF Holdings' settlement proceeds are used, for example,

21    to respond to discovery; is that correct?

22         A.   I was giving an example of a cost that could

23    come up in the context of litigation.

24         Q.   So to your knowledge it never has.  Has AF

25    Holdings' settlement income ever been used to conduct

---

California Deposition Reporters                                    Page: 14

1  discovery, to pay for discovery expenses?

2      A.   You can continue asking the same questions.

3  I'll continue giving the same answer.  The answer is it

4  would be pure speculation and conjecture on my part to

5  know what AF Holdings has and has not done.

6          I'm here to today -- and I prepared today --

7  to discuss the matters that you noticed up on behalf

8  of --

9      Q.   And those include -- tell me if I'm wrong --

10 but do those include AF Holdings' revenues from

11 copyright litigation and how they are distributed.

12     A.   I think that's a pretty tangential

13 relationship.

14     Q.   We'll let somebody else decide -- we'll let a

15 judge decide if AF Holdings will be bound by that.  Is

16 it your position that you have no knowledge whether AF

17 Holdings has ever participated in discovery in any of

18 its BitTorrent cases?

19         MR. GIBBS:  Objection.  Compound.  Also, are

20 we talking about his knowledge personally or his

21 knowledge as the PMK for the company?

22         MR. RANALLO:  It's the same.  He has

23 knowledge.  It either binds the company or it does not

24 bind the company.

25         MR. GIBBS:  Okay.  But I'm saying, you're

1   not -- you said it's tangential.  It really doesn't

2   refer to any of the topics that you noticed, so were you

3   asking him personally?

4           MR. RANALLO:  You can't refuse to answer on

5   that grounds.

6           MR. GIBBS:  I'm not refusing to answer --

7           MR. RANALLO:  So what will happen later is a

8   judge will decide if it's not properly cognizable under

9   these topics, AF Holdings won't be bound by it.  For now

10  I'm going to go ahead and ask the question, okay?

11          MR. GIBBS:  I'm just asking --

12  BY MR. RANALLO:

13      Q.   Mr. Hansmeier, to your knowledge, has AF

14  Holdings' revenues from BitTorrent litigation ever been

15  used to respond to discovery in any of its cases?

16      A.   I have no personal knowledge one way or

17  another, of course this case, but beyond that I couldn't

18  speak authoritatively.

19      Q.   Okay.

20          MR. PIETZ:  So just to clarify.  When you said

21  earlier that AF Holdings' settlement proceeds could be

22  use to respond to discovery, you have no personal

23  knowledge or corporate knowledge, that indeed, that has

24  ever occurred?

25          THE WITNESS:  When I gave the example of a

1  possible cost that could come up in the course of

2  litigation, I was simply providing a list of possible

3  costs that could come up in the course of litigation.

4  BY MR. RANALLO:

5      Q.   Let's go to actual costs that have come up in

6  litigation then instead of just examples.  What, to your

7  knowledge -- AF Holdings' knowledge, what specific

8  expenses have been paid by AF Holdings' settlement -- or

9  with the funds received from AF Holdings' settlement

10  proceeds?

11          MR. GIBBS:  Objection.  Compound question.

12          You can answer if you can understand what he

13  means.

14          THE WITNESS:  Could you repeat the question,

15  please?

16  BY MR. RANALLO:

17      Q.   What specific expenses have been paid out of

18  AF Holdings' attorney -- AF Holdings' settlement

19  proceeds?

20      A.   I can say --

21          MR. GIBBS:  Objection.  This is -- like you

22  mentioned before, this is tangential to the questions.

23          MR. RANALLO:  That doesn't mean you don't get

24  to answer, so object and then answer.

25          MR. GIBBS:  I'm just objecting.  Will you stop

1    yelling.  Please stop yelling.

2          THE WITNESS:  Mr. Ranallo, I'm beginning to

3    feel a little bit uncomfortable with your level of

4    aggressiveness in this deposition.  For the record I

5    would hope that we can keep this professional and

6    cordial.

7          Specific expenses, I can speak to this case

8    specifically, certainly the filing fee involving the

9    case would have been paid for by AF Holdings.  I can't

10   recall -- to the extent we had discovery to find out the

11   identity of Mr. Navasca, there would have been a fee

12   paid to the internet service provider to pay for their

13   cost of complying with the subpoena.  And the cost of

14   taking Mr. Navasca's deposition would have been an

15   expense paid by AF Holdings and --

16   BY MR. RANALLO:

17        Q.   What about 6881 Forensics, do they receive

18   money from AF Holdings' settlement proceeds?

19        A.   If your question is are they paid based on the

20   amount of settlements received, the answer is no.

21        Q.   My question is, do they -- does AF Holdings'

22   settlement proceeds, are they used to pay 6881

23   Forensics?

24        A.   I would answer the question by saying that AF

25   Holdings pay 6681 Forensics and whether that money is

1    sourced from settlement proceeds or otherwise, I mean,

2    directly or indirectly, yes.

3         Q.   Does AF Holdings receive any income outside of

4    settlement proceeds?

5         A.   That goes back to AF Holdings' business model.

6    And the answer to question is AF Holdings' business

7    model is to purchase the intellectual property rights to

8    various copyrights that, four or five years ago, would

9    have been extremely valuable copyrights.  Copyrights

10   have generated hundreds of thousands, if not millions of

11   dollars of revenue per year and because of the heavy

12   epidemic of digital piracy, these copyrights that were

13   once worth considerable amounts of money are now worth

14   next to nothing.

15        Q.   I'm going stop your for a second.  My question

16   here was, does AF Holdings --

17        A.   Mr. Ranallo, I'm answering your question --

18             THE REPORTER:  I can only take one person at a

19   time, just to let you know.

20   BY MR. RANALLO:

21        Q.   Does AF Holdings receive any revenue aside

22   from settlement proceeds?

23             MR. GIBBS:  Objection.  You're not letting him

24   answer the question.

25   ///

BY MR. RANALLO:

Q.   Yes or no, sir, does AF Holdings receive --

A.   I will restart my answer because I know it's important to establish a full and accurate record and I know it's important for attorneys to let witnesses answer the question.

So starting over, AF Holdings' business model is to secure the intellectual property rights to copyrights that, four or five years ago, would have been extremely valuable.  The reason why the intellectual property rights have lost so much value is due to the epidemic of digital piracy.

Now, AF Holdings' businesses model is to take these copyrights or its strategy for -- let me back up for one second.  So AF Holdings is creating a portfolio of copyrights that basically have little to no value right now, because instead of purchasing the copyrighted works, people just simply like to steal them online. And the only way to turn a copyright from very limited value to having a much greater level of value, you know, Circa 2003, 2004 is to stop people from stealing it.

Now, this is why I had to give you the background to answer your question.  AF Holdings recognizes revenue when it believes that the value of the copyright has increased, just like an investment

1   bank holding assets, mortgage-back securities, just like

2   a -- I guess any investment fund, holding any form of

3   asset.

4          The -- you know, the convention of

5   mark-to-market accounting says that you recognize

6   revenue when the value of the asset has increased.  As

7   of right now, it's far too speculative for AF Holdings

8   to say that its campaign to stop people from stealing it

9   works, succeeded or not succeeded.  So as of the now

10  the -- it's been far too speculative for AF Holdings to

11  recognize revenue based of its copyrighted works.

12     Q.   Have they recognized any revenue through any

13  sources other than litigation, for example, through

14  legitimate licensing of it?

15     A.   No.  The only source of revenue that AF

16  Holdings will have with respect to its copyrights are if

17  it increases in value.

18     Q.   Okay.  When was AF Holdings created?

19     A.   AF Holdings was created, I believe, in

20  May 2011.

21     Q.   And who is the initial incorporator?

22     A.   The initial incorporator was Aisha Sargeant,

23  A-I-S-H-A, S-A-R-G-E-A-N-T.

24     Q.   And where does she live?

25     A.   She lives in Nevis -- or the Federation of

```
 1  St. Kitts & Nevis.
 2      Q.   And why was AF Holdings incorporated in Nevis?
 3          MR. GIBBS:  Objection.  I don't believe that's
 4  part of the listed topics.  It's outside of the scope.
 5          MR. PIETZ:  You can answer.
 6          THE WITNESS:  I guess because it's outside the
 7  scope, I didn't ask anyone that specific question.  I
 8  would say, though, that it's a popular forum for
 9  incorporating entities.
10  BY MR. RANALLO:
11      Q.   And do you know any specific benefits that
12  are, you know, that come with incorporating in Nevis
13  versus, for example, the United States, Nevada,
14  California?
15          MR. GIBBS:  Compound.  Objection.  Also
16  outside the scope --
17          THE WITNESS:  I guess I could comment on the
18  benefits and trade offs between Nevis and California or
19  Nevada.
20  BY MR. RANALLO:
21      Q.   Does AF Holdings have any employees?
22      A.   Yes.
23      Q.   And who is AF Holdings -- who are AF Holdings'
24  employees?
25      A.   AF Holdings' sole employee is Mark Lutz.
```

```
 1        Q.   When was Mark Lutz hired?

 2        A.   He was hired very shortly after the

 3   incorporation, within a day or two, so May 2011.

 4        Q.   And does AF Holdings maintain employment

 5   records that would reflect Mr. Lutz' employment?

 6        A.   Could you specifically describe some of these

 7   employment records.

 8        Q.   A W2 for example.

 9        A.   It does not maintain a W2 for Mr. Lutz.

10        MR. PIETZ:  How about a 1099?

11        THE WITNESS:  It does not maintain a 1099 for

12   Mr. Lutz.

13        MR. PIETZ:  What can kind of records does it

14   maintain for Mr. Lutz?

15        THE WITNESS:  I guess -- which topic is this

16   again so I can refresh my recollection?

17        MR. PIETZ:  I'm not going to answer that, but

18   it's on the list.

19        MR. GIBBS:  Objection.  It's not on the list.

20        MR. PIETZ:  I disagree.  You can go ahead and

21   answer.

22        MR. GIBBS:  Which one is it?  I disagree.

23        MR. PIETZ:  It's not our job to tell you.

24   BY MR. RANALLO:

25        Q.   How about AF Holdings' corporate policies
```

 1   regarding business records?

 2       A.   Well --

 3       Q.   Would you consider an employment record to be

 4   a business record?

 5       A.   I wouldn't consider an employment record to be

 6   a corporate policy.

 7            MR. PIETZ:  I'd also note for the record that

 8   the relevant topic -- one of them is No. 7, which

 9   relates to employees of AF Holdings.  However, as a

10   practice, I'm not going to get engaged in having to tell

11   you which topic it relates to every single time.  We can

12   work on it after.  If you have objections, you can note

13   them.

14            MR. GIBBS:  I think, for instance, 7 is a

15   debatable topic, in terms of the record.

16            THE WITNESS:  I guess I just don't know

17   employment record -- the identity in terms of employment

18   doesn't really cover employment records arguably.  But

19   that being said, I guess I'm just not aware of what

20   employment records are required to be kept under the

21   laws of the Federation of St. Kitts & Nevis.

22   BY MR. RANALLO:

23       Q.   You understand that you're testifying as --

24   your testimony is binding on AF Holdings, you understand

25   that as a 30(b)(6) deponent?

```
 1              MR. GIBBS:  Asked and answered.

 2              THE WITNESS:  Yes, I understand that.  And to

 3    finish my answer, I don't think you should interrupt the

 4    witness.  I guess I should say back to my answers about

 5    W2 and 1099, when I was answering that question, I was

 6    answering that as I have not personally seen a W2 for

 7    Mr. Lutz and I have not personally seen a 1099 form for

 8    Mr. Lutz.  Do they have those records, that's not one of

 9    the topics that I was noticed to prepare on.  I'm sure

10    we could get that to you in some form of document

11    request following this deposition.

12                   EXAMINATION BY MR. PIETZ

13        Q.  So you stated earlier that Mr. Lutz is an

14    employee of AF Holdings.  In fact, I think you said he's

15    the sole the employee of AF Holdings.

16        A.  That's correct.

17        Q.  Do you have any documentary support for that

18    whatsoever?

19              MR. GIBBS:  Objection.  This is not --

20    BY MR. PIETZ:

21        Q.  Let me rephrase.  Does AF Holdings have any

22    documentary support whatsoever for the idea that Mark

23    Lutz is its sole employee?

24              MR. GIBBS:  Again, objection.  It's not one of

25    the noticed topics.
```

BY MR. PIETZ:

    Q.   You can answer.

    A.   I guess what I can say on behalf of AF Holdings is that I do not review any documents that would fall within the category of documentary support. Does that mean they have them, perhaps. Perhaps they don't have them. It wasn't one of the noticed topics. I inquired of Mr. Lutz as to who the employees of AF Holdings were and Mr. Lutz said that he was the sole employee.

    Q.   Just to be clear, I disagree that No. 7 is not a noticed topic. I'm asking for the testimony of the corporation, whether the corporation -- pardon me. It's not a corporation. It's a limited liability company. I'm asking whether the entity, not you personally, whether the entity has any documentary evidence that Mark Lutz is its employee.

    MR. GIBBS:  Objection. That is not what No. 7 says.

    THE WITNESS:  Well, I will read No. 7. It says identity and terms of employment for any and all AF Holdings' employees and independent contractors utilized by AF Holdings. I have identified AF Holdings' employee as Mark Lutz. I told you his term of employment is May 2011 through the present and as to whether or not there

1   are documents that further support my testimony, I can

2   only say that I did not review any documents.  I was not

3   given any indication by this notice that I was required

4   to provide a recitation of the various employment

5   records of AF Holdings, so that's outside the scope of

6   my knowledge.

7   BY MR. PIETZ:

8        Q.   Does Mr. Lutz have an employment agreement

9   with Mr. AF Holdings?

10       A.   If Mr. Lutz has an employment agreement with

11  AF Holdings, I did not review it.

12       Q.   Did you investigate whether such an agreement

13  exists?

14       A.   I investigated the identity in terms of

15  employment for any and all AF Holdings' employees by

16  speaking with Mr. Lutz.

17            MR. PIETZ:  I'm going to move to strike that

18  as nonresponsive.

19  BY MR. PIETZ:

20       Q.   With respect to the terms of Mr. Lutz's

21  employment, did you make any kind of investigation, ask

22  anyone, whether Mr. Lutz had a written employment

23  agreement with AF Holdings?

24       A.   I did not ask Mr. Lutz whether he had a

25  written employment agreement with AF Holdings.

```
 1        Q.   Did you ask anyone else whether there was a

 2   written employment agreement with Mr. Lutz?

 3        A.   I asked Mr. Lutz -- I didn't ask Mr. Lutz

 4   whether he had an employment agreement.  I asked

 5   Mr. Lutz who the -- who was employed by AF Holdings and

 6   what were the terms of the employment.

 7        Q.   To be more specific.  Could you elaborate on

 8   the terms of Mr. Lutz's employment with AF Holdings?

 9        A.   He is the -- well, he's essentially the CEO of

10   AF Holdings.

11        Q.   How much is he paid?

12        A.   He does not receive a salary for duties as

13   CEO.

14        Q.   Does he receive a salary for any other role

15   that he fills at AF Holdings?

16        A.   He does not receive a salary from AF Holdings.

17        Q.   Does he receive any other kind of compensation

18   other than salary from AF Holdings?

19             MR. GIBBS:  Again, this is not a noticed

20   topic.

21             MR. RANALLO:  It is his terms of employment.

22             MR. GIBBS:  No, but he's talking about outside

23   of AF Holdings, which is not -- nothing to do with AF

24   Holdings.

25             MR. PIETZ:  I'm asking whether AF Holdings
```

```
 1    pays Mr. Lutz any money of any kind.

 2              MR. GIBBS:  Same objection.

 3    BY MR. PIETZ:

 4         Q.   You can answer.

 5         A.   I guess my answer to that question is that AF

 6    Holdings does not pay Mr. Lutz money.

 7         Q.   What does it pay Mr. Lutz then?

 8              MR. GIBBS:  Objection.  Assume facts not in

 9    evidence.

10              THE WITNESS:  It has not paid Mr. Lutz

11    anything to date.

12    BY MR. PIETZ:

13         Q.   Is there any form of nonmonetary compensation

14    that AF Holdings pays -- extends to Mr. Lutz in exchange

15    for his services as an employee of AF Holdings?

16         A.   There's nothing that I'm aware of.

17         Q.   So it's your testimony here today that

18    Mr. Lutz receives no compensation whatsoever for his

19    role as the sole employee of AF Holdings?

20              MR. GIBBS:  Objection.  Mischaracterization of

21    earlier testimony.

22    BY MR. PIETZ:

23         Q.   It's a question.  You can go ahead and answer.

24         A.   My testimony is that AF Holdings has not paid

25    Mr. Lutz anything during the term of his employment.
```

1          MR. PIETZ:  Move to strike that as

2    nonresponsive.  That wasn't the question I asked.

3    BY MR. PIETZ:

4        Q.   Is your testimony here today that AF Holdings

5    has never paid Mr. Lutz any compensation of any kind for

6    his services as the sole employee of AF Holdings?

7        A.   Could you repeat that?

8             (Record read as requested.)

9             THE WITNESS:  Yes.  My testimony is that year

10   to date -- during the term of his employment he has not

11   been paid anything for his services as an employee.

12           MR. PIETZ:  Move to strike as nonresponsive.

13   BY MR. PIETZ:

14       Q.   I'm not interested during the term of his

15   employment.  I'm interested in at any time in the past

16   has Mr. Lutz received any kind of compensation

17   whatsoever in connection with his services to AF

18   Holdings?

19           MR. GIBBS:  Objection.  Outside the scope of

20   the questions.

21           THE WITNESS:  Just so I'm clear, are you

22   saying before AF Holdings was formed?

23   BY MR. PIETZ:

24       Q.   Well, to clarify, your last question contained

25   a hedge, which was that AF Holdings hasn't paid him

```
 1   anything during the term of his employment.  What I'm
 2   asking is did it pay him any money at any time, not just
 3   during the scope of his employment -- during the term of
 4   his employment.
 5        A.   He has not been paid -- he was not paid prior
 6   to the term of his employment either.
 7        Q.   How about subsequent to the term of his
 8   employment?
 9        A.   Well, he's currently employed, so I think that
10   covers all time in history.
11        Q.   So to be clear then.  Mr. Lutz has never
12   received any compensation of any kind in connection with
13   his services provided to AF Holdings?
14        A.   Mr. Lutz has not been compensated by AF
15   Holdings during the term of his employment and he has
16   not been compensated by AF Holdings prior to the term of
17   his employment.
18        Q.   Has Mr. Lutz been compensated by any person or
19   entity other than AF Holdings in connection with his
20   services AF Holdings?
21             MR. GIBBS:  Objection.  Outside the scope.
22             THE WITNESS:  I have no knowledge who else has
23   compensated Mr. Lutz for what.
24   BY MR. PIETZ:
25        Q.   So is Mr. Lutz paid minimum wage by AF
```

1  Holdings?

2      A.   Again, Mr. Lutz has not been compensated by AF

3  Holdings during the term of his employment or prior to

4  the term of his employment for his services as the sole

5  employee of AF Holdings.

6      Q.   So your testimony is that Mr. Lutz works for

7  AF Holdings completely for free with no compensation of

8  any kind coming from any source?

9      A.   My testimony is he has not been compensated by

10  AF Holdings during the term of his employment or prior

11  to the term of his employment.

12      Q.   Has he been compensated by anyone else for his

13  services provided to AF Holdings?

14          MR. GIBBS:  Objection.  Calls for speculation.

15          THE WITNESS:  You'll have to ask Mr. Lutz who

16  else is compensating him.

17  BY MR. PIETZ:

18      Q.   So I would like to ask you -- and we'll step

19  out of the 30(b)(6) role.  I'd like to ask you whether

20  you have any personal knowledge whether anyone has ever

21  paid Mr. Lutz money or any other kind of compensation in

22  exchange for or as a quid pro quo for his services

23  provided to AF Holdings?

24      A.   I have no recollection of any such

25  arrangement.

```
 1        Q.   How about the company.  Is the company, AF
 2   Holdings, aware of any other person or entity who
 3   compensates Mr. Lutz in exchange for his services
 4   provided to AF Holdings?
 5             MR. GIBBS:  Objection.  Vague.  You're talking
 6   about the company.  What are you talking about?
 7             MR. PIETZ:  I'm talking about AF Holdings.
 8             THE WITNESS:  Could you repeat that, please?
 9   BY MR. PIETZ:
10        Q.   Testifying now on behalf of AF Holdings.  Does
11   AF Holdings have any knowledge of any payments made to
12   Mr. Lutz by parties other than AF Holdings in connection
13   with his employment at AF Holdings?
14        A.   I guess as the corporate representative for AF
15   Holdings appearing here today to testify as to the
16   topics listed in this notice of deposition, I have -- in
17   my preparation for the various topics listed in this
18   notice of deposition, I did not come across any
19   information along those lines.
20        Q.   Did you investigate whether Mr. Lutz is paid
21   by any person or entity other than AF Holdings in
22   connection with his services to AF Holdings?
23             MR. GIBBS:  Objection.  That's was not
24   required --
25             THE WITNESS:  I investigated the noticed
```

1    topics, but I can't see a notice of -- or a noticed

2    topic that contains anything along those lines.  I

3    investigated the identify and terms for Mr. Lutz's

4    employment and I've already testified that Mr. Lutz was

5    not compensated by AF Holdings during the term of his

6    employment or preceding the terms of his employment.

7    BY MR. PIETZ:

8        Q.   Listening to your answer very carefully, I'm

9    just going to tell you what it sounds like to me.  It

10   sounds like you're leaving open an exception, if you

11   will, that perhaps there could be some other person or

12   entity that compensates Mr. Lutz in connection with his

13   services to AF Holdings.

14           I just want to be very clear that you're

15   saying that Mr. Lutz is not compensated by anybody

16   within the knowledge of AF Holdings and you personally,

17   both, in connection with his services to AF Holdings?

18       A.   Is that a question?

19           MR. GIBBS:  It's compound.

20           THE WITNESS:  What's the question?  You

21   started your question with I want to be very clear.

22   BY MR. PIETZ:

23       Q.   Fair enough.  I could be more clear.  Let me

24   try asking it a different way.  Is it the testimony of

25   AF Holdings that as far as AF Holdings is aware, after a

```
 1   reasonable investigation, Mr. Lutz has never received

 2   any compensation from any source in connection with his

 3   services to AF Holdings?

 4        A.   It is the testimony of AF Holdings that during

 5   the course of my investigation so I could come here

 6   today and be prepared to discuss the topics that were

 7   noticed up in this notice of deposition, that the

 8   identity and terms of employment with -- the terms of

 9   employment with respect to Mr. Lutz by AF Holdings, that

10   I conducted my due diligence and investigation so that I

11   could come here and testify on the topic, that I could

12   not find any documents that would suggest that Mr. Lutz

13   was -- or in fact, Mr. Lutz -- in my discussion with Mr.

14   Lutz -- that he is not compensated by AF Holdings in

15   connection -- or he has not been compensated by AF

16   Holdings in connection with his employment with AF

17   Holdings.

18        Q.   I'll note for the record the deponent appears

19   to be reading from a document, which I believe is the

20   deposition notice, but it contains some handwritten

21   notes on there; is that correct?

22        A.   You're welcome to have it.

23        Q.   Could you clarify what page it is that you

24   were just referring to in answering that last question?

25        A.   Page 3.
```

```
 1          Q.   We'll take copies of that afterwards.

 2               MR. PIETZ:  Might I suggest we take a

 3     five-minute break.  Is anybody else amenable to that?

 4               MR. GIBBS:  That's fine by me.  Is that all

 5     right with you?

 6               THE WITNESS:  I prefer to keep going, but if

 7     you guys want to take a break.

 8               MR. PIETZ:  We'll take five.  I think it will

 9     help streamline the proceedings.  We can go off the

10     record.

11               (Off the record at 10:38 a.m. and back

12                on the record at 10:44 p.m.)

13               FURTHER EXAMINATION BY MR. RANALLO

14          Q.   You previously testified -- correct me if I'm

15     wrong -- that AF Holdings is owned wholly by a trust; is

16     that correct?

17          A.   That's correct.

18          Q.   Has that always been the case?

19               MR. GIBBS:  Objection.  It's not one of the

20     noticed topics.

21               THE WITNESS:  I'm just trying to recall.  Yes,

22     I believe so.

23     BY MR. RANALLO:

24          Q.   It's always been owned by a trust?

25          A.   Yes.
```

1     Q.   And that trust, where is that organized?

2     A.   I do not know where the trust is organized.

3            FURTHER EXAMINATION BY MR. PIETZ

4        MR. PIETZ:  Sorry.  Let's stick on that for a

5  moment.  You're telling me that AF Holdings, the

6  company, doesn't know where the trust that it owns is

7  organized?

8        MR. GIBBS:  Objection.  Misstates testimony.

9        THE WITNESS:  I would just refer back to the

10  noticed topics and note that the fact that the noticed

11  topics do not include the --

12        MR. PIETZ:  I'll stop you right there.

13        THE WITNESS:  -- the organizations of -- I'm

14  in the middle of answering the question that you asked

15  me.  If I'm going to be here today and give testimony,

16  you have to listen to my questions -- or if you ask a

17  question, you have to listen my answers and you have to

18  let me answer fully, otherwise you wouldn't want to have

19  an inaccurate record or have it not reflect the truth

20  and the facts.

21  BY MR. PIETZ:

22     Q.   In any event, the reason I was stopping you is

23  that it sounded to me like you were off on a

24  nonresponsive topic and I'll ask the question for a you

25  a different way.

1      A.   Well, first I'd like to answer the question

2   that you asked, but if you'd like to withdraw the

3   question and ask me a different question, that's --

4           MR. PIETZ:  Okay.  I'll tell you what.  I'm

5   going to ask the reporter to please read back the last

6   question.

7           (Record read as requested.)

8           THE WITNESS:  And my answer to that question

9   is in reviewing the list of noticed topics, I do not see

10  a topic that relates to the organization or the domicile

11  or anything along those lines of the -- I guess domicile

12  organization of any parent company.

13          Further -- and I'm not speaking on behalf of

14  AF Holdings here.  I'm speaking personally.  I'm not a

15  trust lawyer, but I wasn't aware the trusts were

16  formally organized.

17          MR. PIETZ:  I'm going to move to strike that

18  entire answer as nonresponsive and refer the deponent to

19  subject matter 6, which includes as a topic, AF Holdings

20  corporate structure.

21  BY MR. PIETZ:

22      Q.   You testified here earlier today that AF

23  Holdings is owned by a trust.  What I'm asking you is

24  what trust?  Where is it located?

25      A.    I will refer you to topic of No. 6 and note

1   the fact, for the record, that AF Holdings corporate

2   structure is a limited liability company organized under

3   the laws of the Federation of St. Kitts & Nevis.

4           The corporate structure of AF Holdings owner,

5   I do not see on Topic 6.  Further, I would, again, note

6   that I'm not even aware if trusts are organized in the

7   sense that a limited liability company is organized or a

8   corporation is organized, so there may not even be an

9   answer to your question.

10      Q.   So in my experience most trusts name at least

11  one beneficial owner, but I believe you testified

12  earlier today that the trust that owns AF Holdings has

13  no beneficial owners; is that correct?

14      A.   The trust that owns AF Holdings is an

15  undefined beneficiary trust.  I would suggest that your

16  experience is not complete when it comes to trusts.

17      Q.   Perhaps you can enlighten me.  What is a

18  undefined beneficiary trust?  Allow me to be more

19  specific.  Can you explain to me what is the undefined

20  beneficiary trust that owns AF Holdings?

21          MR. GIBBS:  Objection.  Outside the topics.

22          THE WITNESS:  I don't understand your

23  question.

24  BY MR. PIETZ:

25      Q.   If there are no defined beneficiaries to the

```
1    trust that owns AF Holdings who are true beneficial

2    owners of that trust?

3              MR. GIBBS:  Objection.  Confusing question.

4              Go ahead and answer if you can.

5              THE WITNESS:  I'm sorry.  Can you please

6    repeat the question?

7    BY MR. PIETZ:

8         Q.   Who are the beneficial owners of the trust who

9    owns AF Holdings?

10             MR. GIBBS:  Objection.  Asked and answered.

11             THE WITNESS:  There are no defined

12   beneficiaries to my knowledge.

13   BY MR. PIETZ:

14        Q.   How about undefined beneficiaries?

15             MR. GIBBS:  Objection.  Can you clarify what

16   an undefined beneficiary is?

17   BY MR. PIETZ:

18        Q.   Go ahead and answer.

19        A.   I guess I don't understand the question.

20        Q.   Suppose AF Holdings recognized a million

21   dollars in tax revenue, who would have a right to claim

22   a piece of that revenue in connection with the trust

23   that owns AF Holdings?

24             MR. GIBBS:  Objection.  It's speculatory.

25             MR. PIETZ:  It's a hypothetical.
```

```
 1              You can answer.

 2              THE WITNESS:  At this point we're getting well

 3    beyond these noticed topics and you're asking me to

 4    speculate as to the innerworkings of a trust that has --

 5    that has not nothing to do with AF Holdings other than

 6    being its owner.

 7              FURTHER EXAMINATION BY MR. RANALLO

 8         Q.   In this case did you have to file any

 9    statement identifying whether AF Holdings had any

10    apparent corporations or owners that owned more than

11    10 percent of its stock?

12         A.   I don't know.

13         Q.   Is it your testimony that this trust owns more

14    than 10 percent of AF Holdings' stock?

15         A.   AF Holdings is owned in whole by the trust.

16              FURTHER EXAMINATION BY MR. PIETZ

17         Q.   Who organized the trust?  Who created the

18    trust?

19         A.   The trust was created by the -- organized by

20    the same individual who incorporated AF Holdings.

21         Q.   Is that Aisha --

22         A.   Sargeant.

23         Q.   Who asked Ms. Sargeant to organize the trust

24    that owns AF Holdings?

25              MR. GIBBS:  This is outside of the noticed
```

1   topics.  Objection.

2   BY MR. PIETZ:

3       Q.   You can answer.

4       A.   I couldn't tell you.  It's outside the scope

5   of the noticed topics.

6       Q.   Is there a document pursuant to which the

7   trust was organized?

8       A.   Once, again, this is outside the scope of the

9   noticed topics.  This isn't something I prepared to

10   answer.

11         MR. PIETZ:  Move to strike the last answer as

12   nonresponsive.

13   BY MR. PIETZ:

14       Q.   Trust are generally created through some kind

15   of a document establishing that a trust is there by

16   being created.  Is there a trust document for the trust

17   that owns AF Holdings?

18       A.   Is that a statement or a question?

19       Q.   It's a question.

20       A.   So what is the question?

21         MR. PIETZ:  Madam reporter, could you read the

22   last question back?

23         (Record read as requested.)

24         MR. GIBBS:  Objection.  Assume facts and also

25   a compound question.

```
 1              THE WITNESS:  Once, again, this is outside the

 2     scope of the noticed topics.  I have not personally

 3     reviewed a trust document.

 4              MR. PIETZ:  Move to strike the answer as

 5     nonresponsive.  I'm going to also note for the record

 6     that you're here today, sir, as the deponent.  It's your

 7     attorney's job representing you to note whether or not

 8     there is an objection about whether my questions are

 9     outside the scope of the deposition.  Do us a favor and

10     cut that out of your answer and then just either answer

11     it or you can -- or your attorney can instruct you not

12     to answer.

13              MR. GIBBS:  Mr. Pietz, he doesn't have to

14     listen to that instruction.

15              MR. PIETZ:  Well, in any event, all I'm saying

16     is that whether or not there's a legal objection

17     typically is an issue for the attorney.  You're here

18     today as a 30(b)(6) fact witness for AF Holdings, not as

19     the attorney for the matter so I just wanted to remind

20     you of that.

21              MR. GIBBS:  Mr. Pietz, I believe what he's

22     saying to you is that he's prepped on these specific

23     topics and so if they're outside of his scope in

24     prepping that they might affect his ability in answering

25     the question that you're asking.
```

1    MR. PIETZ:  Fair enough.  Let's come back to

2    this question though.  We're not done with it and it

3    seems pretty important to me.

4    BY MR. PIETZ:

5        Q.   When Aisha Sargeant organized the trust that

6    owns AF Holdings, did she reduce anything to paper in

7    connection with forming that trust?

8        A.   You would have to ask her.

9        Q.   I'm asking AF Holdings, the corporation,

10   whether there are any documents whatsoever that relate

11   or memorialize the formation of the trust that owns AF

12   Holdings?

13       MR. GIBBS:  Objection.  Outside the noticed

14   topics.

15   BY MR. PIETZ:

16       Q.   You can answer.

17       A.   Again, I did not come here prepared today to

18   talk about issues outside the noticed topics and so I

19   have personal knowledge or did not prepare to answer

20   questions about trusts.

21       Q.   So you said that you have no personal

22   knowledge.  What I'm asking is on behalf AF Holdings

23   testifying about its corporate structure which you

24   testified here today that the corporate structure is --

25   that AF Holdings, LLC is wholly owned by a trust.  I'm

1  asking you as the corporate representative for AF

2  Holdings is there a document memorializing that trust?

3          MR. GIBBS:  Objection.  Compound question.

4          THE WITNESS:  As the corporate representative

5  with respect to these noticed topics, AF Holdings has no

6  testimony regarding that issue.

7  BY MR. PIETZ:

8      Q.   So is your testimony here that AF Holdings

9  does not know whether there is a document memorializing

10  the trust that owns AF Holdings?

11          MR. GIBBS:  Objection.  Misstates the

12  testimony.

13  BY MR. PIETZ:

14     Q.   It was a question.  You can answer.

15     A.   My testimony is that as the corporate

16  representative for AF Holdings I cannot offer any

17  testimony that's just that far outside of the scope of

18  the topics that are noticed.  I can't speak for AF

19  Holdings, whether it has this knowledge because I was

20  not noticed that I would have to give testimony in that

21  regard.

22          MR. PIETZ:  ** I just ask the court reporter

23  to note the previous exchange so that we can potentially

24  get some court intervention to compel a 30(b)(6)

25  corporate answer on the question of whether or not trust

```
 1    documents exit for the AF Holdings deposition.
 2                  I'm going to turn it to over to Mr. Ranallo.
 3                  FURTHER EXAMINATION BY MR. RANALLO
 4         Q.    You previously testified this trust is the
 5    sole owner of AF Holdings; is that correct?
 6         A.    That's correct.
 7         Q.    And has been since the beginning of AF
 8    Holdings; is that correct?
 9         A.    Yes, that's correct.
10         Q.    Does this trust have a name?
11         A.    If it does have a name, I don't know what it
12    is.
13         Q.    This trust is not named Salt Marsh; is that
14    true?
15                  MR. GIBBS:  Objection.  It's assuming facts
16    not in testimony.
17                  MR. RANALLO:  He just actually said that he
18    doesn't --
19                  MR. GIBBS:  But you're talking specifically
20    about Salt Marsh.
21    BY MR. RANALLO:
22         Q.    In this case on July 20th, 2012, AF Holdings
23    through their counsel filed an EER certification
24    identifying Salt Marsh as its owner.  That seems to
25    contradict your testimony today, does it not?
```

1          A.    No.

2          Q.    So Salt Marsh is an owner of AF Holdings?

3          A.    My testimony was that I don't know what the

4     exact name of the trust is.  If the name of the trust is

5     Salt Marsh, then Salt Marsh is the owner.  If the name

6     of the trust is not Salt Marsh, then --

7          Q.    Let me ask you this then.  Because this ADR

8     certification requires a human being to read something.

9     A trust can't read something; is that true?

10         A.    I'm not --

11               MR. GIBBS:  I'm not an expert on --

12               THE WITNESS:  I'll take your word for it.

13    BY MR. RANALLO:

14         Q.    So on July 20th you filed something indicating

15    that Salt Marsh had read the handbook.  Salt Marsh as AF

16    Holdings owner had read the handbook entitled, Dispute

17    Resolution Procedures in the Northern District of

18    California.  You just testified that the sole owner is a

19    trust; is that correct?

20               MR. GIBBS:  Objection.  Compound question.

21               THE WITNESS:  To the extent your question is

22    whether the owner of AF Holdings is a trust, then yes,

23    the owner of AF Holdings is a trust.

24    BY MR. RANALLO:

25         Q.    If -- AF Holdings previously identified Salt

1  Marsh as its owner; is that correct?

2          MR. GIBBS:  What are you referring to?  This

3  is outside -- also outside of the noticed topics.

4  BY MR. RANALLO:

5      Q.  AF Holdings corporate structure -- No. 6 --

6  including past and present officers, director, members,

7  managers and all other beneficial owners or individuals

8  with a pecuniary interest.  An owner, right, Salt Marsh

9  was identified on July 20 by AF Holdings as an owner; is

10 that correct?

11     A.  You're asking me if Salt Marsh was identified

12 by AF Holdings as an owner on July 20th, 2012.  If

13 you're telling me that's in a document filed with the

14 court, I'll take your word for it.

15     Q.  Would you agree that that contradicts your

16 statement that the sole owner of AF Holdings is, in

17 fact, a trust?

18     A.  No.

19     Q.  So is it your testimony that the sole owner of

20 AF Holdings is a trust and AF Holdings is owned by Salt

21 Marsh?

22          MR. GIBBS:  Objection.  Misstates the

23 testimony.  Objection.  Compound.

24 BY MR. RANALLO:

25     Q.  I'm asking if he is saying both of these

1  things are true.

2      A.   Once, again, my testimony is that AF Holdings

3  is owned by a trust and whether the name of the trust on

4  the date in question was Salt Marsh or not, I'm saying I

5  just don't know what the name of the trust was on that

6  date.

7      Q.   I'm asking a slightly different question,

8  because this identifies an individual person Salt Marsh

9  as an AF Holdings owner, okay?

10      MR. GIBBS:  Objection.  Assuming facts not on

11  the record.

12      MR. RANALLO:  Let's take a quick break and I'm

13  going to print --

14      MR. PIETZ:  I'm going to represent that the

15  documents are on the way.  Let's go ahead and continue.

16  BY MR. RANALLO:

17      Q.   So to your knowledge, as AF Holdings'

18  corporate representative -- was Salt Marsh an individual

19  human being named Salt Marsh, ever an owner of AF

20  Holdings?

21      A.   Again, my testimony is that AF Holdings for

22  its existence has been owned by a trust.  I just don't

23  happen to know what the name of the trust is.

24      Q.   Assuming Salt Marsh is a human being, what

25  we'll go ahead and do here, since you testified that

1  Salt Marsh read the handbook entitled, Dispute

2  Resolutions -- or previously filed a document stating

3  that.  Assuming Salt Marsh is a human being, is it your

4  testimony that he is an owner of AF Holdings?

5           MR. GIBBS:  Objection.  Assumes facts.

6           THE WITNESS:  The question is a little bit

7  convoluted, can you please --

8  BY MR. RANALLO:

9      Q.   Is a human being at any point in AF Holdings'

10 history -- let me start that over.  At any time was AF

11 Holdings owned by a human being named Salt Marsh?

12     A.   No.

13     Q.   And so if AF Holdings had previously filed

14 something in this case indicating that it was owned by

15 an individual named Salt Marsh, that would be false; is

16 that correct?

17     A.   I guess I'm not sure what the legal analysis

18 on that would be.  To the extent a trust is considered

19 an individual for the purposes of filing, then I don't

20 know.

21     Q.   I don't think that answered the question at

22 all.

23           MR. GIBBS:  There's a situation where a trust

24 can be part of the lawsuit.  It can be an entity.

25           MR. RANALLO:  That's a speaking objection.

```
 1   I'm going to ask this again.

 2   BY MR. RANALLO:

 3        Q.   On July 20th, AF Holdings filed a document in

 4   this case noting that someone named Salt Marsh had read

 5   the handbook entitled Dispute Resolution Procedures.

 6   They identified this person as an owner.

 7        A.   Is it your position that a human being named

 8   Salt Marsh was AF Holdings owner on July 20th?

 9             MR. GIBBS:  Objection.  Outside the scope.

10             MR. RANALLO:  It absolutely is not.  No. 6,

11   Mr. Gibbs.

12             Go ahead and answer.

13             THE WITNESS:  My position is that -- or my

14   testimony on behalf AF Holdings is that on the date in

15   question -- I believe you said it was July 20th, 2012?

16        Q.   That is correct.

17        A.   AF Holdings was owned by a trust.  Whether the

18   trust was named Salt Marsh at that time or not is

19   outside the scope of my knowledge and whether or not the

20   particular document you're referring to requires a

21   person, an individual, a trust, someone acting on behalf

22   of those entities or what have you, I don't know.

23             MR. PIETZ:  I'm going to mark this for the

24   record.  I think were on 101; is that correct, madam

25   court reporter?  Here is a copy for the court reporter
```

 1    and I have copy for you guys as well.

 2              (Whereupon Defendants' Exhibit No. 101

 3               was marked for identification.)

 4              MR. PIETZ:  I would like to note for the

 5    record -- and I'm giving the witness a copy of the ADR

 6    Certification by Parties and Counsel filed in civil

 7    action 12-cv-2396 in the Northern District of California

 8    ECF No. 8.  I think we marked this as Exhibit 101.

 9              FURTHER EXAMINATION BY MR. PIETZ

10        Q.  Will you please refer to the second to last

11    signature -- the second signature up from the bottom and

12    read what it says there on the slash S line.

13        A.  Salt Marsh, AF Holdings owner.

14        Q.  So your testimony is that a person named Salt

15    Marsh signed this document on behalf the AF Holdings?

16              MR. GIBBS:  Objection.  Misstates the

17    testimony.  Can you restate the question, please.

18    BY MR. PIETZ:

19        Q.  Is it your testimony that a person named Salt

20    Marsh signed this document on behalf of AF Holdings as

21    its owner?

22              MR. GIBBS:  Same objection.

23              THE WITNESS:  I guess I can't offer any

24    testimony with respect to this document because this

25    document was not one of the noticed topics of the

1  30(b)(6) notice and had you noticed it, I would have

2  been glad to inquire with the company as to

3  circumstances of the signature here and what the

4  thinking was when it was signed and whatnot.

5  I can speculate as to the circumstances of the

6  signature now.  Again, this is just speculation --

7  Q.  Then let's go ahead and stop you.  No need for

8  speculation.  It's not worth a darn here in a

9  deposition.  Let me ask you a very simple question and

10  I'm hoping for a simple answer.  Is Salt Marsh the owner

11  of AF Holdings?

12  A.  The owner of AF Holdings is a trust.  The name

13  of the -- the specific name of the trust, if it's Salt

14  Marsh, then yes, Salt Marsh is the owner of AF Holdings.

15  If it's something else -- let me finish -- if the name

16  of the trust is something else, then no, Salt Marsh

17  would not be the owner of AF Holdings, but if Salt Marsh

18  is the name of the trust on July 20, 2012, then, yes,

19  Salt Marsh is the owner of AF Holdings.

20  Q.  So your testimony then on behalf of AF

21  Holdings is that you are not sure if the name of the

22  trust that owns AF Holdings is Salt Marsh or not?

23  MR. GIBBS:  Objection.  That's not what he

24  said.  He's not testifying for AF Holdings.

25  THE WITNESS:  Because we're so far outside the

1    scope of the noticed topics, it is --

2              MR. RANALLO:  Mr. Hansmeier, could you read

3    notice Topic 6 for us?

4              MR. GIBBS:  Mr. Ranallo, could you please stop

5    interrupting people.

6              THE WITNESS:  I was in the middle of my

7    answer.

8              MR. RANALLO:  Go ahead and finish then.

9              THE WITNESS:  Could you please repeat the

10   question.

11             (Record read as requested.)

12             MR. GIBBS:  Again, my same objection from

13   before.

14             THE WITNESS:  This is pretty simple.  I'm not

15   trying to be difficult.  All I'm saying is that I just

16   don't happen to know what the name of the trust was on

17   the particular date in question.

18                  FURTHER EXAMINATION BY MR. PIETZ

19        Q.   Has the name of the trust changed over time?

20        A.   I couldn't tell you what the name of the trust

21   was when it was formed.  I couldn't tell you if the name

22   of the trust has changed over time.  What I do know is

23   AF Holdings' corporate structure, it's a limited

24   liability company organized under the laws of

25   Federation -- laws of the Federation of St. Kitts &

1    Nevis and the ownership interests are held in trust.

2         Q.   But your testimony as AF Holdings corporate

3    representative who has been subpoenaed to appear and

4    testify on the noticed topics, which include as No. 6,

5    AF Holdings' corporate structure, your testimony is that

6    as the corporate representative for AF Holdings, you do

7    not know the name of the trust that owns AF Holdings?

8         MR. GIBBS:  Objection.  Same objection.  It

9    falls outside of the noticed topic.

10        MR. PIETZ:  Duly noted.

11        You can answer.

12        THE WITNESS:  Yes.  My testimony is that in

13   preparing for this deposition, I did not expect the name

14   of the trust to fall within the scope of this.  I did

15   not review the history of the name of the trust.

16   BY MR. PIETZ:

17        Q.   So did you make any inquiry whatever about the

18   trust that owns AF Holdings?

19        A.   Yes, I did make inquiries about the trust that

20   owns AF Holdings.

21        Q.   What were these inquiries?

22        A.   Well, my first inquire was what the corporate

23   structure is of AF Holdings.  I was then informed

24   that --

25        Q.   Pardon.  Can I stop you and I don't mean to

1    interrupt.  Who informed you?

2        A.   Mr. Lutz.

3        Q.   Continue.

4        A.   And he informed me that the membership

5    interest of AF Holdings are held in trust and then I

6    asked -- following down to No. 6 -- who are the

7    beneficial owners of the trust and Mr. Lutz informed me

8    that the trust did not have defined beneficiaries.

9        Q.   Was that the extent of your inquiry about the

10   AF Holdings?

11       A.   With respect to the trust, yes.

12       Q.   What other inquiry did you make about the

13   ownership of AF Holdings?  Pardon me.  Strike that.

14   Before we go to that question.

15            When did you have this conversation with

16   Mr. Lutz about the ownership structure of AF Holdings?

17       A.   I can't recall the specific date in which I

18   discussed this matter with Mr. Lutz.  It was in

19   preparation for this deposition, so it would have been

20   sometime between the date of the notice and today.

21       Q.   Was it a telephone conversation?  Did you

22   speak with Mr. Lutz in person?

23       A.   Again, I can't recall whether this particular

24   conversation took place in person or via the telephone.

25       Q.   If it was a conversation that took place in

1    person, where did it occur?

2        A.   If it was a conversation that took place in

3    person, it would have occurred in Las Vegas, Nevada.

4        Q.   If it was a conversation that occurred in

5    person in Las Vegas, Nevada, when was that?

6            MR. GIBBS:  Objection.  Assuming facts.

7            THE WITNESS:  It would have been, I would say

8    mid January.

9    BY MR. PIETZ:

10       Q.   Mid January.  So there was a face-to-face

11   meeting between you and Mr. Lutz in Las Vegas, Nevada in

12   mid January at which you discussed preparing for this

13   deposition; is that correct?

14       A.   Well, I guess the purpose of the meeting was

15   not exclusively to prepare for the deposition.  The

16   purpose of the meeting was simple -- we would have

17   discussed items that are included on this list.

18       Q.   What other items did you discuss?

19       A.   I can't recall the specific contents of a

20   given conversation in mid January with Mr. Lutz.

21       Q.   Was anybody else in attendance in that meeting

22   other than you and Mr. Lutz?

23       A.   For this -- if we're talking about these

24   items, it would have been me and Mr. Lutz.

25       Q.   Was anybody else in that meeting in connection

1    with talking about other topics?

2         A.   Not that I recall.

3         Q.   So returning to my question that I struck a

4    moment ago.  Was that one conversation with Mr. Lutz,

5    whether it occurred in person or over the phone, the

6    extent of your inquiry about the ownership of AF

7    Holdings?

8         A.   No.  I would not say so.  I talked with

9    Mr. Lutz on several occasions, whether it's in person or

10   over the telephone, regarding these items generally.  I

11   can't say that my conversation with Mr. Lutz regarding

12   the corporate structure was confined to a single

13   conversation or whether it was over the course of

14   several conversations.

15        Q.   Was Mr. Lutz the only source for your

16   knowledge about the corporate ownership of AF Holdings?

17        A.   I guess I can't recall specifically whether he

18   would have been the only source of my knowledge

19   regarding corporate structure or not.

20        Q.   So your answer is you don't know?

21        A.   No, my answer is I don't recall specifically

22   whether Mr. Lutz was a sole source of my information

23   regarding AF Holdings corporate structure or whether

24   anyone else may have also contributed to my knowledge.

25   I would say that Mr. Lutz was my primary source of

1   information regarding AF Holdings' corporate structure.

2       Q.   If we assume for a moment that you did have

3   other sources than Mr. Lutz, what were those sources?

4           MR. GIBBS:   Objection.   Calls for speculation.

5           THE WITNESS:   Well, for example, as I refresh

6   my recollection, I would say that documents, for

7   example, would be another source.

8       Q.   What documents?

9       A.   I could provide a few examples of documents.

10  For example the articles of organization of AF Holdings.

11      Q.   Any other documents?

12      A.   And the other various documents related to

13  corporate formation.

14      Q.   What are those various documents?

15      A.   Well, I couldn't give you an exhaustive list

16  sitting here right now, but I could give as an example,

17  the certificate of formation.

18      Q.   So there is an articles of incorporation and a

19  certificate of formation for AF Holdings; is that

20  correct?

21      A.   That's my recollection, yes.

22      Q.   Who currently has custody of those documents?

23      A.   I could not tell you who currently has custody

24  of those document.

25      Q.   But you have reviewed them, correct?

1    A.   I have reviewed them.

2    Q.   Are there any other documents you reviewed

3 that relate to the corporate structure of AF Holdings?

4    A.   These are the two that come most predominately

5 to mind.  There may have been other documents that I

6 can't recall as I'm sitting here right now.

7    Q.   And the two documents that we just discussed,

8 were those filed with any kind of governmental agency

9 such as Nevis?

10    A.   Well, the documents in question -- my

11 recollection of the documents is that one of the

12 documents was -- had a seal that was issued by Nevis, so

13 it's not filed with the -- they provide it to you.  The

14 articles of organization -- I know that traditionally

15 articles of organization are filed with governmental

16 authorities and I have no reason to believe that these

17 weren't also filed.  Although the exact copies, of

18 course, weren't filed, they were filed -- they may have

19 been signed by the relevant authorities.

20    Q.   Do you still have copies of the specific

21 documents that you reviewed?

22    A.   Personally?

23    Q.   Yes.

24    A.   I don't believe I personally have the copies

25 anymore.

1    Q.   Do you have them in your e-mail?

2    A.   I do not.

3    Q.   So you had paper copies?

4    A.   Yeah, I reviewed them in paper.

5    Q.   Who gave them to you?

6    A.   They were mailed by Mr. Lutz.

7    Q.   So aside from conversations with Mr. Lutz and

8    reviewing two documents, have you done anything else to

9    investigate the corporate formation of AF Holdings?

10   A.   Well, again, I did not testify that I reviewed

11   only two documents.  I gave examples of two documents

12   that I did review.

13   Q.   Hold on a second.  Are you saying now that

14   you're sure you did review both of these documents in

15   preparation for this deposition, because I thought

16   before you'd said you weren't sure whether you reviewed

17   anything, but that if you had, it might be these two

18   documents.  I just want to make sure we're clear.  Can

19   you clarify for me, please?

20   A.   To be clear I think my testimony was that as

21   we were going through this and I was recalling my

22   preparation that I recalled additional documents that I

23   had reviewed and I gave examples of two of those

24   documents and I stated there were other document, I

25   wouldn't know what to call them and I was not trying to

1  insinuate that the two documents that I reviewed was the

2  exhaustive list that I reviewed.

3      Q.   Let's get to the exhaustive list.  What are

4  the other documents you reviewed with respect to the

5  ownership of AF Holdings?

6      A.   Well, just to restate what I just said.  I

7  can't recall exhaustively every single document that I

8  reviewed.  I remember specifically those two documents,

9  the certificate of formation and the articles of

10  organization.  Obviously, when you create a company

11  there are a variety of documents that are generated.

12  I'm not a corporate lawyer.  I don't know the names of

13  each of those documents.

14      Q.   So when Mr. Lutz mailed those documents to

15  you, were they accompanied by other documents?

16          MR. GIBBS:  Objection.  Outside the noticed

17  topics.

18  BY MR. PIETZ:

19      Q.   Let me rephrase.  When Mr. Lutz mailed you the

20  two documents that you testified here today that you

21  reviewed, were these two documents accompanied by other

22  documents?

23          MR. GIBBS:  Objection.  Outside of the noticed

24  topics.

25          THE WITNESS:  I think the assumption here is

1    that he just mailed me one package of documents and that

2    was it.  I received -- you know, I received a mailing of

3    some documents.  Were those the only two documents in

4    there, I don't recall what was in the specific mailing.

5    I reviewed documents when I saw him in Las Vegas.  And

6    so, you know, the exact timing and which documents were

7    in which package and which documents were referred to at

8    what time, that's a pretty complex timeline that I

9    couldn't restate.

10       Q.   How many packages were there?

11       A.    My recollection is that there was -- there

12   were one or two packages.

13       Q.   Can you recall any of the other documents that

14   you reviewed other than the two we have already

15   discussed today?  Can you describe and identify those

16   for me right now, please?

17           MR. GIBBS:  Objection.  Outside the scope of

18   the notice of deposition topics.

19           THE WITNESS:  I can provide an example of one

20   more.  It was a document that listed Aisha Sargeant as

21   the organizer.

22   BY MR. PIETZ:

23       Q.   And what was that document?

24       A.    It was a document.  I don't know what the name

25   or the title of the document would have been.

1     Q.   Approximately how long was it, how many pages?

2     A.   I believe it was one or two pages.

3     Q.   Fair enough.  Are there any other documents

4  that you reviewed or was it just those three?

5     A.   I'm certain I reviewed other documents.  I

6  could not recall the nature and the text and the length

7  and the time I reviewed them, for the many documents.

8  If any of those occur to me during the course of the

9  deposition here today, I'll be glad to supplement my

10  testimony.

11     Q.   Fair enough.  All of the documents that you

12  reviewed, did those come from Mr. Lutz?

13          MR. GIBBS:  Objection.  Outside the notice.

14          THE WITNESS:  Yes.  To best of my

15  recollection.

16  BY MR. PIETZ:

17     Q.   So in your conversations with Mr. Lutz and in

18  your review of documents, was there any information

19  about the trust that owns AF Holdings at all?

20          MR. GIBBS:  Objection.  Outside the noticed

21  topics.

22          THE WITNESS:  Well, yes.  The information

23  about the trust was that it owned AF Holdings and there

24  were not defined beneficiaries.

25  ///

BY MR. PIETZ:

Q.   That was information from your conversation with Mr. Lutz, correct?

A.   That's my recollection.

Q.   And in your conversation neither -- strike that.

Neither in your conversation with Mr. Lutz nor in any of the documents that you reviewed was there anything on the topic of who owns the trust that owns AF Holdings?

A.   Once again --

MR. GIBBS:  Objection.  Not in the noticed topics.

THE WITNESS:  Trust -- well, once again, Mr. Lutz -- my preparation for the deposition revealed that the trust does not have -- or it's an undefined beneficiary trust.  I'm not sure what you mean by owner of a trust.

BY MR. PIETZ:

Q.   Other than the fact that there is a trust, the name of which you do not know, and that the trust is an undefined beneficiary trust, did your investigation of the corporate structure of AF Holdings yield any other details at all about the trust that owns AF Holdings?

MR. GIBBS:  Objection.  Misstates testimony.

1     Objection.  Outside the notice of the deposition topics.

2          THE WITNESS:  Those are the two main points

3     that I learned during my investigation of the trust.

4     BY MR. PIETZ:

5          Q.   Other than main points is there any other

6     information at all, any other detail or anything at all

7     that you learned about the trust that owns AF Holdings

8     other those two pieces of information?

9          MR. GIBBS:  Same objection.  Notice -- not in

10    the notice of deposition topics.

11         THE WITNESS:  I guess nothing that I can

12    recall as I sit here right now.  Although, perhaps a

13    question on the specific topic might jog my memory.

14         MR. PIETZ:  Fair enough.  We'll move on.  I'd

15    like to mark --

16              FURTHER EXAMINATION BY MR. RANALLO

17         Q.   Let me quickly ask you about the beneficiaries

18    of this trust.  You said there's undefined

19    beneficiaries; is that true?

20         A.   Yes.

21         Q.   So who controls the trust?

22         MR. GIBBS:  Objection.  Not in the notice of

23    topics for this deposition.

24         THE WITNESS:  I guess during my investigation

25    of AF Holdings corporate structure, I did not inquire

1    into who controls -- whatever that means -- the trust.

2    BY MR. RANALLO:

3        Q.    What do you understand a beneficial owner to

4    mean?

5            MR. GIBBS:  Objection.  It calls for a legal

6    conclusion.

7            MR. RANALLO:  I'm asking for his

8    understanding.

9            THE WITNESS:  I don't have an understanding of

10   what a beneficial owner means.

11   BY MR. RANALLO:

12       Q.    You don't know what the words beneficial

13   owners mean?

14           MR. GIBBS:  Objection.  Misstates testimony.

15   BY MR. RANALLO:

16       Q.    During your preparation for this deposition

17   you saw the words beneficial owners on the notice of

18   deposition; is that true?

19       A.    Yes.

20       Q.    And what did you take them to mean?

21       A.    I take the phrase beneficial owner as used in

22   this notice of deposition as someone who directly or

23   indirectly has some sort of interest in the company.

24       Q.    So the individuals who control the trust,

25   would you consider them beneficial owners of AF

```
 1    Holdings?

 2              MR. GIBBS:  Objection.  Misstates prior

 3    testimony.

 4              THE WITNESS:  I would not say they are

 5    beneficial owners of AF Holdings.

 6                 FURTHER EXAMINATION BY MR. PIETZ

 7    BY MR. PIETZ:

 8        Q.   Who is the trustee of the trust that owns AF

 9    Holdings?

10              MR. GIBBS:  Objection.  Asked and answered.

11        Q.   You can answer it.  It's a different question.

12    Now I want to know not about the beneficial owners but

13    about the trustee.

14              MR. GIBBS:  Objection.  Not in the scope of

15    the questions -- not in the scope of the noticed topics

16    for the deposition.

17    BY MR. PIETZ:

18        Q.   You can answer.

19        A.   I do not know the identity of the trustee of

20    the trust that owns AF Holdings.

21        Q.   Who is settler of the trust that owns AF

22    Holdings?

23              MR. GIBBS:  Objection.  Not in the notice of

24    the deposition topics.

25              THE WITNESS:  What is a settler?
```

BY MR. PIETZ:

    Q.   It's, I believe, somebody who helps form a trust and may be responsible -- I'm not entirely sure. However, I'm looking at information on the Internet that trusts in Nevis have a settler, a beneficiary and trustee, so I'm asking you as the corporate representative of AF Holdings, whether the trust that owns AF Holdings has a settler -- for the court reporter that's S-E-T-T-L-E-R.

        MR. GIBBS:  Objection.  Not in the notice of deposition topics.  You're asking for a legal definition of something.

        THE WITNESS:  I guess I still don't understand what the settler is.  Does it have any information about what functions they would perform?

BY MR. PIETZ:

    Q.   Frankly, I'm going to be perfectly honest. I'm not sure what a settler is with respect to a trust either, so maybe it's not an appropriate question because neither of us are sure what we're talking about.

        Let me ask it a different way.  If somebody wanted to terminate the trust that owns AF Holdings, who would have the authority to do so?

        MR. GIBBS:  Objection.  Outside of the scope of noticed deposition topics.

 1          THE WITNESS:  I would assume that you would
 2   have to look at the terms of the trust.  I don't know
 3   what the terms of the trust or who is empowered to do
 4   that.
 5   BY MR. PIETZ:
 6       Q.   How would one look at the terms of the trust?
 7          MR. GIBBS:  Objection.  Outside the notice of
 8   topics for the deposition.
 9          THE WITNESS:  I don't know how someone would
10   look at the trust.
11   BY MR. PIETZ:
12       Q.   But there are terms of the trust, correct?
13          MR. GIBBS:  Objection.  Outside the notice and
14   also assumes facts.
15          THE WITNESS:  I can only speculate.  As you
16   stated earlier trusts are generally reduced to a written
17   document.  Was that done in this case?  I did not review
18   the trust documents, so I don't know how you would
19   determine who has the authority to do anything with the
20   trust.  I assume it would be based on the terms.
21   BY MR. PIETZ:
22       Q.   So I think you're saying that there are trust
23   documents out there, but that you haven't reviewed them;
24   is that correct?
25          MR. GIBBS:  Objection.  Calls for speculation.

```
 1    Objection.  Not in the notice of topics for the

 2    deposition.

 3             THE WITNESS:  I can only speculate whether or

 4    not there are trust documents.

 5    BY MR. PIETZ:

 6        Q.   Returning to the question.  Who caused the

 7    trust that owns AF Holdings to be formed other than

 8    Aisha Sargeant?

 9             MR. GIBBS:  Objection --

10    BY MR. PIETZ:

11        Q.   Strike that.  Let me ask it a different way.

12    Who asked Ms. Sargeant or paid Ms. Sargeant to form the

13    trust that owns AF Holdings?

14             MR. GIBBS:  Objection.  Outside the notice of

15    topics for this deposition.

16             THE WITNESS:  I do not know who paid

17    Ms. Sargeant to form the trust.

18    BY MR. PIETZ:

19        Q.   Just to clarify.  I'm asking not for your

20    personal knowledge, but for the knowledge of AF

21    Holdings.

22             MR. GIBBS:  Objection.  Outside the notice of

23    topics for this deposition.

24             MR. PIETZ:  Duly noted.  You can answer.

25             THE WITNESS:  In the course of preparing for
```

1   this deposition I did not see any questions regarding

2   payment to the person who formed the trust that owns AF

3   Holdings and so I -- on behalf of -- AF Holdings has

4   no -- could only speculate in relation to these noticed

5   topics.

6           MR. GIBBS:  Let's stop for one second because

7   these questions are all outside the noticed topics.  If

8   you can point to a place where they are, then maybe we

9   can be better informed in terms of what you guys are

10  asking, but if they're outside the noticed topics, he

11  can't speak about that.  He can only speculate.

12          MR. PIETZ:  I respectfully disagree, but in

13  any event that's not something that we need to get into

14  on the record right now.  We can worry about that

15  afterwards.  This is discovery.  If you want to move to

16  exclude stuff later, you're welcome to do so.

17          MR. GIBBS:  Understood.  I'm just saying that

18  if there is some sort of topic that you can refer us

19  to --

20          MR. PIETZ:  There's several, including No. 6

21  and there's another one, but I'll have to get that to

22  you later.

23          MR. GIBBS:  For the record we don't believe

24  No. 6 covers that.

25          MR. PIETZ:  Fair enough.  Duly noted.  Let's

```
 1   move on to AF Holdings.
 2   BY MR. PIETZ:
 3       Q.   Who caused AF Holdings to be formed?
 4       A.   Ms. Sargeant.
 5       Q.   And who paid or asked Ms. Sargeant to form AF
 6   Holdings?  In other words, who is the organizer or
 7   incorporator of AF Holdings other than Ms. Sargeant?
 8       A.   Well, Ms. Sargeant I believe was the organizer
 9   and incorporator of AF Holdings.
10       Q.   Who asked her to do that?
11            MR. GIBBS:  Objection.  Outside the noticed
12   topics for this deposition.
13            THE WITNESS:  Can you ask the question again
14   just to make sure I answer it precisely.
15            (Record read as requested.)
16   BY MR. PIETZ:
17       Q.   Let me rephrase.  I'm assuming -- and I'll ask
18   you to follow along with me on this assumption -- that
19   somebody paid Ms. Sargeant some kind of money to form AF
20   Holdings on the island of Nevis.  Who did that?  Who
21   paid her the money to form AF Holdings?
22            MR. GIBBS:  Objection.  Calls for speculation.
23   Objection.  Outside the notice of deposition topics.
24            THE WITNESS:  The reason I'm hesitating is
25   because I don't know the exact, you know, trail of
```

1    individuals that ultimately resulted in Ms. Sargeant

2    forming AF Holdings, but she would have done so

3    ultimately through the direction of Mr. Lutz.

4    BY MR. PIETZ:

5         Q.    So Mr. Lutz was responsible for asking

6    Ms. Sargeant to form AF Holdings; is that correct?

7         A.    Yes.

8         Q.    Now, you mentioned a trail of other

9    individuals who may have been involved.  Who was on that

10   trail of individuals who were also involved?

11             MR. GIBBS:  Objection.  Asked and answered.

12   He said he didn't know.

13             THE WITNESS:  The so-called trail of

14   individuals, I probably couldn't identify every single

15   person on that trail, but Mr. Lutz would have delegated

16   this matter to a company that Ms. Sargeant works for,

17   which I believe the name is Trust Services Limited.

18   BY MR. PIETZ:

19        Q.    And is that based on the island of Nevis?

20        A.    I don't know where they're based out of, Trust

21   Services Limited.

22        Q.    Did anybody instruct Mr. Lutz to form AF

23   Holdings?

24             MR. GIBBS:  Objection.  Calls for speculation

25   and objection outside of notice of topics of the

1    deposition.

2    BY MR. PIETZ:

3        Q.   You can answer.

4        A.   Not that I'm aware of.  And ==it's also AF==

5    ==Holdings' position that Mr. Lutz was not instructed by a==

6    ==third party to form AF Holdings.==

7        Q.   ==If someone wanted to terminate the existence==

8    ==of AF Holdings, who would have the authority to do so?==

9          MR. GIBBS:  Objection.  Again, not in the

10   notice of topics.  Objection.  Calls for speculation.

11         THE WITNESS:  Well, I'm not an expert in the

12   corporate law of the Federation of St. Kitts & Nevis.

13   That being said I would speculate that --

14        Q.   Hold on a second.

15        A.   I'm not done answering my question.  Either

16   the owner or -- I guess I would have to review the

17   articles of organization to determine whether Mr. Lutz

18   possess the authority to cause a termination.

19        Q.   Who is the -- I believe it's a trust; is that

20   correct?

21        A.   Yes.

22        Q.   We have been through that.  Are there any

23   members of AF Holdings other than the trust?

24        A.   No.

25        Q.   Is there a manager of AF Holdings?

1       A.   No.  That is the formal title that Mr. Lutz

2  holds.

3       Q.   So he's both the sole employee and the manager

4  of AF Holdings; is that correct?

5       A.   That's correct.  I should clarify my earlier

6  testimony regarding employee status.  He's the manager.

7       Q.   So he's not an employee.  He's the manager of

8  the AF Holdings, is what we're saying now?

9       A.   Again, it's -- I don't know what the precise

10  legal distinctions are, but for all practical purposes

11  he's the manager.

12       Q.   Fair enough.  Are there any other officers of

13  AF Holdings that hold titles like CEO, president,

14  treasurer, secretary other than Mr. Lutz?

15       A.   No.

16       Q.   So is it your testimony that Mr. Lutz would be

17  the only person who had authority to terminate the

18  existence of AF Holdings, LLC?

19            MR. GIBBS:  Objection.  Misstates testimony.

20  Objection.  Not in the noticed topics for the

21  deposition.

22            THE WITNESS:  Again, my testimony regarding

23  the individuals with the authority to terminate AF

24  Holdings is that I would have to review very carefully

25  AF Holdings articles of organization to determine who

1    does possess the authority.  Ostensibly the owners have

2    the authority to terminate AF Holdings and whether or

3    not the articles also provide Mr. Lutz with the

4    authority to terminate AF Holdings is something that can

5    only be determined by careful reference to the articles

6    of organization.

7    BY MR. PIETZ:

8        Q.   So a moment ago you said the owners have the

9    authority to terminate the trust.  Don't you mean owner,

10   which is the trust?  Sorry.  Let me rephrase.

11           A moment ago you said that the owners have

12   authority to terminate AF Holdings.  Did you mean owner

13   because the owner is the trust, right?

14       A.   The owner of AF Holdings is a trust.

15       Q.   Okay.  And are there owners of the trust?

16       A.   When I used owners before I was referring more

17   generally to the principle that owners have the

18   authority to terminate the company, not to indicate that

19   AF Holdings had more than one owner.

20           THE REPORTER:  Can we take a break?  I need to

21   use the restroom.

22           MR. PIETZ:  Sure.

23           (Off the record at 11:41 a.m. and back

24            on the record at 11:48 a.m.)

25           MR. PIETZ:  Back on the record of the 30(b)(6)

1    deposition of AF Holdings.  I'd like to mark this as

2    Exhibit 102.

3              (Whereupon Defendants' Exhibit No. 102

4               was marked for identification.)

5    BY MR. PIETZ:

6        Q.   Mr. Hansmeier, this is similar to another

7    document that we discussed today.  It is an ADR

8    Certification by Parties and Counsel.  This one filed in

9    the Northern District of California No 11-C-3335.

10             Mr. Hansmeier, could you read me what it says

11   on line 19 and we'll finish through to where it ends on

12   line 20, please

13             MR. GIBBS:  Objection.  This is not part of

14   the notice of deposition topics.  Objection.  Not even

15   part of this case.

16             THE WITNESS:  Pursuant to Civil L.R. 16-8(b)

17   and ADR L.R. 3-5(b), each of the undersigned certifies

18   that he or she has.

19       Q.   And then in Paragraph 1 it says read the

20   handbook entitled, Dispute Resolution Procedures.  And

21   then there are two signature lines, including one that

22   says slash s Salt Marsh, AF Holdings owner.

23             I would like to ask you, again, is Salt Marsh

24   a he or a she.  Meaning, is Salt Marsh a natural person?

25             MR. GIBBS:  Objection.  Asked and answered.

1  Objection.  Outside of notice of deposition topics.

2           THE WITNESS:  The only information I can glean

3  about Salt Marsh from this document is that Salt Marsh

4  has been identified as AF Holdings owner.

5  BY MR. PIETZ:

6      Q.   Does AF Holdings know who signed this on

7  behalf of Salt Marsh or who gave the filer permission to

8  use the name Salt Marsh?

9           MR. GIBBS:  Objection.  Outside the notice of

10  deposition topics.

11           THE WITNESS:  I didn't speak to anyone

12  regarding this filing.

13              FURTHER EXAMINATION BY MR. RANALLO

14      Q.   When you spoke with Mr. Lutz about the

15  ownership of AF Holdings, did he ever indicate that a

16  human being named Salt Marsh has any ownership interest

17  in AF Holdings?

18      A.   He indicated that a trust owns AF Holdings.

19      Q.   So no human beings own AF Holdings; is that

20  true?

21      A.   Again, a trust owns AF Holdings.

22      Q.   And a trust is not an actual person; is that

23  correct?

24           MR. GIBBS:  Objection.  Calls for speculation.

25           THE WITNESS:  I don't know what the definition

1  of a natural person is under the law.

2  BY MR. RANALLO:

3      Q.   A natural person is a human being, okay, a

4  living, breathing human being.  Does AF Holdings have

5  any owners that are living and breathing human beings?

6      A.   No.  AF Holdings has an owner that's a trust.

7           MR. RANALLO:  Okay.

8           MR. PIETZ:  Fair enough.

9               FURTHER EXAMINATION BY MR. PIETZ

10     Q.   Moving on.  We've heard a lot today that your

11 knowledge about the ownership of AF Holdings is based on

12 conversations with Mr. Lutz.  Is it your view that

13 Mr. Lutz is more knowledgeable about AF Holdings than

14 you are?

15          MR. GIBBS:  Objection.  Calls for speculation.

16 BY MR. PIETZ:

17     Q.   Strike that.  Let me ask it a different way.

18 How come we're not hearing from Mr. Lutz today?

19          MR. GIBBS:  Objection.  You know the rules of

20 a PMK?

21 BY MR. PIETZ:

22     Q.   You can answer.

23     A.   I guess you'd have to ask Mr. Lutz.

24     Q.   Fair enough.  I would like to return to

25 something we talked about earlier this morning.  I

```
 1   believe you said -- and correct me if I'm wrong -- that
 2   AF Holdings has never recognized any revenue, that
 3   instead AF Holdings' settlement proceeds are paid into
 4   attorney trust accounts and that that money is then used
 5   on litigation expenses in other litigation; is that
 6   correct?
 7             MR. GIBBS:  Objection.  Misstates testimony --
 8   prior testimony.
 9             THE WITNESS:  Yeah, well I mean, I guess I'll
10   restate my answer from before.  My answer from before
11   was that any proceeds of settlements generated aren't
12   distributed to AF Holdings, but are instead used to
13   either pay for previously incurred expenses or held by
14   the attorneys to pay for future litigation expenses.
15   BY MR. PIETZ:
16        Q.   So if a John Doe defendant mails in a check or
17   makes a credit card payment to settle a lawsuit with AF
18   Holdings, where is that money initially deposited?
19             MR. GIBBS:  Objection.  Calls for speculation.
20             THE WITNESS:  Are you asking for a specific
21   bank or are you asking for --
22   BY MR. PIETZ:
23        Q.   Sure.  Let's start with a bank.
24        A.   I don't know what bank it gets deposited in.
25   I suppose it would depend on the attorney associated
```

1   with the case.

2      Q.   So is it your testimony then that if the check

3   comes, it would be deposited in the trust account for

4   the attorney who is counsel of record in that case for

5   the plaintiff, AF Holdings; is that correct?

6           MR. GIBBS:  Objection.  Misstates testimony.

7           THE WITNESS:  ==As a general principle, yes.==

8   BY MR. PIETZ:

9      Q.   What are the accounts where AF Holdings' money

10  is maintained, each of them?

11          MR. GIBBS:  Objection.  Not in the noticed

12  topics for the deposition.  Objection.  Calls for

13  speculation.  Asked and answered.

14          MR. PIETZ:  The objection is duly noted.  I

15  would refer the deponent to Topics No. 10, 11 and --

16          MR. RANALLO:  11, 12.

17          MR. PIETZ:  And ask that the deponent answer.

18          MR. GIBBS:  Same objection in terms of the

19  actual banks.  You're asking him about the banks.

20          THE WITNESS:  Are you asking for account

21  numbers?

22  BY MR. PIETZ:

23     Q.   No, I'm not asking for account numbers.

24  Although, we'll get to that.  What I would like to know

25  is a list of each account where AF Holdings' settlement

1    proceeds are deposited.  And why don't we start with the

2    name of the attorney who owns that account, so a list of

3    names of attorneys who deposit AF Holdings' proceeds

4    into their attorney-client trust accounts.

5            MR. GIBBS:  Objection.  Not on the notice of

6    deposition topics.  10, 11 are not covering those.

7            MR. PIETZ:  I disagree.  The deponent can

8    answer.

9            THE WITNESS:  I don't think it's humanly

10   possible for anyone to commit to memory a list of -- I

11   can't even speculate how many attorneys have worked on

12   AF Holdings cases over the course of its existence and

13   then also to commit to memory the account names

14   associated with those attorneys and then as you alluded

15   to the account numbers associated with those bank

16   accounts.  I don't know if that's humanly possible.

17           I can give you the general principles and the

18   general guidelines that state that if a settlement comes

19   in for, you know, let's say a John Doe lawsuit, having

20   settled with Mr. Navasca, for example, then the money

21   would go to the attorney, their trust account, and then

22   would be -- would stay there, because frankly the scope

23   of the infringement is so significant that there's still

24   a lot of fight left to stop people from pirating the

25   works subject to AF Holdings' copyrights.

1    Q.   Mr. Hansmeier, I appreciate the general gist

2  of what it is that you told me.  I'm asking for

3  specifics.  I would like the list of each attorney that

4  has a client trust account where AF Holdings' settlement

5  proceeds have been deposited.  I'm not asking for the

6  account number and I'm not asking for you to speculate.

7  What I'm asking is, as a 30(b)(6) witness for the AF

8  Holdings entity, name me the accounts where AF Holdings'

9  proceeds have been deposited.

10          MR. GIBBS:  Objection.  This is not one of the

11  noticed topics, period.

12          MR. PIETZ:  Are you instructing him not to

13  answer?

14          MR. GIBBS:  No, I'm just telling you.

15          MR. RANALLO:  AF Holdings revenues derived

16  from BitTorrent copyright --

17          MR. GIBBS:  Since when does that point out --

18          MR. RANALLO:  -- including the distribution of

19  said revenues by AF Holdings and the identity of the

20  recipient.

21          MR. PIETZ:  Guys, we've got to make a record

22  here.  We don't need to get into all of this.  If you're

23  not instructing him not to answer, then answer the

24  question.

25          THE WITNESS:  Well, in response to your

1   question, I would say that if you wanted a list of bank

2   accounts, such as a specific and almost encyclopedic

3   list of information, I would have put that topic very

4   specifically on your notice of deposition topics, so I

5   could have spent the day or two days or three days

6   required to memorize a list of bank accounts and

7   attorney names and so forth and so on.

8           I would note that the attorneys that represent

9   AF Holdings are all listed on the public record.  It's

10  very easy to find out and secondly, each of those

11  attorneys can be presumed to have trust accounts, as

12  attorneys do, associated with their practices and so the

13  list of the attorneys, although I can't recite each one

14  from memory, from top to bottom, is very easily

15  determined and you can then go from the attorney to

16  their trust account.

17                  EXAMINATION BY MR. RANALLO

18      Q.   Let me ask you this.  When AF Holdings sends

19  out their initial settlement letter with the payment

20  authorization form, that payment authorization form has

21  a Chicago, Illinois address; is that correct, regardless

22  of whether the case itself is?

23          MR. GIBBS:  Objection.  Compound question.

24          THE WITNESS:  Can you restate the question,

25  please?

1    BY MR. RANALLO:

2        Q.   When AF Holdings sends out settlement letters

3    with the request for payment authorization, the person

4    returns it with payment, all of those payments

5    regardless of the case go to one place in Illinois; is

6    that correct?

7        A.   No.

8        Q.   And so if Mr. Navasca in this case received a

9    settlement letter from AF Holdings, would it have

10   directed him to make a payment to Mr. Gibbs?

11       A.   Well, if you have a copy of the letter that he

12   received, I would just reference the letter.

13       Q.   I'm asking you.  You just described how this

14   process works and I want -- now in this specific case to

15   see if it would be like that in this case.

16       A.   I can only speculate and say that if --

17           MR. PIETZ:  Can I interrupt for a second?  You

18   said speculate a number of times today.  I just want to

19   make sure that we're clear -- because we didn't cover

20   this in the admonitions -- that we're not asking you to

21   speculate today.  Do you understand the difference

22   between speculation and an estimate?  We are interested

23   in your best estimate.  Do you understand the difference

24   between speculating and estimates?

25           Let me give you an example, because I think

1  it's fairly instructive.  If I was to ask you to tell

2  me, based on memory, how much money you have in your

3  wallet, you might be able to make an estimate to the

4  amount of money that you have in your wallet.  If I was

5  to ask you to tell me how much money I have in my

6  wallet, that would be speculation.  Just to make sure we

7  are clear.  We're not asking you to speculate here

8  today.  I'm sorry to interrupt, but I felt that we

9  should cover that.  In any event, let's return to the

10  questions.

11             THE WITNESS:  Sure.  Could you repeat the

12  question, please?

13  BY MR. RANALLO:

14      Q.   Yes.  You previously said that each attorney

15  that has appeared on behalf of AF Holdings maintains a

16  trust account; is that true?

17      A.    In my best estimate attorneys who practice

18  law, who collect revenues on behalf of clients maintain

19  trust accounts, yes.

20      Q.   I'm asking for attorneys that collect revenues

21  on behalf of AF Holdings, your company?

22             MR. GIBBS:  Objection.  Calls for speculation.

23  BY MR. RANALLO:

24      Q.   Do they maintain individual trust accounts?

25             MR. GIBBS:  Objection.  Calls for speculation.

1    THE WITNESS:  I have not reviewed the specific

2  bank structures of the attorneys who represent AF

3  Holdings.

4         FURTHER EXAMINATION BY MR. PIETZ

5    Q.   Let me ask the question a different way.  When

6  proceeds from AF Holdings' settlements come in, are they

7  initially deposited in accounts associated with Prenda

8  Law and then distributed to the attorneys or are the

9  proceeds deposited directly into the trust accounts for

10  the local counsel?

11         MR. GIBBS:  Objection.  Not within the notice

12  of the deposition topics.

13         MR. PIETZ:  You can answer.

14         THE WITNESS:  I believe there's -- that's

15  handled on a case-by-case basis.  For some attorneys it

16  goes directly into their trust accounts and for other

17  attorneys it goes into accounts associated with Prenda

18  Law.

19  BY MR. PIETZ:

20    Q.   What attorneys does it go directly into their

21  trust accounts?

22         MR. GIBBS:  Not one of the noticed topics of

23  the deposition.  Objection.  Calls for speculation.

24         THE WITNESS:  Again, this is, you know, on a

25  case-by-case basis that I'm trying to recall.  One easy

1    example would be the Anti-Piracy Law Group maintains

2    their own trust accounts separate and independent from

3    the Prenda Law.

4    BY MR. PIETZ:

5         Q.   Let me be clear.  What I'm interested in are

6    names of the attorneys here in response to this next

7    question.  Names of the attorneys, not account numbers.

8    What attorneys receive AF Holdings' settlement proceeds

9    directly into their trust accounts?

10        A.   Again --

11             MR. GIBBS:  Objection.  Outside the scope of

12   the deposition notice.  Also, we're kind of into the air

13   of privilege possibly.

14             MR. PIETZ:  I disagree.  Are you instructing

15   him not to answer?

16             MR. GIBBS:  No.  Just a warning.

17             MR. PIETZ:  Continue.

18             THE WITNESS:  I don't believe that we have

19   attorneys who represent us who maintain trusts accounts

20   in their own name versus in the name of a law firm.  I

21   could be wrong.  It comes down to the mechanics, so

22   whether individual attorneys within a firm maintain

23   trust accounts in their own name -- if I understand your

24   question correctly -- because you're looking for

25   attorneys and not law firms; is that correct?

BY MR. PIETZ:

    Q.   I'm looking for names of attorneys, so whether the trust account is in the attorney's name or in the name of that attorney's firm.  What I'm interested in is a list of names of attorneys who are recipients, directly, meaning the money is paid into their trust accounts of AF Holdings' settlement proceeds.

        MR. GIBBS:  Objection.  Calls for speculation. Also, what are you talking about?  Where is this money coming from?

        MR. PIETZ:  AF Holdings' settlement proceeds. Go ahead and answer the question

        THE WITNESS:  I'm not aware of any attorney who directly receives, in a trust account held by that attorney, settlement proceeds of AF Holdings.

BY MR. PIETZ:

    Q.   How do they indirectly receive the money then?

    A.   Well, a given attorney doesn't indirectly or directly receive settlement proceeds.  The firm's trust account gives the settlement proceeds.

    Q.   Let's ask for names of the firms then, if that's the way you would like to do this.  Please state the name of each firm that directly receives settlement proceeds into its trust account, or if the firm is a solo practitioner, just state the person's name?

1    MR. GIBBS:  Objection.  What scope are we

2 talking about?  Are we talking about just over 2012 or

3 since the formation?  What are we talking about here in

4 terms of the scope in time?

5    MR. PIETZ:  Since the formation of AF

6 Holdings.

7    THE WITNESS:  Well, I'm not certain that I'll

8 be able to provide a comprehensive list of every

9 attorney or every law firm or bank account that any

10 single dollar and any single settlement proceeds in an

11 AF Holdings case has been put into, but I can provide,

12 you know, some names.  For example, Prenda Law, would be

13 one firm that AF Holdings' settlement proceeds have been

14 put into.  Anti-Piracy Law Group would be a second one.

15 I believe that AF Holdings' settlement proceeds have

16 been put into accounts held by a firm called Anderson &

17 Associates.

18 BY MR. PIETZ:

19    Q.  Any others?

20    A.  Beyond that that I would be speculating as to

21 whether the money is directly forwarded to Prenda Law or

22 if it's first passed through the trust accounts of the

23 counsel in any given jurisdiction.

24    Q.  How about the law firm of Steele Hansmeier.

25 Were AF Holdings' litigation proceeds ever paid directly

1    into the trust account of the law firm of  Steele

2    Hansmeier?

3                    MR. GIBBS:  Objection.  Outside the scope of

4    the noticed topics.

5                    THE WITNESS:  If -- I can't recall the exact

6    timing of AF Holdings or the sale of Steele Hansmeier,

7    Steele Hansmeier to Prenda Law, but if we were

8    representing AF Holdings during that time, then it would

9    have gone into the trust account for Steele Hansmeier.

10   BY MR. PIETZ:

11        Q.   Who are the attorneys associated with or the

12   partners in the Anti-Piracy Law Group?

13        A.   You'd have to ask them.

14        Q.   I'm asking AF Holdings, which has just

15   testified that its settlement proceeds are paid directly

16   into the trust account of Anti-Piracy Law Group.  Is it

17   the corporate response then that it's not sure who is in

18   charge of those funds?

19                    MR. GIBBS:  Objection.  Misstates testimony.

20   Objection.  Not in the notice of deposition topics.

21                    THE WITNESS:  The attorney who represents AF

22   Holdings through the Anti-Piracy Law Group is Paul

23   Duffy.

24   BY MR. PIETZ:

25        Q.   Are there any other attorneys connected to the

```
 1    Anti-Piracy Law Group?

 2         A.   Paul Duffy is the attorney who represents AF

 3    Holdings and if there are other attorneys at the

 4    Anti-Piracy Law Group or other counsel, we're only aware

 5    of Mr. Duffy.

 6         Q.   What about John L. Steele, your former law

 7    partner.  Are AF Holdings' settlement proceeds paid into

 8    any trust account in which he has an interest?

 9              MR. GIBBS:  Objection.  Not one of the noticed

10    topics.  Objection.  Calls for speculation.

11              THE WITNESS:  Well, you made the point before

12    about Steele Hansmeier.  So to the extent that he had an

13    interest in that trust account, then yes.  Beyond the

14    scope of Steele Hansmeier, no.

15    BY MR. PIETZ:

16         Q.   So Mr. Steele does not have any right or

17    interest in the trust accounts for Prenda Law, for the

18    Anti-Piracy Law Group or for Anderson & Associates; is

19    that correct?

20              MR. GIBBS:  Objection.  Way outside the notice

21    of deposition topics.

22    BY MR. PIETZ:

23         Q.   Please answer.

24         A.   From AF Holdings' knowledge, no.

25         Q.   How about yourself personally, Mr. Hansmeier.
```

1   Do you have authority or an interest in the Prenda trust

2   account?

3        A.   No.

4        Q.   How about the Anti-Piracy Law Group, do you

5   personally have authority or an interest in that trust

6   account?

7        A.   No.

8        Q.   How about Anderson & Associates?

9        A.   No.

10        Q.   How about the Alpha Law Firm, LLC?

11        A.   Yes.

12        Q.   Does Alpha Law Firm, LLC, represent AF

13   Holdings?

14        A.   It represents AF Holdings in, I would say four

15   or five cases, currently pending in the District of

16   Minnesota.

17        Q.   Does the Alpha Law Firm represent Guava, LLC?

18        MR. GIBBS:   Objection.   That's outside the

19   deposition noticed topics.

20   BY MR. PIETZ:

21        Q.   Are there any other law firms that have trust

22   accounts where AF Holdings' settlement proceeds are paid

23   directly into the trust account for that law firm or

24   sole practitioners or is it just those three, Prenda,

25   Anti-Piracy Law Group and Anderson & Associates?

```
 1            MR. GIBBS:  Objection.  Compound question.

 2            THE WITNESS:  As I testified before, I'm not

 3   familiar with the exact mechanisms by which the money

 4   goes from one account to another.  Those -- to best of

 5   my knowledge those are the ones.

 6   BY MR. PIETZ:

 7       Q.   You just testified that Alpha Law Firm

 8   represents AF Holdings.  Has AF Holdings collected any

 9   settlement proceeds in the cases where Alpha Law Firm is

10   counsel of record?

11            MR. GIBBS:  Objection.  Outside the scope of

12   the topics in the notice of deposition.

13            THE WITNESS:  Yes.

14   BY MR. PIETZ:

15       Q.   And when AF Holdings collected those

16   settlement proceeds, were they paid directly into the

17   Alpha Law Firm?

18       A.   No.

19       Q.   How did Alpha Law Firm receive the money?

20       A.   The Alpha Law Firm did not receive the money.

21       Q.   Who received the money?

22       A.   The proceeds were directed to the Prenda Law

23   trust account.

24       Q.   So to be clear.  When Alpha Law Firm settles

25   AF Holdings cases, the proceeds are paid to the Prenda
```

```
 1   Law Firm, not to the Alpha Law Firm; is that correct?

 2       A.    They are deposited into the Prenda Law trust

 3   account, yeah.

 4       Q.    So what if Alpha Law Firm or yourself needs

 5   those proceeds to file further litigation, how do you

 6   access the funds?

 7            MR. GIBBS:  Objection.  Calls for speculation.

 8   Objection.  Outside the notice of deposition topics.

 9            THE WITNESS:  I don't understand the question.

10   BY MR. PIETZ:

11       Q.    I believe you testified earlier that

12   settlements of AF Holdings' proceeds are paid into a

13   trust account, so that the money can be used by

14   attorneys in conducting litigation, whether it's paying

15   past expenses or paying ISPs to turn over the names.

16   You just testified that you've settled AF Holdings'

17   cases on behalf of Alpha Law Firm and that the

18   settlement proceeds in those cases were deposited into

19   Prenda Law's trust account.  So if Alpha Law Firm needs

20   to access those funds to file new lawsuits on behalf of

21   AF Holdings or pay litigation expenses for AF Holdings,

22   how does Alpha Law Firm access the funds?

23            MR. GIBBS:  Objection.  Outside the notice of

24   deposition topics.

25            THE WITNESS:  So you're saying in the future
```

1   if Alpha Law Firm filed cases on behalf of AF Holdings,

2   how would we get the money?

3       Q.   No.  Let's try it again.  I believe you

4   testified earlier that AF Holdings' settlement proceeds

5   are paid into law firm trust accounts, so that the

6   lawyers litigating AF Holdings cases can use the

7   proceeds to spend on expenses incurred in connection

8   with the litigation, like paying ISPs for their time in

9   responding to subpoenas.  Now, you just testified a

10  moment ago that AF Holdings has indeed settled cases

11  where counsel of record is the Alpha Law Firm and that

12  those settlement proceeds were paid into the trust

13  account of Prenda, not Alpha Law Firm.

14          So my question for you is if Alpha Law Firm

15  was going to use the settlement proceeds to further

16  litigation on behalf of AF Holdings, how would it access

17  the settlement proceeds that have been deposited into

18  the Prenda trust account?

19          MR. GIBBS:  Objection.  Compound question.

20          THE WITNESS:  Just so I understand the

21  question.  You're asking if we were to file cases going

22  forward for AF Holdings, how would we get access to the

23  funds to pay for those expenses?

24  BY MR. PIETZ:

25      Q.   That's not the question I asked.  I'm sorry if

1    it's confusing.

2         A.    I understand the lead up to the question.

3    It's just the last part of it that I'm having trouble

4    getting my head around.

5         Q.    Fair enough.  Let me ask it a different way.

6    In the cases that Alpha Law Firm have settled for AF

7    Holdings, where the proceeds were deposited into the

8    Prenda trust account, has Alpha Law Firm ever withdrawn

9    those proceeds to use in connection with other AF

10   Holdings' litigation?

11        MR. GIBBS:  Objection.  Compound.  Objection.

12   Not in the notice of deposition topics.

13        ==THE WITNESS:  Alpha Law Firm has not withdrawn==

14   ==money from a trust account owned and operated by Prenda.==

15   BY MR. PIETZ:

16        Q.    Has Prenda sent Alpha Law Firm a check?

17        A.    I think the point you're trying to get is how

18   do we cover litigation expenses on behalf of AF Holdings

19   if the money isn't going to into Alpha Law Firm, but is

20   instead going into Prenda.  So the answer to your

21   question, if that's your question, is that would we ask

22   for reimbursement from Prenda for a certain -- for the

23   litigation expenses, for example, filing fees, or if

24   there's ISPs bills or whatever else.

25        Q.    How would that reimbursement come?  Do you

1   invoice Prenda Law?  And when I say you, I'm asking

2   about Alpha Law Firm.

3           MR. GIBBS:  Objection.  Outside the scope of

4   the noticed topics.

5           THE WITNESS:  I should clarify.  I'm not

6   speaking on behalf of AF Holdings right now.  I'm just

7   speaking on behalf of myself.  Typically, it would be --

8   we would ask Prenda for reimbursement and they would

9   provide the reimbursement.

10  BY MR. PIETZ:

11      Q.   How would you ask for reimbursements is my

12  more specific question?

13      A.   Generally would we ask the bookkeeper.

14      Q.   Who is the bookkeeper?

15      A.   Someone by the first name of Cathy.

16      Q.   Do you know Cathy's last name?

17      A.   I don't.

18      Q.   Where is she located?

19      A.   She's located in Las Vegas, Nevada.

20      Q.   When you would ask her, how would you ask her?

21  Is it an e-mail?  Is it an invoice?

22          MR. GIBBS:  Objection.  Outside the notice of

23  deposition topics.

24          THE WITNESS:  You're asking me to recall basic

25  bookkeeping transactions that happened a year ago.  I

1    would have to review my records to figure out the exact

2    method of reimbursement requests.

3    BY MR. PIETZ:

4        Q.   In any event, let me ask a slightly different

5    question because my interest is not so much in how Alpha

6    Law Firm is reimbursed for litigation expenses.  Rather

7    my interest is what happens to AF Holdings' settlement

8    proceeds after they're paid by John Doe defendant.  ==So==

9    ==for the cases that Alpha Law Firm has settled for AF==

10   ==Holdings, where the money was paid to Prenda Law, not==

11   ==Alpha Law, what happened to that money?==  ==Is it still==

12   ==sitting in Prenda Law's trust account?==

13          MR. GIBBS:  Objection.  Compound question.

14   Outside the notice of deposition topics.

15          ==THE WITNESS:==  ==Well, the money that was==

16   ==deposited into Prenda's trust account would either be==

17   ==used to pay for litigation expenses or still be there.==

18   BY MR. PIETZ:

19        ==Q.==  ==Are you not sure where your client's==

20   ==settlement proceeds are or what's happened to it?==

21        A.   Are you asking me as AF Holdings corporate

22   representative or me personally?

23        ==Q.==  ==I'm asking you personally and on behalf of the==

24   ==Alpha Law Firm.==

25          MR. GIBBS:  So this is something -- objection.

1    Outside the notice of deposition.

2            MR. PIETZ:  I'm going to ask it the other way

3    next, but you can go ahead and answer.

4            THE WITNESS:  I'm aware that the proceeds are

5    deposited into the Prenda Law trust account.

6    BY MR. PIETZ:

7        Q.   And where do the proceeds go from there, what

8    happens to them?

9        A.   I would give the same answer again, which is

10   they are either used to -- now, speaking from AF

11   Holdings' prospective, they would be used to either pay

12   for litigation expenses or they would be used or the

13   proceeds would remain in trust.

14       Q.   Do you have an obligation to make sure that

15   your client, AF Holdings, receives settlement proceeds,

16   don't you have an ethical obligation to do that as an

17   attorney?

18       A.   Are you asking me as an attorney?

19       Q.   I'm asking you as attorney for Alpha Law Firm.

20           MR. GIBBS:  Objection.  Outside the notice of

21   deposition.  Also assuming facts not in evidence.

22           THE WITNESS:  Well, I can say as an attorney I

23   have no concern over how the proceeds are handled.

24   BY MR. PIETZ:

25       Q.   So how does AF Holdings get the money from the

1    Alpha Law Firm, AF Holdings cases?

2              MR. GIBBS:  Objection.  Misstates testimony.

3    Objection.  Outside the notice of deposition topics.

4              THE WITNESS:  Once again, when there's a

5    settlement in an AF Holdings case, where Alpha Law Firm

6    is the law firm of record, the settlement proceeds are

7    deposited into the trust account at Prenda Law.

8    BY MR. PIETZ:

9         Q.   Do you have written consent from anyone at AF

10   Holdings agreeing to this procedure?

11             MR. GIBBS:  Objection.  Outside the notice of

12   deposition topics.

13             MR. PIETZ:  Go ahead and answer.

14             THE WITNESS:  I guess I would have to review

15   my records of correspondence with AF Holdings.

16   BY MR. PIETZ:

17        Q.   Did you ever discuss this arrangement with

18   Mr. Lutz?

19        A.   I would have to review my records.

20             MR. GIBBS:  Objection.  Outside the notice of

21   deposition topics.

22   BY MR. PIETZ:

23        Q.   Well, let me ask this now in your capacity,

24   not as the attorney for Alpha Law Firm, but in your

25   capacity as the corporate representative for AF

1    Holdings.  Has AF Holdings ever agreed to allow

2    settlement proceeds collected by one law firm to be

3    deposited into a trust account for an entirely different

4    law firm?

5              MR. GIBBS:  Objection.  Outside the notice of

6    deposition.  Objection.  You're basically stating

7    something as if it is a fact.

8              MR. PIETZ:  Go ahead and answer, please.

9              THE WITNESS:  Could you please restate the

10   question?

11             MR. PIETZ:  Madam court reporter, could you

12   read that one back?

13             (Record read as requested.)

14             MR. GIBBS:  Objection.  Vague and ambiguous.

15   Outside the notice of deposition topics.

16             THE WITNESS:  Yes.

17   BY MR. PIETZ:

18        Q.   Please elaborate.

19        A.   Is that a question?

20        Q.   Can you elaborate?

21        A.   Would you please ask me a specific question.

22        Q.   How has AF Holdings provided consent to the

23   procedure that we just described?

24        A.   I would have to review documents and records

25   of AF Holdings regarding consent.

1     Q.   But you haven't done that in preparation for

2  this lawsuit today?

3     MR. GIBBS:  Objection.  Outside the notice of

4  deposition topics.

5     THE WITNESS:  My review of documents in

6  preparation for the noticed topics did not include a

7  review of consent or whatever you referred to in terms

8  of different lines of authority.

9  BY MR. PIETZ:

10     Q.   So as the corporate representative for AF

11  Holdings, the corporation -- I should say limited

12  liability company -- has no concern whatsoever with the

13  fact that settlement proceeds payable on an Alpha Law

14  case are paid into the Prenda Law Firm's trust account?

15  As far as AF Holdings is concerned, one is just as good

16  as the other?

17     MR. GIBBS:  Objection.  Misstates testimony.

18  Objection.  Outside the notice of deposition topics.

19     THE WITNESS:  I can't speak to AF Holdings'

20  arbitrary concerns.

21            EXAMINATION BY MR. RANALLO

22     Q.   Let me ask you this.  You said AF Holdings.

23  BitTorrent settlement proceeds are 100 percent directed

24  towards cost or future litigation; is that true?

25     A.   No.  I think what I said was that the proceeds

```
1    of AF Holding/BitTorrent settlements are to cover --

2    well, to cover litigation expenses or to cover future

3    litigation expenses.

4        Q.   Okay.  So does AF Holdings anticipate filing

5    lawsuits forever?

6            MR. GIBBS:  Objection.  Calls for speculation.

7    BY MR. RANALLO:

8        Q.   Does AF Holdings anticipate filing further

9    lawsuits past today?

10       A.   Yes.

11       Q.   Does AF Holdings plan on spending 100 percent

12   of the money in trust on future lawsuits or past costs?

13       A.   Well, AF Holdings plans on spending money on

14   lawsuits to the extent that this epidemic scale of

15   piracy continues.

16       Q.   So let's say that, you know, for whatever

17   reason the piracy problems go away and this money is

18   left in attorney/client trust accounts, how does AF

19   Holdings get that money?

20           MR. GIBBS:  Objection.  Calls for speculation.

21   Based on an assumption.  I mean, come on.

22   BY MR. RANALLO:

23       Q.   Does AF Holdings have any authority to force

24   these attorneys to give them money, the money that

25   belongs to them from their settlement proceeds?
```

```
 1              MR. GIBBS:  Objection.  Calls for speculation.

 2    Objection.  Outside the noticed topics for the

 3    deposition.

 4              THE WITNESS:  Yes.

 5    BY MR. RANALLO:

 6        Q.   And where would those proceeds go?

 7              MR. GIBBS:  Objection.  Calls for speculation.

 8    Objection.  Outside the deposition topics noticed for

 9    this deposition.

10              THE WITNESS:  I can say that it hasn't yet, so

11    I would not be prepared to speculate where the money

12    would go in that event.

13              FURTHER EXAMINATION BY MR. PIETZ

14        Q.   Mr. Hansmeier, just to clarify.  When you say

15    it hasn't happened yet, does that mean there has never

16    been a distribution out of money held in trust for AF

17    Holdings by its various attorneys, that has gone to

18    anything other than the litigation expense; is that

19    correct?

20              THE WITNESS:  Yes, that's correct.  The

21    purpose of the litigation isn't to generate money for AF

22    Holdings.  The purpose of the litigation is to generate

23    a deterrent effect in stealing its copyrighted works.

24    BY MR. PIETZ:

25        Q.   So not a single penny of settlement proceeds
```

```
 1    paid into a trust account for AF Holdings various

 2    attorneys has ever been transferred to the attorneys who

 3    are working on those case?

 4              MR. GIBBS:  Objection.  Misstates testimony.

 5    Objection.  Calls for speculation.  Objection.  Outside

 6    the notice of deposition topics.

 7              THE WITNESS:  Can you say the question again.

 8    BY MR. PIETZ:

 9         Q.   I think you said that the purpose of the

10    litigation is not to make money.  It's just to increase

11    the value of AF Holdings' copyrights.

12         A.   Correct.

13         Q.   I believe you testified that the money is

14    simply deposited into trusts for the attorneys who

15    represent AF Holdings where it remains until it is

16    expended on litigation-related expenses; is that

17    correct?

18              MR. GIBBS:  Objection.  Misstates testimony.

19              THE WITNESS:  I didn't follow everything you

20    said, but the general point that the money has not been

21    distributed to AF Holdings is correct.

22    BY MR. PIETZ:

23         Q.   So what about distributions to AF Holdings'

24    attorneys.  When we were talking about

25    litigation-related expense, in your view, does that
```

1  include expenses paid to AF Holdings' attorneys for the

2  work that they have done on AF Holdings cases?

3      A.    Yes.

4      Q.    So how much money has AF Holdings paid to its

5  attorneys in connection with the copyrighted work that's

6  at issue in this lawsuit?

7            MR. GIBBS:  Objection.  Outside the notice of

8  deposition topics.

9            MR. PIETZ:  I disagree.

10           MR. GIBBS:  Objection.  Calls for speculation.

11  You're asking for a specific amount of money, you know,

12  down to the cent, so you're asking him to guess?

13           MR. PIETZ:  No.

14           MR. RANALLO:  We're ask him to testify about

15  No. 10, pretty much exactly what it says.

16           THE WITNESS:  Well, as I'm sure you can

17  appreciate, the attorneys don't track this information

18  with respect to a particular work.  They do it with

19  respect to litigation, because -- and so No. 10 asks for

20  copyright litigation related to the work, which I trust

21  refers back to the work "Popular Demand" and that number

22  is not determinable.

23  BY MR. PIETZ:

24      Q.    Let me move on to a slightly different topic.

25  The money that AF Holdings pays to its attorneys for

1    work they've done on AF Holdings' litigation, how is

2    that accounted for?  Is there an invoice?  Is it billed

3    hourly?  Is it a contingent fee?  Is it a flat fee?

4    Please explain how that works.

5        A.   The compensation arrangements with respect to

6    attorneys --

7            MR. GIBBS:  Objection.  Is this one of the

8    noticed topics?

9            MR. PIETZ:  It is.

10           MR. GIBBS:  Which number.

11           MR. PIETZ:  Ten among other.  Go ahead and

12    answer.

13           MR. GIBBS:  I disagree.  Objection.  Outside

14    the noticed deposition topics.

15           MR. PIETZ:  Duly noted.

16           THE WITNESS:  So with respect to the

17    distributions to various attorneys with respect to the

18    work "Popular Demand".  Again, it's just now how the,

19    you know, the accounting is done or how bookkeeping is

20    done.

21    BY MR. PIETZ:

22        Q.   I believe you're answering my second to last

23    question.  What I asked you more recently was, how are

24    the payments from AF Holdings' trust accounts to AF

25    Holdings' various attorneys accounted for?  Is it

1   through invoices?  Is it a contingent fee arrangements?

2   Is it a flat fee?  I'm asking how the payments that are

3   transferred made from AF Holdings' trust accounts to the

4   attorneys who run that trust account, how is that

5   accounted for?

6           MR. GIBBS:  Objection.  Compound question.

7           THE WITNESS:  Are you asking for a bookkeeping

8   answer or are you asking for --

9   BY MR. PIETZ:

10      Q.   Let's take it one step at a time.  The

11  attorneys who do work for AF Holdings, do they charge AF

12  Holdings on an hourly basis?  And let me clarify when I

13  say do work.  I mean, with respect to AF Holdings'

14  copyright litigation.

15          MR. GIBBS:  Objection.  Not part of the

16  noticed deposition topics.

17          THE WITNESS:  I'm trying to refresh my

18  recollection as much as possible.  I do think that this

19  is outside the scope of the noticed topics, but I'll do

20  my best to give some information in this area.

21          My understanding is that on behalf of the

22  company, to the extent that I was able to tangentially

23  review these topics, is that most attorneys are paid or

24  compensated on a contingency fee basis.

25  BY MR. PIETZ:

1    Q.   And what is the contingency fee basis?

2    A.   Well, a contingency fee basis is where they

3    receive a percentage of a settlement.

4    Q.   What's the percentage?

5         MR. GIBBS:  Objection.  Outside the notice of

6    deposition topics.

7         THE WITNESS:  I couldn't tell you the precise

8    percentages.

9    BY MR. PIETZ:

10   Q.   Can you give me a range?

11        MR. GIBBS:  Objection.  Calls for speculation.

12   Objection.  Outside the notice of deposition topics.

13   You don't want him to speculate, correct?

14        MR. PIETZ:  I would like to him to answer the

15   question.

16        THE WITNESS:  I'm trying to refresh my

17   recollection.

18   BY MR. PIETZ:

19   Q.   Mr. Hansmeier, you are both the corporate

20   representative for AF Holdings and an attorney who

21   represents AF Holdings in copyright litigations matters

22   with respect to your Alpha Law Firm; isn't that correct?

23   A.   I'm the corporate representative for AF

24   Holdings with respect to the topics that were noticed up

25   for today's deposition and I'm also an attorney for who

1    AF Holdings on the cases pending in Minnesota, yes.

2        Q.    And you're telling me that you're having

3    difficulty recollecting how it is that you were paid for

4    this work.

5        A.    No.  What I'm telling you is that I'm having

6    difficulty recollecting the range of contingency fee

7    arrangements nationwide among the dozens, if not several

8    dozen, of attorneys who have worked on AF Holdings'

9    matters in the past, in light of the fact that the topic

10   of -- the range of contingency fee payments for AF

11   Holdings' attorneys was not a notice topic, not even

12   very tangentially related to a noticed topic listed for

13   the -- how do you say it -- today's deposition.

14            I can tell you in the matters for Alpha Law

15   Firm, I can testify as to that issue.  The fee

16   arrangement was that Alpha Law Firm did not receive

17   compensation or did not receive a contingency fee for

18   those cases.

19       Q.    But other attorneys who work for AF Holdings

20   do receive contingent fees; is that correct?

21       A.    Yes, that is correct.

22       Q.    So is Alpha Law Firm paid on an hourly basis?

23       A.    Alpha Law Firm did not receive compensation

24   for its efforts in connection with the Minnesota AF

25   Holdings' cases.

```
 1        Q.    Did Alpha Law Firm take these cases pro bono?

 2        A.    Alpha Law Firm did not receive compensation

 3   for the cases filed on behalf of AF Holdings in

 4   Minnesota.

 5        Q.    No compensation of any kind?

 6        A.    That's correct.

 7              MR. GIBBS:  Objection.  Asked and answered.

 8   BY MR. PIETZ:

 9        Q.    Okay.  Now, how about speaking in your

10   capacity as the corporate representative for AF Holdings

11   and recognizing that perhaps the relationship between

12   Alpha Law Firm and AF Holdings is different from most of

13   the other relationships between AF Holdings and its

14   attorneys, please explain how the payments from AF

15   Holdings' trust accounts are paid to the attorneys who

16   handle AF Holdings' copyright infringement matters?

17              MR. GIBBS:  Objection.  Compound question.

18              THE WITNESS:  Well, if -- your question

19   includes a premise, which I don't think is correct.

20   BY MR. PIETZ:

21        Q.    Let me strike it then.  What is the -- what is

22   the range of contingent fee agreements that AF Holdings

23   uses with respect to its attorneys who prosecute

24   copyright infringement matters --

25        A.    So using Alpha Law Firm as a low end, it would
```

```
 1   be zero.

 2        Q.   Okay.  I'm not asking about Alpha Law Firm,

 3   because you said it's different and it hasn't received

 4   any money.

 5        A.   I didn't say it's different.  I said Alpha Law

 6   Firm is not compensated for its work with AF Holdings.

 7        Q.   Is that true of the other law firms that

 8   represent AF Holdings, none of them receive any money?

 9             MR. GIBBS:  Objection.  Calls for speculation.

10             THE WITNESS:  Again, you're asking me to

11   estimate or speculate with respect to matters that

12   weren't noticed up for the deposition.  That being said,

13   I would say that the range -- based on my best

14   recollection of this matter, I would say the range is

15   generally -- or the amount of compensation for attorneys

16   on an a contingency fee basis is generally in the range

17   of 33 -- or in the ballpark of 33 percent.

18   BY MR. PIETZ:

19        Q.   If Paul Duffy settles a case on behalf of AF

20   Holdings through the Anti-Piracy Law Group, what

21   percentage of the proceeds is Paul Duffy entitled to?

22             MR. GIBBS:  Objection.  Out the notice of

23   deposition topics.  Objection.  Speculation.

24             THE WITNESS:  I can't -- I don't know what

25   precise percentage Paul Duffy is paid.
```

BY MR. PIETZ:

Q.   Can you give me a ballpark?

MR. GIBBS:  Objection --

BY MR. PIETZ:

Q.   Can you give me an estimate?

A.   I can speculate that's it's in the ballpark of a third.

Q.   It's not higher than a third?

MR. GIBBS:  Objection.  He just said it was within the ballpark, which means higher or lower.

BY MR. PIETZ:

Q.   Let me clarify.  Is it possible that Mr. Duffy is paid a contingent fee higher than 33 1/3 percent?

A.   Again, you're asking me to speculate. Anything is possible.

Q.   I'm asking you to answer on behalf of AF Holdings.

A.   I'm answering on behalf of AF Holdings that you asked is it possible, of course, AF Holdings -- when you ask about -- when you couch questions in terms of possibilities, yes, it's possible.

Q.   Does AF Holdings have a written fee agreement with Paul Duffy of the Alpha Law Firm?

MR. GIBBS:  Objection.  Outside the scope of the noticed deposition topics.

1          THE WITNESS:  Again, that's outside the scope

2   of the notice of deposition topics, so I did not review

3   the various fee agreements.

4   BY MR. PIETZ:

5          Q.   Is it your testimony that AF Holdings is not

6   sure if it has a fee agreement with its attorney, Paul

7   Duffy?

8          MR. GIBBS:  Objection.  Misstates testimony.

9          THE WITNESS:  It's my testimony that the fee

10  agreements with respect to the various attorneys

11  representing AF Holdings was not incorporated directly

12  or tangentially to the noticed topics.

13         Q.   I disagree with that assertion, but I'll ask

14  you one final time.  I don't mean to belabor the point.

15  I'm asking AF Holdings now.  Is there a written fee

16  agreement between AF Holdings and Paul Duffy?

17         MR. GIBBS:  Objection.

18         THE WITNESS:  I guess I would incorporate the

19  answer I previously gave to the exact question.

20         MR. PIETZ:  Move to strike the deponent's last

21  two answers as nonresponsive.

22         Let me read one more thing.  One of the notice

23  topics today was -- we were -- we put you on notice that

24  we wanted to inquire into the, quote, the identities of

25  the recipients, unquote, of AF Holdings' revenues from

1    BitTorrent copyright litigation.

2         A.    Related to the work.

3         Q.    -- related to the work in question.  Wouldn't

4    you agree that Mr. Duffy, with a contingent fee interest

5    in the outcome of the litigation would qualify as a

6    recipient of the proceeds from BitTorrent copyright

7    litigation?

8         A.    Sure and we have identified him.

9         Q.    But what you can't do is clarify the exact

10   basis upon which the revenue is paid.  So it may be

11   something in the ballpark of a third, but you aren't

12   certain --

13            MR. GIBBS:  Objection.  Misstates prior

14   testimony and objection.  Outside the notice of the

15   deposition topics --

16            THE REPORTER:  Please hold on.

17            THE WITNESS:  Could you please restate the

18   question?

19   BY MR. PIETZ:

20        Q.    Let me start over.  How about this case.  Does

21   AF Holdings have a written contingent fee agreement?

22            MR. GIBBS:  Objection.  Outside of the notice

23   deposition topics.

24   BY MR. PIETZ:

25        Q.    Go ahead and answer.

1    THE WITNESS:  Well, this case hasn't generated

2    any revenues yet so it didn't specifically occur to me

3    to review arrangements with the attorneys in cases that

4    haven't generated any revenue.

5    Q.  So in other AF Holdings' copyright litigations

6    cases where Mr. Gibbs has obtained settlements for AF

7    Holdings, wouldn't you agree that Mr. Gibbs is an

8    ultimate recipient of AF Holdings' settlement proceeds

9    by virtue of a contingent fee arrangement?

10    MR. GIBBS:  Objection.  Outside the notice of

11    deposition topics.  This is a constant theme here.

12    A.  Wouldn't I agree to what?

13    (Record read as requested.)

14    MR. GIBBS:  Objection.  To the extent that

15    we're not even talking about the same case here, right?

16    Do you have any cases in mind we're talking about here

17    or just generally?

18    MR. PIETZ:  I'm sure I can come up with some.

19    I would like the deponent to answer the question.

20    A.  So the question is if Mr. Gibbs received

21    proceeds from a settlement, would he be -- would he be

22    an ultimate recipient of the proceeds?

23    Q.  My question more simply states, wouldn't you

24    agree that Mr. Gibbs is a recipient of AF Holdings'

25    settlement proceeds?

 1              MR. GIBBS:  Objection.  Out the notice of

 2    deposition topics and you're also asking him for a

 3    definition here that he doesn't necessarily have.

 4    BY MR. PIETZ:

 5         Q.   Go ahead and answer.

 6         A.   I guess I'm pretty confused by the question.

 7    It would depend on how Mr. Gibbs is compensated.

 8         Q.   How is Mr. Gibbs compensated?

 9              MR. GIBBS:  Objection.  Outside the notice of

10    deposition topics.

11    BY MR. PIETZ:

12         Q.   In this case if Mr. Gibbs were to obtain a

13    settlement from the defendant, what contingent fee

14    percentage would he be given?

15              MR. GIBBS:  Objection.  Outside the notice of

16    deposition topics.  Again we're going over the themes

17    that aren't in the topics here.

18              MR. RANALLO:  Mr. Gibbs, we're aware that's

19    your position.  Our position is that --

20              MR. GIBBS:  We're belaboring something here

21    that is really just becoming an annoyance and we're

22    asking the same sorts of questions.  This structure is

23    what he studied, you understand that, to come to this

24    deposition that's a requirement of the 30(b)(6)6.

25              MR. PIETZ:  Mr. Gibbs, we don't have to get

1  into a bunch of a colloquy on the record.  We can talk

2  about it afterwards.  What I'd like right now is for the

3  deponent to simply answer the question.

4          THE WITNESS:  Well, to the noticed topic of

5  would Mr. Gibbs be someone who would receive

6  revenue if a settlement was reached in this case, I

7  believe the answer is yes.

8  BY MR. PIETZ:

9      Q.   And what percentage of the revenue would

10  Mr. Gibbs keep?

11      A.   I can't answer that question specifically.

12      Q.   I am going to note -- I'm going to object to

13  the last answer as nonresponsive.  ** Madam court

14  reporter, would you also be so kind to note this part of

15  the transcript so that we can refer to it later

16          MR. GIBBS:  What do we have in terms of what's

17  left.

18          MR. PIETZ:  It's going to be a full-day

19  deposition.  It's 12:45 now.  I say we break for lunch.

20  Should we come back at 1:45 o'clock?

21          (Off the record at 12:48 p.m. and back

22           on the record at 1:52 p.m.)

23  BY MR. PIETZ:

24      Q.   Back on the record in the 30(b)(6) deposition

25  of AF Holdings.  Mr. Hansmeier, I will refer you to the

1  deposition notice that accompanied the subpoena bringing

2  you here today.  I believe it's marked as Exhibit 100.

3  Attached thereto as Exhibit A is a copyright assignment

4  agreement.  Could you turn to the second page of the

5  copyright assignment agreement.  There on the bottom

6  right, can you read me what it says there on the

7  signature line, please?

8       A.    It says Alan Cooper on behalf of assignee, AF

9  Holdings, LLC.

10       Q.    Who is Alan Cooper?

11       A.    Alan Cooper is an individual who was

12  designated as a corporate representative of AF Holdings,

13  LLC.  The circumstances that led to Mr. Cooper's

14  designation as a corporate representative to acknowledge

15  the copyright assignment agreement on behalf of AF

16  Holdings, LLC, is that Mark Lutz -- we're backing up a

17  little bit.  AF Holdings makes use of corporate

18  representatives, the reason for that is that obviously

19  you guys know that there's a lot of people out there who

20  don't like what we're doing, specifically to people who

21  have infringed on works and want to retaliate against

22  people who are enforcing copyrights.

23            Now, some people who infringe on works aren't

24  of a very serious, morally corrupt manner, but some of

25  them are people who are, you know, quite nefarious and

1    who are quite capable of committing quite a bit of harm.

2              AF Holdings makes use of corporate

3    representatives to help prevent the -- I guess the

4    officer, Mark Lutz, himself, from being targeted by

5    these individuals.  The manner in which Mr. Cooper was

6    designated as a corporate representative was Marks Lutz

7    asked attorney John Steele to arrange for a corporate

8    representative to acknowledge the assignment agreement

9    on behalf of AF Holdings.  Mr. Steele did so and

10   returned the assignment agreement to AF Holdings bearing

11   the signature of Mr. Alan Cooper.

12             When this whole -- I guess the first time we

13   heard about any form of controversy with respect to --

14   the first time AF Holdings heard about any form

15   controversy with respect to the assignment agreement was

16   when an attorney named Paul Godfread, G-O-D-F-R-E-A-D,

17   contacted AF Holdings and said that -- I can't remember

18   the exact text of the e-mail, but something to the

19   effect of he's representing someone named Alan Cooper

20   and they're concerned that Alan Cooper is being held out

21   as AF Holdings CEO.

22             And so when that occurred, we -- or AF

23   Holdings and Mark Lutz specifically, he asked, you know,

24   what is the exposure of AF Holdings here and there were

25   two specific concerns.  One specific concern was the

1  issue of fraud.  Namely, that if AF Holdings is

2  distributing agreements that have someone's signature on

3  it, but he didn't sign it or somehow his identity was

4  coopted, then obviously that's something that AF

5  Holdings would have to -- once it became aware of that

6  issue -- stop doing -- shut it down and make sure it

7  didn't happen anymore, because obviously there's no

8  reason to distribute an assignment or any agreement

9  bearing someone's signature if there was a forgery or

10  some sort of fraudulent action involved in that sense.

11          And so to address that issue AF Holdings --

12  well, spoke to Mr. Steele -- Mark Lutz spoke to

13  Mr. Steele and said, Well, I understand that there's an

14  issue with this Alan Cooper and asked Mr. Steele

15  point-blank, Is the signature a forgery.  Mr. Steele

16  said the signature is not forgery.  And he asked him, Is

17  the -- is this signature authentic.  Mr. Steele says,

18  yes, the signature is authentic.  Based on Mr. Steele's

19  representation, we have no reason to believe from what

20  Mr. Steele said, at least, that the signature is a

21  forgery or there's some sort fraud going on with respect

22  to the signature.

23          Then AF Holdings reached out to Paul Godfread

24  and said what, you know, evidence do you have of some

25  form of fraud or forgery or anything else.  Paul

1  Godfread did not -- was not responsive.  We further --

2  Mr. Steele further reached out to Paul Godfread and said

3  what can AF Holdings do to give your client the

4  assurances that we're not holding him out as somehow

5  being the CEO of AF Holdings.  And again Paul Godfread

6  was nonresponsive.  And so based on Mr. Steele's

7  representations that everything is authentic and Paul

8  Godfread's -- well, I guess, failure to give any

9  information regarding his client, plus this letter that

10 he filed that simply says that his client is being held

11 out as the CEO of AF Holdings, we concluded that at

12 least at this time there's not any evidence to support

13 some sort of concern of fraud or some sort of concern of

14 a forged or inauthentic signature.  And, of course, we

15 can't speak to Mr. Cooper directly because he's, of

16 course, represented by attorney Paul Godfread.

17         You know the second concern that was raised by

18 Mr. Godfread's inquiry was the issue of standing.

19 Namely, that if the worst case scenario played out and

20 the signature was inauthentic, would that somehow affect

21 our standing to proceed forward with cases.  When I say

22 our, I mean AF Holdings.  We looked at two different

23 things.  The first thing we looked at was the copyright

24 act itself, which says, of course, that the formal

25 requirements for a valid standing -- or a valid

1   assignment agreement are a written document, one, and

2   then that it's signed by the assignor.  So to give

3   ourselves close comfort with respect to the issue of

4   standing, we contacted the assignor, because obviously

5   the assignor -- Alan Cooper would be signing on behalf

6   of the assignee, of course.  And so we contacted the

7   assignor Raymond Rogers and asked him, you know, there's

8   this concern about Alan Cooper and who is Alan Cooper

9   and is his signature authentic or is his signature not

10  authentic, but can you confirm for us that you, in fact,

11  did sign this and you believe that the assignment is

12  effective and as far as you're concerned AF Holdings is

13  the owner of the copyright in question, in both this

14  case and of course the other copyright that Raymond

15  Rogers was involved in assigning to AF Holdings.  And he

16  did confirm that.  He said, yes, I do believe that this

17  agreement is authentic.  I entered into it voluntarily.

18  My signature is not forged.  Everything is fine from our

19  end.

20          And so that gave us comfort.  We also reviewed

21  Ninth Circuit case law, specifically the case of --

22  Cohen is in the title where the Ninth Circuit reviewing,

23  you know, section 204 of the Copyright Act concluded

24  that, Well, as long as you have a writing and it's

25  signed by the assignor, you have standing.

1       And then I guess the next action AF Holdings
2  is planning on taking to remove any doubt that the
3  assignment was and continues to be effective as between
4  AF Holdings and Heartbreaker, I guess, vice versa, is
5  they're preparing a ratification of the agreement, so
6  that without any Alan Cooper whatsoever that both the
7  Heartbreaker entities and then AF Holdings will confirm
8  that the assignment is intended to be effective through
9  the ratification.

10      Q.   Thank you for that very thorough answer.
11  Although you're jumping ahead a little bit to some
12  issues that I'm sure will come up eventually.  I would
13  like to come back to the more simple issue though of
14  just identifying who is this Alan Cooper that signed on
15  here.  Is the Alan Cooper whose signature on here the
16  same Alan Cooper who's represented by attorney Paul
17  Godfread?

18      A.   Well, first of all, I don't know who attorney
19  Godfread represents and who he doesn't represent.  If
20  you're talking about the guy who's in Minnesota and was
21  John Steele's former caretaker, all I can say is that AF
22  Holdings -- the only person who knows who this Alan
23  Cooper is is John Steele and we asked Mr. Steele, is
24  this the same guy, is this not the same guy, is there
25  another Alan Cooper and Mr. Steele declined to respond

1   on the basis that Mr. Cooper has sued Mr. Steele and

2   they're actively involved in litigation.

3       Q.   I believe you testified today throughout the

4   entire duration of AF Holdings duration -- AF Holdings

5   existence the only employee member, officer manager, the

6   person wearing all the hats and the only person who has

7   ever had any official capacity with AF Holdings is Mark

8   Lutz; isn't that correct?

9       A.   I testified that Mr. Lutz is the sole

10  manager/employee of AF holdings, correct.

11      Q.   And there's no other manager or employees

12  right through to this present day; is that correct?

13      A.   That's correct.

14      Q.   Mr. Lutz has been the only one.  So this begs

15  the question was John Steele ever an owner, manager or

16  employee of AF Holdings?

17      A.   No.

18      Q.   So why then did AF Holdings rely upon John

19  Steele to sign documents on AF Holdings' behalf?

20      A.   What document are you referring to that he

21  signed on AF Holdings' behalf?

22      Q.   Let me rephrase.  Why is AF Holdings relying

23  on John Steele to arrange for signatures on documents

24  that are being signed on AF Holdings' behalf?

25           MR. GIBBS:  Objection.  Calls for speculation.

```
 1              THE WITNESS:  Well, it would be speculation as
 2   to why AF Holdings took one action or another.  I would
 3   say that, for example, you know, Mr. Lutz is an
 4   individual.  There are a certain number hours in a day
 5   and for him to accomplish everything he's going to
 6   accomplish in any given day, or for anyone in any
 7   capacity in any business, you rely on third parties to
 8   aid you to accomplish various tasks.
 9              For example, the -- Mr. Lutz relied on me
10   personally to arrange for the signature of Raymond
11   Rogers.  And the reason he did that was because he
12   needed me to help him out in that task.
13          Q.   So am I to understand correctly then that with
14   respect that AF Holdings litigation, you and Mr. Steele
15   are both taking orders from Mr. Lutz; is that correct?
16              MR. GIBBS:  Objection.  Misstates the prior
17   testimony.
18   BY MR. PIETZ:
19          Q.   He's your client, so on the issues --
20          A.   Mr. Lutz or AF Holdings?
21          Q.   Mr. Lutz is the client representative of AF
22   Holdings, so you, in your capacity as an attorney, and
23   Mr. Steele in his capacity as an attorney, are doing
24   what Mr. Lutz tells you to do; is that correct?
25              MR. GIBBS:  Objection.  Misstates testimony.
```

1    I just don't like the characterization.  Do whatever you

2    want to do.

3    BY MR. PIETZ:

4        Q.   Go ahead.

5        A.   I am not sure what you mean by we do what he

6    tells me to do.

7        Q.   If Mr. Lutz says settle a case, you as counsel

8    for the Alpha Law Firm, settle the case.

9        A.   Yes.

10        Q.   If Mr. Lutz says arrange to have this document

11    signed, you arrange to have the document signed; is that

12    correct?

13        A.   It depends on what document.

14        Q.   Well, for example, this copyright assignment

15    agreement that we're looking at as Exhibit A.  Mr. Lutz

16    told you to arrange to have it signed by Raymond Rogers

17    and you did that because Mr. Lutz is essentially the

18    client and your boss and you do what he tells you to do,

19    correct?

20        MR. GIBBS:  Objection.  Compound question.

21    BY MR. PIETZ:

22        Q.   Can you explain why that is not correct?

23        A.   Well, Mr. Lutz is not my client.  AF Holdings

24    is the client of Alpha Law Firm in certain matters.

25    When Mr. Lutz asked me to help facilitate that signature

1    as a logistical matter, I don't recall having -- you

2    know, acting in the capacity of an attorney.  I was just

3    assisting him facilitate it.

4         Q.   Did you ever work for Prenda Law, Inc.?

5         A.   No.

6         Q.   You were never attorney of record with Prenda

7    Law, Inc.?  You were never of counsel there?

8         A.   I guess I'd have to go back over the various

9    appearances that I filed.  I don't recall anything

10   specifically.  Does that mean that there's not one on

11   record somewhere, I can't say with exact certainty.

12        Q.   Was Mr. Lutz employed as a paralegal at Steele

13   Hansmeier?

14             MR. GIBBS:  Objection.  It's outside the scope

15   of the deposition noticed topics.

16             THE WITNESS:  Mr. Lutz was for a time employed

17   with Steele Hansmeier, yes.  What his exact title was, I

18   don't recall.

19   BY MR. PIETZ:

20        Q.   While he was employed at Steele Hansmeier you

21   were his boss, correct?

22        A.   I would not agree with that characterization.

23   The reason I wouldn't agree with that characterization

24   is because he worked directly under Mr. Steele.

25        Q.   So Mr. Steele was Mr. Lutz's boss at Steele

1    Hansmeier; is that correct?

2        A.    Yes.    Mr. Lutz reported to Mr. Steele in his

3    capacity of working for Steele Hansmeier.

4        Q.    And what did Mr. Lutz do for Mr. Steele at

5    Steele Hansmeier?

6             MR. GIBBS:    Objection.    Calls for speculation.

7             THE WITNESS:    I would -- you'd have to ask

8    Mr. Steele what specific duties Mr. Lutz performed.

9    BY MR. PIETZ:

10       Q.    Let me ask this question.    I'm asking for your

11   personal knowledge, not the knowledge of AF Holdings.

12   You were the other named partner on the masthead.    What

13   kind of tasks did Mr. Lutz perform at your law firm?

14       A.    Mr. Lutz did not perform any tasks directly

15   for me.    He performed tasks for Mr. Steele.

16       Q.    What kind of tasks did he perform?

17       A.    Again, you'd have to ask what kind of tasks

18   Mr. Lutz performed for Mr. Steele.

19       Q.    Would it be fair to characterize them as

20   paralegal-level tasks?

21       A.    I don't know if you could characterize them or

22   not because first you'd have to identify what they are.

23       Q.    And you have absolutely no idea what Mr. Lutz

24   did for Mr. Steele while working at your law firm; is

25   that correct?

1    A.   Yes.  Mr. Lutz did not perform any tasks for

2    me.  He performed tasks for Mr. Steele.

3    Q.   And you're not sure if it was paralegal work

4    or secretarial work or you have no idea what kind of

5    work it was Mr. Lutz did for Mr. Steele; is that

6    correct?

7    MR. GIBBS:  Objection.  Misstates testimony.

8    Calls for speculation.

9    THE WITNESS:  It would be correct to say that

10   Mr. Lutz worked for Mr. Steele.  He worked performing

11   tasks for Mr. Steele and reported to Mr. Steele.  I did

12   not delegate any work to Mr. Lutz, so I could not tell

13   you what he was doing on a day-to-day basis.

14   BY MR. PIETZ:

15   Q.   Did you ever sign Mr. Lutzs' paychecks?

16   A.   No.

17   MR. PIETZ:  I would like to mark into the

18   record Exhibit 103.

19   (Whereupon Defendants' Exhibit No. 103

20   was marked for identification.)

21   BY MR. PIETZ:

22   Q.   So having now marked 103, which is a Motion

23   for Withdrawal and Substitution of Counsel filed in the

24   Northern District, California case 4221, ECF No. 22.

25   Mr. Hansmeier, I'll ask you to turn to the

```
1    second page of this document.  Can you read me what it
2    says on the bottom signature line there, who signed and
3    in what capacity.
4         A.   There's three signature on the bottom.
5         Q.   The very bottom one on the left?
6         A.   Brent Gibbs, in-house counsel, AF Holdings,
7    LLC.
8         Q.   I believe you testified a moment ago that
9    throughout the entire duration of AF Holdings, the only
10   employee or officer -- the person wearing all of the
11   hats was Mark Lutz.
12        A.   Uh-huh.
13        Q.   Based on this document that appears to be
14   incorrect because isn't Mr. Gibbs now in-house counsel
15   for AF Holdings?
16        A.   No.  I think it's -- I don't know why it's
17   here.  I don't think it's --
18        Q.   So Mr. Gibbs is not in-house counsel for AF
19   Holdings?
20        A.   That's correct.
21             MR. PIETZ:  Well, shoot.  I'm just going to
22   ask you, Mr. Gibbs.  Did you prepare and sign this
23   document?
24             MR. GIBBS:  It's not my deposition.  I'm not
25   quite sure why I would be answering questions.
```

1    MR. PIETZ:  Well, there's an E-file document

2    here with your signature on it that says you're in-house

3    for AF Holdings.  I thought I'd give you the opportunity

4    as a courtesy to clarify for the record.

5              MR. GIBBS:  Okay.

6              MR. PIETZ:  You're not going to address it?

7              MR. GIBBS:  I don't think I need to address

8    it.

9    BY MR. PIETZ:

10        Q.   Is there anybody else who currently has the

11   position of in-house counsel for AF Holdings?

12        A.   No.

13        Q.   Who are the current employees of the Alpha Law

14   Firm?

15        A.   Current employees of the Alpha Law Firm --

16             MR. GIBBS:  Objection.  Outside the notice of

17   deposition.

18   BY MR. PIETZ:

19        Q.   Speaking from your personal knowledge, not on

20   behalf of AF Holdings.

21        A.   Alpha Law Firm doesn't have any employees.

22   I'm the manager.

23        Q.   What licensed attorneys do work for Alpha Law

24   Firm?

25        A.   I do work for Alpha Law Firm.

1    Q.   What other attorneys?

2    A.   If you want me to give you a list of any

3  attorney in history who have done work at Alpha Law

4  Firm, I'd have to go back and review my records.

5    Q.   How about Michael Dugas, does he do work for

6  Alpha Law Firm?

7    A.   I believe he has performed work for Alpha Law

8  Firm, but again I'd had to check my records.

9    Q.   How about his wife, has she also performed

10  work for the Alpha Law Firm?

11    A.   I do not believe so, but again I'd have to go

12  back and check my records.

13    Q.   Did Michael Dugas previously work at the

14  Prenda Law Firm?

15    A.   I would have to go review the employment

16  records of the Prenda Law Firm.

17    Q.   Didn't you hire Mr. Dugas?

18    A.   For who?

19    Q.   For Alpha Law Firm.

20    A.   He's performed work on behalf of Alpha Law

21  Firm, but he's not a paid employee of Alpha Law Firm.

22    Q.   So when you engaged him to perform work for

23  Alpha Law Firm, did you review a resume and note that he

24  previously worked for Prenda Law Firm?

25    A.   I can't recall reviewing his resume.

1    Q.   Were you aware when you hired him, that he had

2   worked previously at the Prenda Law Firm?

3    A.   I don't recall hiring him and I don't recall

4   reviewing his resume.

5        MR. GIBBS:  Objection.  Outside the notice of

6   deposition topics.

7   BY MR. PIETZ:

8    Q.   So returning now to your capacity as corporate

9   representative for AF Holdings.  To clarify, AF Holdings

10  position is that John Steele was responsible for

11  obtaining Alan Cooper's signature and whether or not the

12  signature is authentic is a question that only

13  Mr. Steele and presumably Mr. Cooper can answer and that

14  AF Holdings --

15   A.   That is not our position.  The position is

16  that whether or not -- the position is that

17  Mr. Steele's -- the position of AF Holdings, I guess, is

18  not so far off of what you're saying.  It's that

19  Mr. Steele arranged for the signature and that it's a

20  matter of open debate between Mr. Cooper and Mr. Steele

21  and any other third party regarding the signature and I

22  trust that the matter will be addressed in due course

23  with the litigation between Mr. Cooper and Mr. Steele.

24   Q.   Other than the gentleman in Minnesota who is

25  represented by Attorney Godfread has AF Holdings ever

```
1    engaged or has employed any other Alan Cooper?

2        A.    AF Holdings has had one employee/manager since

3    its formation and that's Mark Lutz.

4            FURTHER EXAMINATION BY MR. RANALLO

5        Q.    You mentioned that AF Holdings oftentimes gets

6    corporate representatives, you called them, to do

7    various things on behalf of the company; is that true?

8        A.    I don't know if I used the word oftentimes but

9    from time to time AF Holdings has done so, yes.

10       Q.    Are those people paid?

11       A.    No.

12       Q.    And why would somebody be a corporate

13   representative totally gratuitously for no compensation

14   and do something like this?

15           MR. GIBBS:   Objection.   Calls for speculation.

16   BY MR. RANALLO:

17       Q.    Let me ask you this.   You said you have been

18   corporate representative for them, why did you do it for

19   free?

20       A.    When did I say I was a corporate

21   representative for them?

22       Q.    I believe you said that you were engaged to

23   acquire the signature on this document; is that correct?

24       A.    No, I didn't say I was engaged to -- in a

25   legal capacity to acquire the signature for them.
```

1      Q.   So he just asked you as a friend?

2      A.   I would characterize it in that circumstance

3  as asking for a favor, which I was happy to help him out

4  with.

5      Q.   And do you generally do these kind of favors

6  for companies that you're not associated with in any

7  capacity?

8      A.   I guess I don't know what you mean by these

9  kind of favors.

10      Q.   Have you ever acquired any other signatures

11  for any other company?

12      A.   In my entire time in being a lawyer?

13      Q.   Yes.

14      A.   I suspect I have.  Could I identify any

15  specific instances as I sit here right now, I'm trying

16  to refresh my recollection.  Not as I sit here right

17  now.  If you ask as a general principal, do I perform

18  favors for other people, do I assist them without

19  demanding compensation for every last task or whatever

20  else I might aid them in as a courtesy, sure I

21  perform -- I help people out.

22      Q.   In this case what did acquiring the signature

23  entail?

24      A.   I contacted Mr. Rogers and --

25      Q.   Let me stop you for a minute.  How did you

1    contact him?

2        A.   This is quite a while ago.  To the best of my

3    recollection I would have contacted him by phone.

4          MR. RANALLO:  Okay.

5            FURTHER EXAMINATION BY MR. PIETZ

6        Q.   How many copyright infringement lawsuits has

7    AF Holdings filed since it's been established?

8        A.   I could not give you an exact number sitting

9    here right now, but certainly that's a matter of public

10   record that could be easily ascertained by reference to

11   the public record.

12       Q.   Would you say it's over 50 lawsuits?

13       A.   I would guess so, yes.

14       Q.   How many attorneys has AF Holdings engaged as

15   counsel in these various cases?

16       A.   Again, that's something outside the scope of

17   the noticed topics, but it is a matter of public record

18   of how many attorneys we have retained over the course

19   of our corporate existence, but I couldn't give you a

20   precise number.

21       Q.   Would you say it's approximately 20 attorneys,

22   maybe more?

23       A.   I'm just trying to think through all the

24   various attorneys that --

25       Q.   My intent here isn't to pin you down to a

1    specific number.  Your best estimate as to range.

2        A.    Sure.  But I want to be able to give you an

3    accurate estimate so I have to think through all of the

4    different attorneys at AF Holdings.

5        Q.    Could you think out loud for me?

6        A.    No.

7        Q.    You can or you won't?

8            MR. GIBBS:  He doesn't need to.

9            THE WITNESS:  I guess your ballpark estimate

10   of 20 doesn't seem too far off the mark based on my gut

11   reaction.

12   BY MR. PIETZ:

13       Q.    At least 50 cases, at least 20 attorneys and

14   presumably every single one of these attorneys is taking

15   instruction from Mark Lutz; is that correct?

16       A.    I don't know.

17       Q.    I'm asking now as the corporate representative

18   for AF Holdings.  There are decisions in a lawsuit,

19   which you very well know, that need to be made by a

20   client.  With respect to this fairly sizeable volume of

21   litigation, is it your testimony that perhaps 20

22   lawyers, in perhaps 50 different civil litigations, are

23   all taking their marching orders from Mark Lutz; is that

24   correct?

25           MR. GIBBS:  Objection.  Misstates testimony.

1  Objection.  It's not in the deposition noticed topics.

2          THE WITNESS:  Well, I guess I can say that

3  what I learned during the process of investigating the

4  topics that were noticed for today and that is Mark Lutz

5  is the sole -- the manager, the person with the decision

6  for litigation decisions at AF Holdings and whether he

7  speaks directly or indirectly with the attorneys around

8  the nation who have filed lawsuits against the

9  infringers of AF Holdings' copyrighted works, it would

10  naturally fall that, yes, directly or indirectly that

11  the marching orders come from Mark Lutz.

12      Q.   Is Mark Lutz an attorney?

13      A.   He's not an attorney.

14      Q.   Has ever been an attorney?

15      A.   Not that I'm aware of.

16      Q.   How did Mark Lutz come to be the sole manager,

17  officer, what have you of AF Holdings?

18          MR. GIBBS:  Objection.  Outside the notice of

19  deposition topics.  I think this has already been

20  covered possibly.  Objection.  Asked and answered.

21          THE WITNESS:  He became the sole manager of AF

22  Holdings when AF Holdings was formed and he was

23  appointed to that role.

24          MR. RANALLO:  Who was he given that role by?

25          THE WITNESS:  It would have been the person I

1  referenced, Aisha Sargeant.

2  BY MR. PIETZ:

3      Q.   So Ms. Sergeant was the one who designated

4  Mr. Lutz as the manager of AF Holdings; is that correct.

5      A.   I believe so, yes.

6      Q.   Was Ms. Sergeant following anyone's

7  instructions when she did that?

8      A.   I can only speculate at this point, but I

9  believe she would have been following Mr. Lutz's

10  instructions.

11      Q.   So let me get this straight.  Mr. Lutz worked

12  at your law firm performing paralegal level tasks for

13  John Steele and now when AF Holdings was formed, all of

14  a sudden, he's the sole manager of an enterprise

15  overseeing dozen of cases and at least 20 lawyers in

16  various jurisdictions around the country.  Does that

17  seem a little bit odd to you?

18          MR. GIBBS:  Objection.  Argumentative.

19          THE WITNESS:  I don't think there's an

20  accurate factual statement in what you said.

21  BY MR. PIETZ:

22      Q.   So returning to these corporate

23  representatives.  Have there been any other corporate

24  representatives other than Alan Cooper, Mark Lutz for AF

25  Holdings?

```
 1        A.    I can think one of other corporate

 2  representative.

 3        Q.    And who is that?

 4        A.    And that would Anthony Saltmarsh.

 5        Q.    Where does Mr. Saltmarsh reside?

 6        A.    I don't know where Mr. Saltmarsh resides.

 7        Q.    Was Mr. Saltmarsh ever compensated for acting

 8  as a corporate representative for AF Holdings?

 9        A.    Not that I'm aware of.

10        Q.    Exhibit 101 and 102.  Those are both the ADRs

11  that are signed by Salt Marsh.  I believe you testified

12  you thought that that might be of the name the trust

13  that owns AF Holdings.  Could that be a misspelling of

14  Anthony Saltmarsh?

15        A.    The only thing I can say about these documents

16  is that if you wanted me to come prepared to testify

17  about them, you may have included them as exhibits to

18  the notice or supplement the notice with the documents.

19  You're asking me is it possible that Salt Marsh as

20  spelled on here is a misspelling of the name Anthony

21  Saltmarsh?

22        Q.    Perhaps an alias would be a better word for

23  it.

24        A.    Or an alias for Salt Marsh.  I'm a bit

25  skeptical of that theory because it says AF Holdings
```

1  owner and Anthony Saltmarsh is not an owner of AF

2  Holdings.

3       Q.   Is there a corporate representative who has

4  worked for AF Holdings before by the name of Anthony

5  Saltmarsh?

6       A.   No.

7       Q.   Where did I go wrong?

8       A.   Working for AF Holdings.  To the extent that

9  implies employment or a managerial capacity.

10       Q.   When did you first meet John Steele?

11       A.   I personally first meet John Steele in law

12  school.

13       Q.   Approximately what year?

14       A.   2005.

15       Q.   Were you in the same class?

16       A.   Are you referring to the graduating year?

17       Q.   Yes.

18       A.   Yes.

19       Q.   2005 when you both started law school?

20       A.   I believe so, yes.

21       Q.   Have you ever met John Steele's sister Jamie?

22       A.   He has two sisters.  I've met one of them.  I

23  don't remember if her name is Jamie.

24       Q.   Are you aware that John Steele's sister Jamie

25  Steele lives -- has shared residence with Anthony

1    Saltmarsh?

2         A.   I do not know not who she's lived with in the

3    past.

4         Q.   Was Mr. Steele responsible for procuring the

5    signature on Exhibits 101 and 102?

6         A.   I did not have occasion to ask Mr. Steele

7    about these exhibits.  They weren't noticed up for me to

8    be prepared to be discussed.

9         Q.   Do you have any idea who did procure that

10   signature that says Salt Marsh?

11        A.   No.

12        Q.   But to be very clear Anthony Saltmarsh is not

13   the owner of AF Holdings, correct?

14        A.   That's correct.

15        Q.   And he's never, in fact, been compensated by

16   AF Holdings, has never been an employee, member or a

17   manager.  His only connection is that apparently his

18   name has been signed as corporate representative of AF

19   Holdings; is that correct?

20        A.   No.  It's not correct.

21        Q.   Where did I go wrong?

22        A.   Could you repeat the question?

23        Q.   Strike that.  We'll do it one at a time.

24   Anthony Saltmarsh has never been a member of AF

25   Holdings?

```
 1        A.    He is -- that's correct.

 2        Q.    Never been a manager?

 3        A.    That's correct.

 4        Q.    Never been a shareholder or a person with a

 5   pecuniary interest in AF Holdings?

 6        A.    That's correct.

 7        Q.    And never been an employee or an agent of AF

 8   Holdings?

 9        A.    Well, to the extent of how you define agent, I

10   believe he's served in a corporate representative

11   capacity for AF Holdings in the past.

12        Q.    And in so doing who was it that deputized him

13   as an agent of AF Holdings?

14        A.    Are you referring to a corporate

15   representative?

16        Q.    Right.  In other words, who is it that decided

17   that Anthony Saltmarsh would be a corporate

18   representative of AF Holdings?

19        A.    I am not familiar with who deputized him to be

20   a corporate representative.

21        Q.    I'm asking you now as the corporate

22   representative AF Holdings yourself.  Is it the

23   testimony of AF Holdings that it doesn't know how it is

24   that Anthony Saltmarsh was designated as a corporate

25   representative?
```

1    A.    I believe the circumstances were in the -- in

2    connection with the formation of AF Holdings there are

3    various tasks that had to be performed and he acted as a

4    corporate representative in that connection.  My

5    estimate is that Aisha Sargeant would have deputized him

6    in -- as a corporate representative around that time.

7    Q.    How about Alan Cooper, who decided that Alan

8    Cooper was authorized as a corporate representative of

9    AF Holdings?

10   A.    Mark Lutz asked John Steele to find someone

11   who would be willing to serve in the capacity as a

12   corporate representative and so Mark Lutz made the

13   decision.

14                FURTHER EXAMINATION BY MR. RANALLO

15   Q.    Let's go ahead and take a look at paragraph

16   two of the assignment agreement that's attached as

17   Exhibit A.  I'm specifically looking at 2C and 2D.  So C

18   says under representations and warranties.  One of them

19   is, The work in the intellectual property rights

20   protecting them are free and clear of all encumbrances,

21   including without limitation, security interests,

22   licenses, liens, charges or other restrictions.  Is that

23   a true statement?

24   A.    So are you asking me in the capacity of AF

25   Holdings' corporate representative?

1    Q.   Yes.

2    A.   The company certainly hopes it's true.  That's

3  a representation that was made by the assignor to the

4  copyright assignment agreement and we have no reason to

5  believe it's not true.

6    Q.   Are you -- is AF Holdings aware of any

7  preexisting grants of rights from Heartbreaker

8  Productions to any company whatsoever?

9    A.   No.  Again, Heartbreaker made a representation

10 warranty that the -- it's free and clear of all

11 encumbrances and we've never had any reason to doubt

12 that statement.

13   Q.   Do you know who represented Heartbreaker

14 Productions in negotiating this agreement?

15   A.   No.

16   Q.   Do you know who represented AF Holdings in

17 negotiating this agreement?

18   A.   No.

19        FURTHER EXAMINATION BY MR. PIETZ

20   Q.   Didn't you say that you obtained the signature

21 for the assignor on this agreement, though?

22   A.   Yes.

23   Q.   So you were involved in the negotiations of

24 this agreement yourself, correct?

25   A.   Well, you're aware that obtaining a signature

1    is not the same of negotiating a document?

2        Q.    Well, you just testified that you don't know

3    who negotiated the agreement, so what was your role in

4    all of this?  Why were you tasked with finding the

5    signature?

6        A.    Are you asking me to speculate why Mr. Lutz

7    asked me to procure the signature for him?

8        Q.    I'm asking based on your personal knowledge

9    how did you become involved in the negotiation of this

10   assignment agreement?

11            MR. GIBBS:  Objection.  Asked and answered.

12            THE WITNESS:  I guess I'm not sure why you

13   continue using the verb negotiation.  You're the one

14   using the verb negotiation.  I said I did Mark Lutz the

15   favor of arranging for Mr. Rogers signature.

16   BY MR. PIETZ:

17       Q.    When you arranged for his signature that was

18   it, I just I need your signature on this, pointed to the

19   dotted line and he gave it to you and that was that?

20       A.    Yes.

21       Q.    You had no substantive discussions whatsoever

22   with the representative of Heartbreaker Productions who

23   signed this agreement?

24       A.    That's correct.  I didn't negotiate terms or

25   do anything along those lines.

1    Q.   And corporate 30(b)(6) testimony of AF

2    Holdings is that it's not sure who negotiated this

3    agreement?

4    A.   Well, I think before you asked me and maybe if

5    I misheard you, I misunderstood and I would correct my

6    testimony, that this would have been discussed between

7    Mr. Lutz and Mr. Rogers.

8    Q.   Did Steele Hansmeier ever represent

9    Heartbreaker Productions?

10   A.   I believe we may have represented them in a

11   case -- I guess I'd have to check my records.  I don't

12   recall if we represented them or not.

13   Q.   But you think Steele Hansmeier may have

14   represented Heartbreaker Productions?

15          MR. GIBBS:  Objection.  Calls for speculation.

16          THE WITNESS:  I'd have to refresh my records

17   about --

18          MR. PIETZ:  I'll mark for the record

19   Exhibit 104.  I've only got this one copy, but I'll ask

20   to you refer to it.  I have here Plaintiff's Notice of

21   Dismissal Without Prejudice of Remaining Doe Defendants

22   in Illinois, Northern District, No. 11-cv-2860-ECF23.

23   I'm going to turn to page two, hand this to the deponent

24   and ask him whether this refreshes his recollection.

25          (Whereupon Defendants' Exhibit No. 104

1    was marked for identification.)

2        THE WITNESS:  So this is Heartbreaker

3  Productions, Inc.  So it appears that Steele Hansmeier

4  did represent Heartbreaker Productions, Inc.

5  BY MR. PIETZ:

6    Q.  So if I understand correctly, the important

7  agreement that would become the foundation for numerous

8  lawsuits when it was being negotiated was tasked to Mark

9  Lutz, John Steele's former paralegal at your old law

10  firm and Mr. Lutz negotiated the whole thing and you had

11  nothing do with it; is that correct?

12        MR. GIBBS:  Objection.  Misstates testimony.

13        THE WITNESS:  There's substantial shortcomings

14  in here.

15        MR. GIBBS:  Also it's a compound question.

16  Assumes facts not in the record.

17        THE WITNESS:  I would say no that's not

18  correct.  Several of the facts you stated in the course

19  of your question were incorrect.

20            FURTHER EXAMINATION BY MR. RANALLO

21    Q.  So Mark Lutz negotiated this agreement on

22  behalf of AF Holdings; is that correct?

23        MR. GIBBS:  Objection.  Asked and answered.

24        THE WITNESS:  Mark Lutz would have been --

25  yeah, I believe that's correct.  Mark Lutz was the lead

1   on securing the agreement from Heartbreaker Digital,

2   LLC.

3   BY MR. RANALLO:

4       Q.   Is that also true of the assignment for Sexual

5   Obsessions, another AF Holdings film?

6       A.   You would have to ask Mr. Lutz.

7       Q.   Okay.  Let me ask you this.  Who did Mark Lutz

8   negotiate with?

9       A.   I would -- well, Heartbreaker Digital, LLC.

10      Q.   And who on behalf of Heartbreaker?

11      A.   I would suspect it was Raymond Rogers.

12      Q.   Personally and not an attorney?

13      A.   I do not believe Heartbreaker Digital, LLC had

14   an attorney in its negotiations.

15      Q.   And is that also true for the Sexual

16   Obsessions agreement, did -- let me rephrase.  Did

17   Steele Hansmeier represent Heartbreaker Productions in

18   the negotiation for that assignment?

19      A.   I don't have the assignment agreement in front

20   of me.  I don't even know if Heartbreaker Productions is

21   the assignor in that agreement.

22      Q.   We'll get that one for you shortly.  To the

23   extent that Steele Hansmeier represented Heartbreaker

24   Productions and you're a former partner at Steele

25   Hansmeier, do you have any personal knowledge of Steele

1    Hansmeier representing Heartbreaker Productions on that

2    side of this negotiation against Mark Lutz, the

3    paralegal, at Steele Hansmeier on the other side.

4         A.   You continually call Mark Lutz a paralegal.  I

5    don't think I've testify that Mark Lutz is a paralegal.

6    You continually use Heartbreaker Productions, but the

7    assignor here is Heartbreaker Digital, LLC versus

8    Heartbreaker Productions, Inc.  And I think it's very

9    important to be precise when we're speaking about legal

10   entities and roles and so forth and so on to get these

11   right.  So if you want to restate the question with more

12   accurate and more precise identities of parties, because

13   right now I'd have to say no that's not correct to

14   everything you say because everything you're premising

15   your question on is incorrect.

16        Q.   Let's get back to this assignment agreement.

17   It's your understanding that there are no third parties

18   with any right to distribute this work; is that true?

19        A.   Which assignment agreement are we talking

20   about?  Are we talking about Sexual Obsession or --

21        Q.   We're talking about the one in this case that

22   you have in front of you.

23             MR. PIETZ:  Referring now to Exhibit A to the

24   deposition notice.

25             THE WITNESS:  So this is with respect to

1    Popular Demand. The work title Popular Demand. Yes.

2    AF Holdings is the sole copyright owner of Popular

3    Demand.

4    BY MR. RANALLO:

5        Q.   And no other entities have the right to

6    distribute this movie; is that correct?

7        A.   Right. AF Holdings is the sole owner of all

8    of the rights associated with it, including rights of

9    reproduction and distribution and everything else

10   associated with it.

11       Q.   And is this film distributed in any way?

12       A.   Well, certainly by the infringers. It was

13   distributed I believe before we received the assignment

14   to it. I don't think it's distributed now currently.

15       Q.   It's not distributed in any manner currently.

16   Is that your testimony?

17       A.   Well, I can give you -- the testimony is that

18   we're not aware of any form of distribution that has

19   taken place with respect to the work, except, of course,

20   with respect to BitTorrent-based infringement, which is

21   occurring across the world and --

22       Q.   Is it AF Holdings' position that if I wanted

23   to purchase this film legitimately would there be any

24   method for doing so?

25       A.   I suspect that before we received the

1  assignment to it that it was being distributed, so there

2  may be sites out there where you could buy it now.  You

3  certainly could buy it on the secondary market, because

4  I think there's a principle under copyrights where if

5  you buy it once then you can -- the first-sale doctrine.

6  And but frankly from AF Holdings' perspective the cost

7  of doing a proper marketing campaign and doing a proper

8  distribution campaign and the time and the effort and

9  the capital investment required and everything along

10 those lines, simply isn't worth it because virtually no

11 one buys these DVDs, everyone just steals them.

12         FURTHER EXAMINATION BY MR. PIETZ

13     Q.   I would like to clarify one thing about the

14 assignment that we're referring to right now, Exhibit A,

15 on the deposition notice.  The corporate testimony of AF

16 Holdings is that John Steele played absolutely no role

17 whatsoever in this agreement as an attorney and that the

18 only role that Mr. Steele played in the execution of

19 this agreement was in obtaining a signature from Alan

20 Cooper; is that correct?

21     A.   Yes.

22     Q.   So Mr. Steele was not representing

23 Heartbreaker Digital, LLC or AF Holdings when this deal

24 was negotiated; is that correct?

25     A.   Yes, that's correct.  Mr. Steele was not an

1  attorney representing either party in the negotiation of

2  this agreement.

3          FURTHER EXAMINATION BY MR. RANALLO

4      Q.   Is AF Holdings aware whether this film is

5  available through gamelink.com?

6      A.   We are not aware of whether it's available

7  through gamelink.com.  What is GameLink first of all, I

8  guess?

9      Q.   It's a video distribution service.

10     A.   I'm not familiar with gamelink.com.

11     Q.   But it is your testimony that AF Holdings has

12  not licensed anyone to distribute this work

13  legitimately?

14     A.   There's no license agreement beyond this

15  agreement right here (indicating).

16     Q.   Those two pages are 100 percent of the

17  agreement between Heartbreaker Productions and AF

18  Holdings regarding this work?

19     A.   Yes.

20     Q.   Is it AF Holdings' position that this film is

21  not available for commercial purchase; is that true?

22          MR. PIETZ:  Before we get too far afield,

23  let's go ahead and mark this as the next exhibit.

24          (Whereupon Defendants' Exhibit No. 105

25           was marked for identification.)

1          MR. RANALLO:  Let's go ahead and mark this one

2     as 106.

3          (Whereupon Defendants' Exhibit No. 106

4          was marked for identification.)

5     BY MR. RANALLO:

6     Q.   This is an article from -- let's see, AVN

7     discussing the distribution of the Popular Demand.

8     Could you read the highlighted section for me?

9     A.   Nina Mercedez performs the first double

10    penetration scene of her career in the new Heartbreaker

11    films movie, Nina Mercedez Popular Demand, that will be

12    available July 27th from Exile Distribution.

13    Q.   So after reading that, do you believe that

14    Heartbreaker Productions has licensed other people to

15    distribute this work?

16    A.   I can't speak on behalf of Heartbreaker

17    Productions.

18    Q.   After reading that, and as a corporate

19    representative of AF Holdings that told me that AF

20    Holdings has all the rights to distribute this work and

21    no one else has any rights to distribute this work.

22    Would you agree that the exhibit I just showed you tends

23    to contradict that?

24    A.   Well, I know from reading the blog sites that

25    you two participate in that I shouldn't believe

1  everything I read on the Internet.

2          MR. PIETZ:  That's nonresponsive.

3  BY MR. RANALLO:

4      Q.   Do you have any reason to believe that Exile

5  Distribution has a right to distribute this work, the

6  work that forms the basis of this suit?

7      A.   I'll keep on referring back to this assignment

8  agreement.  This is the only agreement with respect to

9  this copyrighted work.

10     Q.   That exists in the world?  You're saying that

11 Heartbreaker Productions does not have an assignment

12 agreement with Exile Distribution?

13     A.   I don't know the agreements that Heartbreaker

14 Productions has with Exile.

15     Q.   As far as AF Holdings knows, no one has the

16 right to distribute this legally; is that correct?

17     A.   No, that's not correct.  I already told you

18 before that under the first-sale doctrine, for example,

19 someone could distribute their copy of it.

20     Q.   Discounting the first-sale doctrine,

21 discounting secondary market.

22     A.   That would be it.  This is the only agreement

23 with respect to reproducing and distributing copyrighted

24 work at the heart of the agreement (indicating).

25     Q.   In preparing for this deposition did you

1   investigate whether Heartbreaker Productions had

2   licensed this work to any third parties?

3      A.  Well, in preparing for this deposition I think

4   one of the noticed topics was -- I'll read it

5   specifically.  All licenses and assignment agreements

6   from AF Holdings to any nonparties.  And there aren't

7   any.  This is the only agreement that AF Holdings is

8   aware of with respect to the reproduction and

9   distribution of copyrighted work.

10      Q.  So even after you read that article that I

11   just handed you that's Exhibit 105, is it still AF

12   Holdings' position that those are the only agreements

13   that they are aware of?

14      A.  That article doesn't mean anything to me.

15   There's been nothing registered with the copyright

16   office.  There's no -- how do you say it -- no

17   challenges to the assignment agreement and the

18   assignment agreement contains a representation of

19   warranty that this is the only -- that is being conveyed

20   full right, title and interest and we've had nothing

21   to -- nothing formal.  I mean, we've got some blog sites

22   there or news articles saying one thing.  We'd have to

23   investigate the facts and circumstances of that further.

24      Q.  Do you intend to examine those facts and

25   circumstances, investigate those facts and circumstances

now that they have been brought to your attention?

A.   Do I personally intend to do that or does AF Holdings?

Q.   AF Holdings?

A.   I assume AF Holdings will examine the facts and circumstances in those articles and see if they have any factual basis.

Q.   In preparation for this deposition did you ever look online or anywhere else to see if a copy of this movie could be obtained legitimately?

A.   No, because that wasn't one of the noticed topics.  What I did do was inquire of Mr. Lutz to determine whether or not there were any other -- whether he had somehow I guess -- I don't know what the phrase would be -- sublicensed or granted a nonexclusive license or conveyed any sort of rights to any other third party that was in the description of topics that was noticed and I looked at the copyright office and this is the only agreement that's on record with respect to this copyrighted work.

No one else as far as I could find had done any form of filings or whatever else, so it's AF Holdings' position that this is the only agreement that exists.

Q.   Let me refer to you No. 4 on the subject of

1  examination, which asks about all license and assignment

2  agreements, and any other grants of rights, however

3  titled, from Heartbreaker Productions to any third

4  parties relating to the work.  Did you investigate that

5  topic in preparation for this?

6      A.   Yeah.  AF Holdings has no records of any form

7  of license or assignment agreements or any other grants

8  of rights from Heartbreaker to any third parties.  And

9  further there's nothing in the copyright office when I

10 examined the record, which I'm sure you guys have,

11 regarding anyone else who is claiming a right or

12 interest in this copyrighted work.

13     Q.   AF Holdings isn't listed with the copyright

14 office, are they, in relation to this work?

15     A.   I'd have to go back and check the office

16 specifically.  I believe they are, though.

17     Q.   And in what capacity?

18     A.   If they were listed with the copyright office,

19 they would be listed as the assignee of the copyright.

20              FURTHER EXAMINATION BY MR. PIETZ

21     Q.   So it's your testimony that the assignment

22 agreement that is attached as Exhibit A to the

23 deposition notice was filed with the copyright office?

24     A.   I guess I have no -- I can speak generally

25 about the process of recording the assignment and then

```
 1    answer your question more specifically from there.  It's

 2    my understanding that if you want to record an

 3    assignment with the copyright office, there's one of two

 4    ways to do it.  One way is to submit the original to the

 5    copyright office, the original assignment agreement.

 6    The other way is to have -- there's a form you fill out

 7    reflecting the assignment.  I don't know which one was

 8    done in this circumstance.

 9          Q.   Are you a shareholder in 6681 Forensics?

10          A.   No.

11          Q.   Are you familiar with the company?

12          A.   Yes.

13          Q.   Are you an officer in 6681 Forensics?

14          A.   No.

15          Q.   Are you an employee of 6681 Forensics?

16          A.   No.

17          Q.   Have you ever received any kind of

18    compensation of any sort from 6681 Forensics?

19          A.   No.

20          Q.   Do you maintain an e-mail at 6681 Forensics?

21          A.   I do have an e-mail address that has a 6681

22    Forensics domain.

23          Q.   And why is that?

24          A.   Why do I have an e-mail address with the 6681

25    Forensics domain?
```

1    Q.   Right.

2    A.   The reason I have an e-mail with 6681

3  Forensics domain is that they gave me one when Alpha Law

4  Firm was filing cases in Minnesota and they will

5  transmit certain technical data to my address there.

6    Q.   Who is they?

7    A.   6681 Forensics.

8    Q.   Who are the shareholders in 6681 Forensics?

9    A.   I don't know who the shareholders are in 6681

10 Forensics.

11   Q.   AF Holdings is using 6681 Forensics services,

12 correct?

13   A.   Sure.

14   Q.   Is John Steele a shareholder of 6681

15 Forensics?

16        MR. GIBBS:  Objection.  Asked and answered.

17        THE WITNESS:  I don't know who the

18 shareholders are in 6681 Forensic.

19 BY MR. PIETZ:

20   Q.   How about the officers?  Is John Steele an

21 officer of 6681 Forensics?

22   A.   I guess AF Holdings does not know who the

23 officers are in 6681 Forensics.

24   Q.   Do you personally know?

25   A.   I do not know either, personally.

```
 1        Q.   When AF Holdings corresponds with 6681

 2   Forensics, who corresponds from the 6681 Forensics site?

 3        A.   I don't believe that 6681 Forensics

 4   corresponds directly with AF Holdings.

 5        Q.   I'm just going to note that that pretty much

 6   contradicts what you told me about two minutes ago when

 7   you were explaining your AF Holdings -- your 6681

 8   Forensics e-mail address.  Are you sure you don't want

 9   to clarify your answer here?

10             MR. GIBBS:  I don't believe it does

11   contradict.

12             THE WITNESS:  Maybe we should have the

13   reporter read the information back.  I don't think it

14   does at all.

15   BY MR. PIETZ:

16        Q.   Have you ever -- maybe I'm misunderstanding

17   here.  Are you saying that Alpha Law Firm corresponds

18   with 6681 Forensics, but AF Holdings doesn't?

19        A.   Well, I think what you're not

20   understanding is -- the source of the confusion is the

21   idea that -- if we're receiving technical reports in the

22   capacity of filing a lawsuit on behalf of AF Holdings,

23   those technical reports aren't necessarily being

24   directed back to AF Holdings, they're being directed

25   straight to counsel of record for use in the litigation.
```

FURTHER EXAMINATION BY MR. RANALLO

Q. So the e-mails that you received at 6681 Forensics, are those solely -- were those solely in regards to the Minnesota Alpha Law AF Holdings cases?

A. I believe I received other e-mails at that address.

Q. Is that an address that you regularly use?

A. I guess I don't understand what you mean by regularly.

Q. Did you receive e-mails at that e-mail address about any litigation matters that AF Holdings is not involved in?

MR. GIBBS: Objection. Outside the notice of deposition topics.

THE WITNESS: I'd have to go review what e-mails I do and do not receive there. I know I get a lot of spam at that e-mail address.

FURTHER EXAMINATION BY MR. PIETZ

Q. Have you ever received an e-mail from John Steele using the 6681 Forensics domain name?

A. It's entirely possible, but I would have to go review what exact e-mail addresses I've received at that account versus another account and frankly whether there's some forwarding situations set up where it's -- where we're trying to consolidate e-mails in a single

```
 1    account.
 2         Q.    How about your brother Peter Hansmeier, is he
 3    involved in 6681 Forensics?
 4         A.    Yes.
 5         Q.    What's his capacity?
 6         A.    He's a technician for 6681 Forensics.
 7         Q.    Is he an owner of the company?
 8         A.    I don't know who the owners of 6681 Forensics
 9    are.
10         Q.    Personally speaking now, do you know whether
11    your brother has an ownership interest in 6681
12    Forensics?
13         A.    I do not.
14         Q.    Is your brother Peter Hansmeier -- speaking
15    now on behalf of AF Holdings -- is your brother Peter
16    Hansmeier an officer of 6681 Forensics?
17         A.    AF Holdings does not know who the officers in
18    6681 Forensics are.
19         Q.    So you're not sure whether your brother is an
20    owner or an officer of 6681 Forensics; is that correct?
21         A.    That's correct.
22         Q.    You know he works there, but you're not
23    completely sure in what capacity; is that correct?
24         A.    No.  That's not right.
25         Q.    Where did I go wrong?
```

1       A.   I stated before that he's a technician at 6681

2   Forensics.  It's where you said, you know, he works

3   there but you don't know in what capacity.  I do know in

4   what capacity.  I know he's a technician.

5       Q.   How many other technicians are employed at

6   6681 Forensics?

7       A.   I don't know.

8       Q.   Have you ever received correspondence from any

9   other technicians other than your brother?

10      A.   From 6681 Forensics?

11      Q.   Correct.

12      A.   No.

13      Q.   <mark>So as far as AF Holdings is concerned the only</mark>

14  <mark>technicians at 6681 Forensics who have communicated with</mark>

15  <mark>AF Holdings are -- is your brother Peter Hansmeier?</mark>

16      <mark>A.   Right.</mark>  But he doesn't communicated with AF

17  Holdings as far as AF Holdings knows.  He's communicated

18  directly with the attorneys in the various matters.

19      Q.   Which would include yourself in the Alpha Law

20  cases where Alpha Law is representing AF Holdings; is

21  that correct?

22      A.   That's correct.

23      Q.   Was your brother -- does your brother do work

24  for Steele Hansmeier?

25      A.   How do you mean?

1      Q.   Did he perform a similar task at Steele
2   Hansmeier as a technician?
3      A.   I don't believe he was ever a technician at
4   Steele Hansmeier.
5      Q.   He certainly signed many declarations of cases
6   filed by Steele Hansmeier; is that correct?
7      A.   Well, you'd have to show me the declaration
8   that you're speaking of.
9      Q.   Well, I'm talking generally speaking now about
10   declarations which were submitted by Steele Hansmeier
11   attorneys in connection, generally, with a request for
12   early discovery wherein Peter Hansmeier, under penalty
13   of perjury, that he had logged various ISP addresses
14   that are supposedly responsible for copyright
15   infringement activities.
16           MR. GIBBS:  The issue you're saying is that --
17   whether he worked for Steele Hansmeier, not that he
18   didn't file these documents.
19           MR. PIETZ:  Well, the last question was one
20   and this question is another.
21           MR. GIBBS:  Objection.  It's compound.
22   BY MR. PIETZ:
23      Q.   So in any event.  Steele Hansmeier utilized
24   the services of your brother Peter Hansmeier in some
25   capacity, correct?

1      A.   He did -- he was a technician that performed

2  similar services -- 6681 Forensics, I believe he's a

3  technician for 6681 Forensics.

4      Q.   But when you were a partner at Steele

5  Hansmeier, was your brother a technician at 6681

6  Forensics or was he with a different company at that

7  time?

8      A.   I believe he was with 6681 Forensics.

9      Q.   Not the Minnesota Copyright Group?

10     A.   That's correct.

11     Q.   Has your brother ever worked for or been

12 associated with the Minnesota Copyright Group -- pardon

13 me.  Let me rephrase.  I meant Media Copyright Group.

14          MR. GIBBS:  Objection.  Outside of the notice

15 of deposition topics.

16          THE WITNESS:  I'd have to go back and review

17 my records for declarations and employment history of my

18 brother from almost two years ago now.

19 BY MR. PIETZ:

20     Q.   So Steele Hansmeier filed AF Holdings cases

21 including some where your brother signed declarations.

22 I'm asking AF Holdings, who was your brother working for

23 at the time?

24     A.   I believe it was 6681 Forensics.

25     Q.   How about MCGIP Inc.  Has your brother ever

1   worked for them?

2         MR. GIBBS:  Objection.  Outside the scope of

3   the deposition notice.

4         THE WITNESS:  I don't know if my brother has

5   ever worked for MCGIP Inc.

6   BY MR. PIETZ:

7         Q.    Are you familiar with that company?

8         A.    No.

9             FURTHER EXAMINATION BY MR. RANALLO

10        Q.    Are you aware of the existence of a

11  corporation or an LLC -- pardon me -- named Media

12  Copyright Group that was organized in Minnesota?

13        MR. GIBBS:  Objection.  Outside the notice of

14  deposition topics.

15  BY MR. RANALLO:

16        Q.    Are you aware of the existence of a company

17  called Media Copyright Group, LLC, which was organized

18  in Minnesota?

19        THE WITNESS:  Yes.

20        MR. GIBBS:  Same objection.

21  BY MR. RANALLO:

22        Q.    And did you have any role in that company?

23        MR. GIBBS:  Same objection.

24        THE WITNESS:  Yes.

25  ///

BY MR. RANALLO:

Q. And what was your role?

A. I believe I was the organizer of the company. And then in its very earliest inception I was a technician there myself.

Q. Were you a member of Media Copyright Group?

MR. GIBBS: Again, outside the notice of deposition topics.

THE WITNESS: I'm trying to think back to what my formal capacity was with it and I'd have to go review the corporate records and determine whether I was ever formally recognized as a member or manager or whatever the legal capacity. It's almost two years ago now.

FURTHER EXAMINATION BY MR. PIETZ

Q. Is Media Copyright Group the same thing as MCGIP, LLC?

A. No.

Q. Are you familiar with MCGIP, LLC?

A. I believe I was the organizer of MCGIP, but I'd have to check my records.

Q. And what's the difference between the two companies? What do they do?

A. Media Copyright Group performed technical services. MCGIP I don't believe ever performed technical services.

1    Q.   Media Copyright Group performed technical

2    services that were utilized by the Steele Hansmeier law

3    firm; is that right?

4    A.   I don't believe so, no.

5    Q.   So your employment or involvement --

6    A.   I should clarify that.  I do believe that in

7    cases filed by Steele Hansmeier, Media Copyright Group

8    did perform services.  Again, this almost two years ago.

9    I'd have to go back and refresh my recollection as to

10   who -- one company performed services for almost two

11   years ago.

12   Q.   What are your brother's qualifications as a

13   technical advisor or technical technician?

14   A.   You would have to ask my brother what his

15   qualifications are as a technician.

16   Q.   Did your brother attend high school?

17   A.   He attended high school.

18   Q.   Did he graduate?

19   A.   Yes.

20   Q.   Did he attend college?

21   A.   Yes, he attended college.

22   Q.   Did he graduate?

23   A.   Yes.

24   Q.   What kind of degree does your brother have?

25   A.   I don't know the specific degree that my

1    brother got.

2        Q.    Was it a Bachelor of Arts or a Bachelor of

3    Science?

4            MR. GIBBS:  Objection.  This is all outside

5    the notice of deposition topics.

6            THE WITNESS:  If you want the education

7    history of my brother, you're going to have either

8    notice the topic up before the deposition or ask him

9    yourself directly.

10   BY MR. PIETZ:

11       Q.    Was it related to computers?

12       A.    There's only so many ways that I can say that

13   I don't know what exact degree my brother has.

14       Q.    It's the word exact that troubles me.

15       A.    I don't know what degree my brother has.

16       Q.    Was it Liberal Arts?

17       A.    I don't know what degree my brother has.

18            FURTHER EXAMINATION BY MR. RANALLO

19       Q.    Let me ask you this.  You said that you were

20   previously a technician at Media Copyright Group?

21       A.    Yes.

22       Q.    What are your technical qualifications?

23       A.    My education is I have a high school degree.

24   I have a Bachelor of Arts in Economics and I attended

25   law school.

1    Q.    So you don't have any computer training?

2    A.    No.  I don't agree with that statement.

3              FURTHER EXAMINATION BY MR. PIETZ

4    Q.    What was your computer training?

5    A.    I was trained to use the software that was

6    developed for the purpose of catching infringers.

7    Q.    Who trained you?

8    A.    The software company that produced the

9    software.

10    Q.    What were they called?

11    A.    I can't recall their exact corporate name.  It

12    was something along of the lines of Alena (phonetic) or

13    something like that.

14    Q.    Where were they -- where was their place of

15    business?

16    A.    Their place of business is in Minnesota.

17    Q.    Was your brother trained to use the same

18    software while at Media Copyright Group?

19    A.    I would be speculating, but I suspect he

20    received very similar training to what I received.

21    Q.    Did your brother obtain any post graduate

22    college degrees in computers?

23    A.    I don't believe so.

24    Q.    Has your brother had any kind of formal

25    computer training other than the training that you

1  received?

2       A.   Again, I don't know what classes he took or

3  didn't take in college and I can't speak to his, outside

4  of college, computer training.

5       Q.   Did Steele Hansmeier ever get your brother

6  qualified as an computer expert in any litigation?

7       A.   I'd have to go back and check the relevant

8  records.  I can't think of anything off the top of my

9  head.  We've had many cases.

10      Q.   So the software that was developed by the

11 company -- I think you said was Alena or something

12 similar -- is that the software that Steele Hansmeier

13 used at the beginning when it started filing copyright

14 infringement lawsuits?

15      A.   Steele Hansmeier has never used software.

16      Q.   How does to Steele Hansmeier record IP

17 addresses that are involved in copyright infringement

18 cases?

19      A.   Steele Hansmeier is a law firm.  It doesn't do

20 the recording activities.

21      Q.   What entity provided the recording activities

22 for Steele Hansmeier in the early cases?

23      A.   Well, what do you mean by the early cases?

24      Q.   I believe Steele Hansmeier started filing

25 copyright infringement cases on or around the second

```
 1   half of 2011.  So at the beginning what was the way that
 2   Steele Hansmeier obtained IP address information?
 3        A.   So for cases filed after 2011 -- I mean, the
 4   general point is that a third-party company provided the
 5   IP address to Steele Hansmeier.
 6        Q.   What was the company?
 7        A.   It would have been either Media Copyright
 8   Group or 6681 Forensics.
 9        Q.   Did Media Copyright Group use the software
10   that you were trained on?
11        A.   Yes.
12        Q.   Does 6681 Forensics use that same software?
13        A.   I do not know.
14        Q.   I'm asking now on behalf of AF Holdings, which
15   files lawsuits based on the information gathered by 6681
16   Forensics.  Is the testimony of AF Holdings that it
17   doesn't know what software 6681 Forensics uses?
18        A.   You're asking me if we know what the precise
19   software they're using is?
20             MR. GIBBS:  Objection.  Outside the notice of
21   deposition topics.
22             THE WITNESS:  Yeah, I think -- I think it's
23   very possible that they're doing it.  I can't
24   specifically testify definitively to that.
25   ///
```

BY MR. PIETZ:

    Q.   Why don't you tell me as much as you can.

        MR. GIBBS:  Calls for speculation.  Objection.

        THE WITNESS:  I would just say that the data reports and -- this is me speaking personally through the capacity of Alpha Law Firm -- but the data reports and whatever else we receive are similar to the data reports that were generated by the other software, which leads me to believe that it's likely the same software.

BY MR. PIETZ:

    Q.   I'm asking in your corporate capacity, if you would.  Is the testimony of AF Holdings that it's not quite sure exactly what the software is that's used?

    A.   Well, it would be the testimony of AF Holdings that it's never been sure about any of the software that's been used.  It's not -- for example, it's not something that Mark Lutz would be qualified to analyze or assess or anything else.

    Q.   Has there ever been a change in the software, such that you noticed the reports started looking different at one point?

    A.   Personally or on behalf of AF Holdings?

    Q.   Let me rephrase and strike that entirely.

        Has AF Holdings consistently used the same software from 6681 Forensics?

1    A.   You have to be really precise.  AF Holdings is

2   not using the software.  It's the technical service

3   companies that are using the software.

4    Q.   During the time that AF Holdings has engaged

5   6681 Forensics to provide technical services has it

6   always been the same software?

7    A.   I guess the only thing I can say is that AF

8   Holdings is not aware of any changes in the software

9   used by 6681 Forensics.

10    Q.   What was the software used to record the IP

11   address at issue in the case that brings us here at

12   issue today?

13        MR. GIBBS:  Objection.  Outside the notice of

14   deposition topics.

15        THE WITNESS:  Well, it was the software

16   deployed by 6681 Forensics.  I'm not sure if it has a

17   formal name.

18   BY MR. PIETZ:

19    Q.   So here at the 30(b)(6) deposition of AF

20   Holdings, AF Holdings is still not sure and can't tell

21   Mr. Navasca the name of the software that was used to

22   allegedly record his IP address?

23    A.   That's entirely incorrect.  The testimony of

24   AF Holdings is that the software that was used to record

25   Mr. Navasca's infringing activities was the software

1    used by 6681 Forensics.

2         Q.    But other than the fact that the whole process

3    is outsourced to 6681 Forensics, AF Holdings essentially

4    has no idea how the IP address was recorded; is that

5    correct?

6              MR. GIBBS:  Objection.  Misstates testimony.

7              THE WITNESS:  AF Holdings' knowledge regarding

8    the technical process by which Mr. Navasca infringing

9    activities were recorded, is that 6681 Forensics

10   utilized software identifying Mr. Navasca and then

11   records his IP address as being involved in infringing

12   activities.

13   BY MR. PIETZ:

14        Q.    Did you make any inquiries of 6681 Forensics

15   about how the process works in preparation for this

16   deposition here today?

17        A.    Well, I can speak on a general level about how

18   the process works.

19        Q.    That's not the question.

20        A.    Which topic are we talking about?

21        Q.    Topic 14.  Which I'll read for the record.

22   It's actually Topics 13 through 15, but I'll read 14 for

23   the record.  Process by which AF Holdings determined

24   which IP addresses and subsequently individuals to sue,

25   including how Joe Navasca was chosen as the defendant in

1    the instant action.

2         What I'm asking you for, sir, is some detail

3    about that process.  So far all I've heard is that 6681

4    Forensics uses some kind of software, but you're not

5    sure what it is.  Can you provide any detail beyond

6    that?

7         A.   Could you give me a better idea of what you're

8    talking about detail beyond that.  What is it in

9    reference to that you're looking for more detail?

10        Q.   The name of the software would be a terrific

11   start.

12        A.   I'm not even sure if the software is even

13   named.  It's not commercial software that's -- or how do

14   I put it?

15        Q.   Off the shelf.  Is that the term you're

16   looking for?

17        A.   It's not off the shelf.  It's not like

18   Microsoft Windows.  I don't know if there's a specific

19   name for it.

20        Q.   Who developed the software?

21        A.   For one that's being used by 6681 Forensics or

22   the one that's used by Media Copyright Group?

23        Q.   The one that was used to identify Mr. Navasca

24   as the defendant in this action.

25        A.   I guess you'd have to ask 6681 Forensics who

1  specifically developed the software, based on what I

2  discussed with you before.  The most logical guess would

3  be the same company that did the original software for

4  Media Copyright Group.

5       Q.   So which is it, is it custom software designed

6  by 6681 Forensics is it the off-the-shelf software that

7  was designed by the company that provided the software

8  you used?

9       A.   Well, I think you're making the incorrect

10 assumption that the original software from Media

11 Copyright Group was off-the-shelf software.  I'm not

12 sure that's been established.

13      Q.   So the software that 6681 Forensics uses, is

14 it based on the Alena software?

15      A.   Yes.  My testimony before was that the data

16 reports and other information are very similar between

17 the two.  My best guess would be the 6681 Forensics

18 software would be the same software that was utilized by

19 Media Copyright Group.

20      Q.   But AF Holdings isn't actually sure today and

21 can't provide a definitive answer to that question; is

22 that correct?

23      A.   If it's the same software previously used by

24 another company?

25      Q.   If the software that was used to identify

1  Mr. Navasca as a defendant is based on the software

2  produced by Alena, whether it's customized, off the

3  shelf or what have you?

4        MR. GIBBS:  Are you asking for his best

5  estimate at this point?

6  BY MR. PIETZ:

7     Q.   No. I'm asking for AF Holdings' testimony

8  about what software was used to identify Mr. Navasca as

9  the defendant.

10    A.   The difficulty with your question is there's

11 no specific way to identify software.  Well, you say

12 it's these -- how do you -- so if you're asking if it's

13 the same one as the one that was involved by this third

14 party company, I'm saying that AF Holdings' position

15 would be that it is very likely the same software.  Can

16 we definitively determine the software or the version

17 or, you know, any of the other variety of technical

18 differences that would makes some software different in

19 even a slight manner then another piece of software, I

20 can't say I know specifically what version, whatever

21 else.  That information would certainly be -- the 6681

22 Forensics, I would trust would be in -- how do you say

23 it -- possession of that information, but I think that

24 goes a little bit beyond the scope of what we reasonably

25 could have expected to know.  If you wanted me to tell

1  you what version of the software that was used, it would

2  have been simple to notice that up.

3          I can tell you what the process is by which we

4  would determine what IP address we chose and we have

5  asked 6681 Forensics to really target -- specifically in

6  these 101 case -- some of the more serial infringers,

7  people who are really doing quite a bit of infringement.

8                  FURTHER EXAMINATION BY MR. RANALLO

9      Q.   Let me ask you this.  You said that you target

10  people who -- IP addresses that are doing quite a lot of

11  infringement.  Does AF Holdings have any records of the

12  IP address at issue in this case downloading other

13  films?

14      A.   6681 Forensics may have those records.  If --

15      Q.   If AF Holdings --

16      A.   I'm in the middle of my answer.  You need to

17  let me finish.

18      Q.   Go ahead.

19      A.   Well, I'd like to state for the record that

20  it's hard to get a full answer out when Attorney Ranallo

21  continues to interrupt me.

22          That's what 6681 Forensics was charged with.

23  I'm trying to refresh my recollection to determine

24  whether Mr. Navasca was seen infringing on other works

25  in this particular action.

1    I can say this.  Based on the instructions

2 that were provided to 6681 Forensics it would be AF

3 Holdings' position that 6681 Forensics did identify

4 Mr. Navasca as being associated -- or the IP associated

5 with Mr. Navasca being associated with other infringing

6 activities.  Can I specifically identify which other

7 files he was infringing, as I sit here right now, no I

8 cannot.  But I can say that was the -- that would be

9 the -- the first goal with getting infringers is to take

10 care of the people who are the worst infringers.

11    Q.  So is it AF Holdings' position that

12 individuals who are chosen for individual suits are

13 likely associated with IP addresses that have downloaded

14 large numbers of works.

15        MR. GIBBS:  Objection.  Misstates prior

16 testimony.  Objection.  Compound question.

17        THE WITNESS:  Can you restate the question?

18 BY MR. RANALLO:

19    Q.   Is it AF Holdings' position that when they

20 choose a defendant for these individual suits, they

21 choose individuals who have infringed a large number of

22 works?

23    A.   Well, I think that's -- that lacks a certain

24 nuance.  There's two different ways to be a serial

25 infringer, so to speak.  One is to infringe upon a large

1  number of works and the other way is to maintain

2  infringing activities for an extended period of time

3  with respect to a given work.  Just to use an example,

4  there are quite a few sites out there where the -- the

5  people who go on the sites, they're private sites,

6  private BitTorrent sites and they're dedicated to a

7  specific topic, such as -- obviously, there's a lot

8  dedicated specifically to adult content.  And the people

9  who go on these sites, they have to maintain a certain

10  upload to download ratio.  And in order to do that, that

11  means they have to continue making the work available

12  for an extended period of time after they've originally

13  taken it, because then they have to subsequently provide

14  bandwidth liquidity to subsequent people who join the

15  site.

16         Someone who could be classified as a serial

17  infringer or someone who has really done a lot of harm

18  to someone is not only someone who has taken down a lot

19  of different works or, you know, downloaded every single

20  file for a given client, for example, downloading a

21  siterip, which is a compilation of all the works

22  associated with a given website or what have you.

23         It could also be someone who is just a --

24  almost a constant source for access to the file over an

25  extended period of time.

1        THE WITNESS:  Before you ask me your next

2   question, I would like to take a bathroom break.

3        MR. PIETZ:  Yeah, no problem.

4        (Off the record at 3:21 p.m. and back on

5         the record at 3:25 p.m.)

6   BY MR. RANALLO:

7        Q.   Before the break we were discussing the

8   process by which AF Holdings identifies particular

9   infringers of its copyright.  Let's take it a step

10  beyond where we just were.  Once you get an IP address,

11  once AF Holdings gets an IP address, how does it

12  determine which particular person is the infringer

13  associated with that IP address?

14       A.   I would make the general comment that it's

15  important to distinguish between AF Holdings and its --

16  shall we say its forensics experts and its attorneys.

17  To a significant degree, AF Holdings delegates these

18  matters to its attorney and to its, you know, technical

19  services company to make these determinations.

20       With respect to the specific question of how

21  it goes from -- shall we say the account holder -- so

22  you get the IP address and then you do the discovery.

23  You get the account holder's name back and then the

24  question is who at the household -- was it the account

25  holder someone else at the household who used the IP

1  address, which I think is your question, if I understand

2  it correctly, how do you determine who at the household

3  used the IP address.

4     Q.   Once 6681 gets an IP address, I want you to go

5  through the whole process and let's start with the

6  subpoena to the IP address.

7     A.   So the first thing you do is you file the

8  lawsuit.  You've got an IP address that 6681 Forensics

9  says this guy has been involved in infringing in

10  whatever work has been identified in the complaint.  You

11  file the lawsuit.  You seek early discovery from the

12  court, because you can't proceed forward with the case

13  until you figure out who the defendant is.  The only way

14  to match an IP address and an identification is through

15  that process and then if the court grants leave to issue

16  the subpoena then you issue the subpoena to the ISP.

17          I think in this case it was -- I'm not sure

18  what ISP it was.  So then you issue the subpoena to the

19  ISP and ship it off to the them and the ISP will then

20  perform a resolution of the IP address to a specific

21  individual and then you get the individual's name back.

22     Q.   Do you get an individual's name back

23  100 percent of the time?

24     A.   No.

25     Q.   And what percentage would you estimate comes

1    back not resolved to any name?

2        A.   I couldn't possibly begin to estimate.  It

3    really varies.

4        Q.   Let's try to get a rough idea.  Are we talking

5    1 in 10 or closer to 1 in 100 or closer to 1 in a 1,000.

6        A.   I would say 1 in a 1,000 is not correct.  It's

7    too extreme in the scarcity.  I suspect it would be

8    between 1 and 10 and 1 and 100, that's kind of a

9    ballpark estimate.

10       Q.   Some few percentage come back unresolved to

11    anybody, though?

12       A.   Somewhere between 1 and 10 percent by that

13    ballpark estimate.

14       Q.   What is the reason when they come back empty,

15    so to speak, what is the reason behind that?

16       A.   The reason behind that is that -- they really

17    don't give a reason.  They just say could not locate

18    subscriber information.  We have asked them about that

19    in the past, because we still have to pay for it, AF

20    Holdings does.  They say sometimes it's because the -- I

21    can't recall the reason that they give.  They just say

22    that there's no information available.

23       Q.   Is it fair to say that the ISPs' recordkeeping

24    is not, let's say, 100 percent accurate with regard to

25    each IP address?

1      MR. GIBBS:  Objection.  Misstates testimony.

2      THE WITNESS:  I would say they're world-class.

3  If it's not 100 percent, it's got to be right there.

4  BY MR. RANALLO:

5      Q.   Let's say -- I mean, in the cases where it

6  resolves to no subscriber, is that because they attract

7  the wrong IP address or because Comcast, for example,

8  wasn't able to say who that IP address belonged to?

9      A.   I will say that Comcast or Verizon or Time

10  Warner, whoever the ISP is, if they're not 100 percent

11  on when they give that information out, they'll just say

12  they can't do it.  They are very careful.  They're

13  world-class.

14           FURTHER EXAMINATION BY MR. PIETZ

15      Q.   So Mr. Hansmeier, you're an attorney.  You've

16  been very involved in these cases.  You're aware that

17  there's a certain amount of controversy that goes along

18  with these cases.  Am I correct?

19      A.   What do you mean?

20      Q.   The issue I'm interested in -- which is an

21  issue I'm sure Mr. Gibbs is well versed on, because it's

22  a topic I know he's addressed several times.  But the

23  particular issue that I'm concerned with -- that I'm

24  going to be asking AF Holdings to opine upon -- is the

25  process by which plaintiffs in cases like these, so the

```
 1    process by which AF Holdings alleges that an Internet
 2    user, who has been identified as paying for an Internet
 3    account by his ISP, is identified as a John Doe
 4    defendant, who is guilty of alleged infringement.  So I
 5    recognize that was kind of a mouthful, but let me --
 6    that was just to sort of explain to you the topic.
 7              Paragraph 22 of the first amended complaint in
 8    this action states that Defendant and that's Defendant
 9    with a big D, which refers to Joe Navasca, using IP
10    address 69.109.216.238 without plaintiff's authorization
11    for license intentionally a downloaded a Torrent file,
12    in particular, plaintiff's video, purposefully loaded
13    that Torrent file into his BitTorrent file.  In this
14    case uTorrent 2.2.1, entered a BitTorrent's forum,
15    particular to plaintiff's video and reproduced and
16    distributed the video to numerous third parties.
17              Here's my question.  Beyond the fact that
18    Mr. Navasca was presumably identified by his ISP as
19    having paid for Internet service, what facts are there
20    to support that allegation in the complaint found on
21    paragraph 22?
22         A.   I believe that facts that form the basis of
23    our investigation and the basis for naming Mr. Navasca
24    in this case are set forth in our response to the --
25    through his attorney Mr. Ranallo's for motion for
```

1    undertaking.  If I had that in front of me, it could

2    refresh my memory as to the exact facts that were used

3    to determine that Mr. Navasca was the infringer.

4         Q.   Would AF Holdings agree that the mere fact

5    that somebody happens to pay the Internet bill is not

6    enough to justify naming and serving them with a

7    complaint?

8         A.   I don't think AF Holdings has a particular

9    position on that issue.  I can tell you that AF Holdings

10   generally does an investigation -- or the attorneys and

11   technical experts do an investigation beyond simply

12   naming the subscriber.

13        Q.   You represent AF Holdings as counsel of

14   record.  You're an attorney.  What's your view on that

15   question?

16             MR. GIBBS:  Objection --

17             THE WITNESS:  What is the question?

18   BY MR. PIETZ:

19        Q.   The question of whether the mere fact that

20   somebody pays the Internet bill is enough to justify

21   naming and serving them in a complaint for copyright

22   infringement?

23             MR. GIBBS:  Asking for opinion.  You can

24   answer as an opinion.

25             THE WITNESS:  I guess my personal view on that

```
 1    issue is that -- I guess I don't have a personal view on
 2    the issue of whether that is sufficient under Rule 11 or
 3    any applicable legal standard.  Having their name back
 4    as the infringer is enough to justify or is enough to
 5    satisfy whatever legal requirement exists before naming
 6    and serving someone with a complaint.  Certainly the
 7    fact that they're an account holder that's associated
 8    with infringing activity would suggest that they have
 9    some connection whether it's -- how do you say it --
10    whether they're the direct infringer or whether they
11    have provided the means or whether they had knowledge of
12    some form of infringement activity occurring over their
13    IP address.  So I don't know.  I think that's an open
14    question that has yet to be definitively resolved at the
15    higher levels of the judicial system.
16         Q.  So return to --
17         A.  I'm not done.  That being said, my personal
18    approach is I will generally look for information above
19    and beyond just being named as the -- shall we say
20    account holder by the IPS.
21              One factor that one might look at includes,
22    does the -- when you speak to the account holder, can
23    they identify someone else who did it.  And if the
24    account holder says it wasn't me, it was my roommate and
25    I'm willing to sign an affidavit, then that would
```

1  probably be a better course of action, you know, to

2  continue to proceed forward against the roommate.

3      Q.   So I'd like to return then to how AF Holdings

4  came to allege that Mr. Navasca, the defendant in this

5  case -- what facts is the allegation in Paragraph 22

6  based on?

7      A.   Again, if someone has a copy of the response

8  to the motion for undertaking, I can refresh my

9  recollection as to the facts that --

10              FURTHER EXAMINATION BY MR. RANALLO

11      Q.   Let me ask you do this.  In preparation for

12  this, did you do any research into the facts upon which

13  AF Holdings has based its identification of Joe Navasca

14  as the infringer?

15      A.   Again, I reviewed the response for the motion

16  of undertaking.  I believe that's set forth by a few

17  facts.  I just can't recall them out of recall after a

18  long day of deposition.

19              FURTHER EXAMINATION BY MR. PIETZ

20      Q.   So is it AF Holdings' testimony that the only

21  facts that are relied upon in naming Mr. Navasca are the

22  ones recited in the undertaking motion opposition?

23      A.   I would have to review the undertaking motion

24  very carefully before saying that those are the only

25  facts.

 1          MR. PIETZ:  Let's take a five-minute break and

 2    I'll ask you to do that, sir.

 3          THE WITNESS:  Does someone have a copy of it?

 4          (Off the record at 3:37 p.m. and back on

 5          the record at 3:40 p.m.)

 6          FURTHER EXAMINATION BY MR. RANALLO

 7    Q.   Let me go ahead and ask you this.  Who at AF

 8    Holdings knows the facts underlying the identification

 9    of Joe Navasca as the infringer?

10    A.   Well, again, as I said before you got to be

11    careful when you assume that, for example, Mark Lutz,

12    who is, you know, AF Holdings sole manager, member, what

13    have you, is intimately familiar with the facts, for

14    example this specific case.  There are too many cases or

15    too many -- he delegates these matters to his counsel,

16    to his attorneys.  Just like any CEO, the CEO of Ford or

17    CEO of Facebook.  I don't think Mark Zuckerberg is

18    intimately familiar with the facts upon which every

19    lawsuit that Facebook files prior to the filing of a

20    lawsuit.  It's not a very realistic way to run a

21    business.  But I'm sure like just Mark Zuckerberg, Mark

22    Lutz delegates these matters to his attorneys and the

23    independent contractors such as 6681 Forensics.

24          In preparation for the deposition today, we

25    did review what factors were at play when Mr. Navasca

1   was chosen as the defendant.  And those are set forth in

2   the response for the motion for undertaking that we'll

3   be reviewing very shortly.

4       Q.   Could you tell me the identity and location of

5   the individuals with knowledge about the facts

6   underlying AF Holdings' identification of Joe Navasca,

7   the infringer?

8       A.   Sure.  Counsel, Mr. Gibbs, he's right here.

9   Let's see.  The ISP -- if you can remind me what the ISP

10  was in this case, Comcast maybe?

11      Q.   This is a pretty clear statement in No. 15 of

12  what we're looking for.  This is something you were to

13  be prepared for.

14      A.   Well, Mr. Ranallo, this has been a long day of

15  deposition.  And the idea that I'm going to remember

16  every single fact, every single person, every single

17  identity of every person who had any connection to this

18  suit in the history of mankind, is a bit unrealistic.

19          Now, I pointed to something that could help me

20  refresh my recollection so I could answer the question

21  and fully answer the question for you and instead of

22  just simply providing a copy of the complaint which

23  would identify the ISP, you decided instead to chastise

24  me for reasons that remain unclear and forever will be

25  unclear.  If someone does have a copy of the complaint,

```
 1    I'd be happy to refresh my recollection so I could
 2    identify the ISP and that will trigger my memory of who
 3    at the ISP has the information regarding the subscriber
 4    resolution for Mr. Navasca.
 5                   FURTHER EXAMINATION BY MR. PIETZ
 6         Q.   Since we're going to return to this topic in a
 7    moment after we get you the opposition that you want to
 8    refresh your recollection, let me ask a couple of other
 9    questions.
10              What business records does AF Holdings
11    routinely keep related to these cases?
12         A.   This must be Item No. 5.  So the business
13    records would be the ISP subscriber return,
14    correspondence from counsel and, of course, copies of
15    the agreements, the assignment agreements and those are
16    the primary records kept by AF Holdings.  Of course,
17    when you've got a company that's -- one-person company
18    he's not going to generate a lot of e-mail or
19    correspondence between himself naturally, but certainly
20    the assignment agreements and those sorts of records
21    would be kept.
22         Q.   How about tax records.  Has AF Holdings ever
23    filed a tax return?
24         A.   I don't not believe they have filed a tax
25    return in Nevis.  I believe there's an exception that if
```

1  you're not recognizing revenue, to filing a tax return,

2  so I don't not believe they have filed a tax return in

3  Nevis.

4      Q.   Has AF Holdings ever filed a tax return in the

5  United States?

6      A.   I'd have to think about that.  I'm not aware

7  of any tax returns that AF Holdings has filed in the

8  United States.

9      Q.   I'm asking now for the corporate testimony of

10  AF Holdings, not your personal recollection.  Has AF

11  Holdings filed a tax return in the United States?  Is

12  the answer yes, no or maybe?

13      A.   I know I specifically asked about tax returns

14  in Nevis in preparation for this deposition.  With

15  regard to a tax return in the United States, of course,

16  AF Holdings isn't formed in the United States --

17          MR. RANALLO:  Excuse me.  Could we put on the

18  record what that says (indicating).

19          THE WITNESS:  Sure.  It says ISP, AT&T.

20          MR. GIBBS:  I didn't want to interrupt.

21          THE WITNESS:  I believe I asked about the US

22  tax returns and they did not have any tax returns for my

23  review.

24  BY MR. PIETZ:

25      Q.   And that's a conversation you had with

1  Mr. Lutz; is that correct?

2      A.   Yes.

3      Q.   Does AF Holdings have an accountant?

4      A.   AF Holdings does not have an outside

5  accountant.

6      Q.   Does it utilize accountant services of any

7  person?

8      A.   No, there are no outside accountants.

9      Q.   Any accountants ever of any kind?

10      A.   There are no accountants of any kind.

11      Q.   How about bookkeeper.  Does AF Holdings have a

12  bookkeeper?

13      A.   I would say Mr. Lutz generally performs the

14  services of a bookkeeper.  It's not a very complicated

15  set of books.

16      Q.   How about the -- so Mr. Lutz has a set of

17  books for AF Holdings in his possession?

18      A.   Let me think about that question.

19      Q.   You just said it's not a very complicated set

20  of books.  I'm implying from your answer that a set of

21  books does exist.  Is that a correct implication?

22      A.   No.  My answer was meant to convey the idea

23  that the financial records of AF Holdings and the

24  financial transactions of AF Holdings are not complex

25  and that's what I meant by it wouldn't be -- to be

1    perfectly precise I would say it wouldn't be a very

2    complicated set of books.

3          Q.   So are there books?

4          A.   I'm trying to refresh my recollection.

5          Q.   If so, who has them?

6          A.   Well, in the financial records I reviewed

7    there were some Excel spreadsheets, I guess if you're

8    going to call them books, that had some sort of numbers

9    on them.  They weren't very complete and they weren't

10   very well labeled, but they were in Mark Lutz's

11   possession.

12         Q.   Are those the only financial records you've

13   ever seen for AF Holdings?

14         A.   Yes.

15         Q.   Are aware if any other financial records

16   exist?

17         A.   I'm not aware of any other financial records.

18         Q.   Is the company aware of any other financial

19   records?

20         A.   No.

21         Q.   Just the Excel spreadsheets that Mr. Lutz has

22   that you reviewed in preparation for this hearing?

23         A.   Yes.

24         Q.   What are AF Holdings assets?

25         A.   The assets of AF Holdings are the intellectual

property that it holds.  I suppose its claim of right on

any proceeds of lawsuits currently in the trust accounts

of various attorneys.

Q.  So how about -- that was my next question.

How about cash in trust accounts.  What's the total of

AF Holdings' assets in various trust accounts across the

country?

A.  Which item are we referring to so I can

refresh my recollection?

Q.  Distribution and proceeds of AF Holdings'

settlement money.

MR. GIBBS:  Objection.  That not what you're

asking for, though.  You're talking about something

that's outside the notice of deposition.

MR. RANALLO:  AF Holdings' revenues.

MR. PIETZ:  Duly noted.

MR. GIBBS:  We're talking about bank accounts,

not revenue.

THE WITNESS:  This is why I don't have a

recollection.  This says revenues derived from

BitTorrent copyright infringement related to work.

There's no way for AF Holdings to determine that number.

BY MR. PIETZ:

Q.  There's no way at all for AF Holdings to know

how much money is being held in trust for its benefit in

1   various attorney trust accounts across the country?  No

2   way at all?

3        A.   I'll read back the noticed topic --

4        Q.   Please don't.  I've read it.  Refer me to the

5   number, if you would.

6        A.   I'm reading No. 10 now.  AF Holdings' revenues

7   derived from BitTorrent copyright litigation related to

8   the work.  The breakdowns that -- for example, you know,

9   I'm talking about Alpha Law Firm.  If Mark Lutz called

10  me up and said, How much revenues have we derived from

11  this particular work, I couldn't break it down for him

12  like that.  I cold break it down for him in terms of the

13  settlements that we have received on your behalf overall

14  is a different amount, or is X, Y and Z.  I don't know

15  the number off the top my head.  If he ever called me up

16  and said, How much have we gotten for this work?  That's

17  not a way people do accounting.

18       Q.   So the way that AF Holdings does its

19  accounting, how much cash does it have in

20  attorney-client trust accounts across the country?

21       A.    I believe this was a noticed up topic that I

22  had to go ahead and collect the cash and determine the

23  amount of cash.

24            MR. GIBBS:  Objection --

25            MR. RANALLO:  Let me ask you this --

```
 1              MR. PIETZ:  Hold on a second.  Wait.  Wait.
 2   Are you refusing to answer the question or is your
 3   answer you're refusing to answer or is your answer that
 4   you don't know?
 5              MR. GIBBS:  Objection.  Outside the notice of
 6   topics.
 7   BY MR. PIETZ:
 8       Q.   Go ahead and answer, please.
 9       A.   I'm not refusing to answer the question.
10   The -- my answer to the question is that as a corporate
11   representative for AF Holdings sitting here right now
12   testifying on behalf of the company, I can't tell you
13   how much cash they have, as a snapshot in time as we sit
14   here right now.  And, frankly, even if it had been
15   noticed up, it still would be a very difficult topic to
16   adequately prepare for, because there are claims on the
17   cash, for example, for incurred expenses and future
18   expenses and it's very complicated.
19       Q.   I thought the books were simple.  So who has
20   claims on the cash?
21              MR. GIBBS:  Mr. Pietz, I would appreciate you
22   not to interject random comments.
23              MR. PIETZ:  I'm just indicating an apparent
24   inconsistency and asking the deponent to explain.
25              MR. GIBBS:  You're being snarky is what it is.
```

```
 1              THE WITNESS:  That's true.  Mr. Pietz, I will
 2    ask you as a 30(b)(6) corporate representative to
 3    maintain professionalism and politeness.  I don't think
 4    there's any need for you to try and intimidate and
 5    influence my testimony or make me feel bad about the
 6    testimony I previously gave just because you're trying
 7    to be a bully.
 8              MR. PIETZ:  I apologize if my comments were
 9    seen as bullying.  That's not my intent.
10    BY MR. PIETZ:
11         Q.   Return to the apparent inconsistency.  On the
12    one hand a moment ago you said AF Holdings' books were
13    not very complicated and then just more recently, a few
14    seconds ago you stated that it would actually be pretty
15    complicated to determine the cash on hand that AF
16    Holdings has because of various claims on those funds.
17              What I'm asking you to do -- again, my apology
18    if you took this the wrong way -- is to reconcile that
19    apparent inconsistency.  Can you explain to me the kinds
20    of claims that exist on the cash in attorney trust
21    accounts.
22              MR. GIBBS:  Objection.  This is something --
23    you're misstating his testimony.
24    BY MR. PIETZ:
25         Q.   Go ahead and answer, please.
```

```
 1        A.   Well, I think it's important to recognize it.
 2   When you say books, you're not -- the assumption you're
 3   making is that books equal balance sheet.  If you're
 4   asking me about balance sheets specifically, then the
 5   balance sheet isn't simple for the reasons I just
 6   described.  Books means, generically speaking, financial
 7   statements at least as I understood it.  Maybe you have
 8   a different understanding.  So we're all on the same
 9   page.  When I heard you say books with respect to AF
10   Holdings, I understood you to mean inputs, outputs, the
11   corporate expenses, the -- how do you say it -- the
12   income and expenses and the -- that's pretty simple.
13   It's not -- AF Holdings has made the decision that to
14   sell and distribute and market and perform all of these
15   activities, would be very difficult in terms of making
16   any money from it because the piracy is so great.
17   That's what I meant when I said it's relatively simple.
18   But to determine an exact cash position on any given
19   point in time would be very complicated.
20        Q.   So let's go to some specifics then.  Let's
21   return to the topic we discussed earlier, which was
22   settlement proceeds that were paid in AF Holdings cases
23   where Alpha Law was counsel of record.  What kinds of
24   claims on the cash in trust and apparently in trust with
25   Prenda Law would there be on that money?
```

1  A. There would be no specific claims on -- can

2 you please restate the question.  I want to make sure I

3 understand it fully.

4  Q. So Alpha Law obtains settlements, money was

5 paid into attorney trust accounts, which was the Prenda

6 trust account.  You've stated that money -- AF Holdings'

7 funds in attorney trusts are subject various kinds of

8 claims.  In the cases that you're personally familiar

9 with, what kinds of claims was the trust account money

10 subject to?

11    MR. GIBBS:  Objection.  Compound question.

12 Objection.  Misstates testimony.

13    THE WITNESS:  I'm not really understanding

14 what you mean by claims, if it was money from -- that

15 goes into Prenda's trust account.  I can't tell you what

16 kinds of claims it was subject to in Prenda's trust

17 account.

18 BY MR. PIETZ:

19  Q. Have you been reimbursed for expenses incurred

20 by the firm out of Prenda's trust account in connection

21 with the AF Holdings cases where Alpha Law Firm

22 represented AF Holdings?

23  A. Yes.

24  Q. What kind of expenses?

25  A. The expenses we previously outlined, which

1    were filing fees and ISP fees.

2         Q.   Any professional services fees?

3         A.   No.  As I previously stated, I was not paid by

4    Alpha Law Firm or -- Alpha Law Firm was not paid by AF

5    Holdings for --

6         Q.   To clarify.  I didn't mean professional

7    services earned by Alpha Law.  I meant professional

8    service fees paid to some other third-party vendor?

9         A.   I guess I'm not familiar.  If you can give me

10   a specific example that you're talking about, I just

11   don't have a frame of reference.

12        Q.   How about payments to 6681 Forensics?

13        A.   No.

14        Q.   How about payments due to any other computer

15   company?

16        A.   Alpha Law Firm did not make any payments to

17   6681 Forensics.

18        Q.   How was 6681 Forensics paid in AF Holdings'

19   litigation?

20        A.   6681 Forensics is paid a flat monthly fee to

21   do monitoring service.

22        Q.   And what's the flat fee?

23        A.   It's arranged over time between -- well, I

24   mean.  It was lower before and now it's increased over

25   time.  I believe the number is -- the current number is

1    $6,000 per month.

2         Q.   And that is payable by whom?

3         A.   It is payable by -- are you asking for the

4    exact precise financial transaction?  AF Holdings owes

5    that money to 6681 Forensics.

6         Q.   And how is it paid?

7         A.   The exact bookkeeping for the payment -- I'm

8    trying to refresh my recollection.  I believe it's paid

9    from Prenda Law to 6681 Forensics from the proceeds of

10   settlements

11        Q.   Has Alpha Law ever made any payments to 6681

12   Forensics?

13        A.   No.

14        Q.   How about the Anti-Piracy Law Group.  Has that

15   ever made any payments to 6681 Forensics?

16        A.   None that I'm aware of.

17        Q.   The Anderson firm that we talked about

18   earlier.  Has that made any payments to 6681 Forensics?

19        A.   Well, are you talking about executing the

20   financial transaction purpose of it?

21        Q.   I'm talking about any money at all flowing out

22   of the those firms' client trust accounts to 6681

23   Forensics?

24        A.   I couldn't tell you with respect to Anderson &

25   Associates, but none that I'm aware of.

1    Q.   Would it be fair to say then that on a global

2  basis 6681 Forensics is paid when Prenda Law every month

3  pays them $6,000 on behalf AF Holdings?

4    A.   I believe so.  I believe that's accurate, yes.

5    Q.   And would it also be fair to say that 6681

6  Forensics doesn't obtain any other compensation from AF

7  Holdings other than that $6,000 a month?

8    A.   Yes, that would be fair to say.

9    Q.   How about the employees and officers of 6681

10  Forensics.  Are they paid by AF Holdings in some way

11  other than the $6,000 a month that's paid to the

12  company?

13    A.   No.

14    Q.   Returning to the question of -- let me ask now

15  about who -- and I think I can guess the answer to this

16  question, but I'll ask anyway.  Who at AF Holdings has

17  authority to settle a lawsuit?

18    A.   Mark Lutz.

19    Q.   Is he the only person at AF Holdings with that

20  authority?

21    A.   He's the only person at AF Holdings, yes.

22    Q.   How about -- same question but with dismissing

23  a case.  Is Mark Lutz the only person who has the

24  authority to dismiss an AF Holdings case?

25    A.   Yes.  Well, I should clarify my two prior

```
 1   answers.  Are you talking about people specifically at
 2   AF Holdings?
 3       Q.   My question was in litigation brought by AF
 4   Holdings, who has the authority to settle and dismiss
 5   those cases.
 6       A.   I need to clarify my answers to the two prior
 7   questions.  And my answers to the two prior questions --
 8   I understood your two prior questions to say, who has
 9   the authority to do it -- who at AF Holdings had the
10   authority to do it and I thought you were asking that
11   question because I think you said you already knew the
12   answer implying that it was -- since there's only one
13   person at AF Holdings you were implying it was Mark Lutz
14   and the question -- and the answer was self-evident.
15           But to the extent that you're asking who in
16   the world has authority to enter into settlement
17   agreements or make certain specific litigation decisions
18   on behalf of AF Holdings, I would say that -- like any
19   other company that exists that is involved in
20   litigation, the attorneys for the -- attorneys who
21   represent AF Holdings in districts across the country,
22   in a case-by-case basis -- not in any global whatever --
23   from time to time will have authority to enter into
24   settlements within ranges -- standard settlement ranges
25   and then make other decisions regarding the cases.
```

1    Q.    So sometimes AF Holdings' outside counsel will

2    be delegated settlement authority for AF Holdings cases;

3    is that correct?

4    A.    On a case-by-case basis, yes.

5    Q.    Did that occur in this case?

6    A.    That came up in this case, because the --

7    well, I'd have to double check.  I couldn't say

8    specifically whether in this particular instance the

9    authority was delegated.

10    Q.    How about initiating litigation.  Does AF

11    Holdings outside counsel have authority to initiate

12    litigation on AF Holdings' behalf?

13    A.    How do you mean by initiate litigation?

14    Q.    I mean, going down to the courthouse and

15    filing a compliant?

16    A.    Well, certainly Mark Lutz is not going to go

17    down to the courthouse and file complaints in every

18    district that AF Holdings files a case.  Of course, the

19    outside counsel has authority to file the complaint on

20    AF Holdings' behalf.

21    Q.    Let me ask the question a different way.  Is

22    it conceivable that Prenda's outside counsel has filed

23    complaints without specifically running that particular

24    complaint by Mr. Lutz?

25    A.    No.  But I would qualify that by saying

1    that -- as you guys know -- Prenda's role with respect

2    to AF Holdings is more national counsel role.  They you,

3    know -- they're not just on the ground fighting case by

4    case and so forth and so on.  They have a more

5    significant role than that.  So Mr. Lutz is not going to

6    go case by case and say, Oh, let's sue this guy.  Let's

7    sue that guy, but this guy or not this guy or that guy.

8    He delegates some of that to Prenda Law to assist him in

9    not spending all of his day focusing on litigation, but

10   instead trying to focus on business opportunities.

11         Q.   So if Prenda is overseeing AF Holdings'

12   litigation nationally, what does the Anti-Piracy Law

13   Group do?

14         A.   They are outside counsel for AF Holdings.

15         Q.   In only certain limited jurisdictions?

16         A.   I couldn't recite the various jurisdictions in

17   which the Anti-Piracy Law Group operates.  I believe

18   they're in California and I believe they're in Illinois.

19   Those are the only two jurisdictions that I'm aware of.

20         Q.   And who are the principals of the Anti-Piracy

21   Law Group?  Is that just Mr. Duffy?

22         A.   Mr. Duffy is the principal of the Anti-Piracy

23   Law Group.

24         Q.   Isn't he the principal of Prenda Law?

25         A.   Yes, he is also the principal of Prenda Law.

1    Q.   So what's the difference between the two?

2    A.   They're two separate entities, two separate

3    firms.

4    Q.   And they both represent AF Holdings?

5    A.   They both represent AF Holdings, yes.

6    Q.   Could they have other clients in common?

7    A.   You'd have to ask them.  I'm sure it's all a

8    matter of public record.

9         MR. GIBBS:  Objection.  Outside of his

10   knowledge, outside the deposition topics.

11        MR. PIETZ:  Let's take that five-minute break

12   we mentioned a while ago and allow the deponent to

13   review the opposition to the bond motion.

14        (Off the record at 4:06 p.m. and back on

15         the record at 4:11 p.m.)

16   BY MR. PIETZ:

17   Q.   Back on the record in the 30(b)(6) deposition

18   of AF Holdings.  Mr. Hansmeier, while we were taking a

19   break, did you have an opportunity to review AF

20   Holdings, LLC's response to defendant, Joe Navasca's,

21   motion to post undertaking?

22   A.   I did.

23   Q.   And I'll note for the record that document --

24   in case -- Northern District of California

25   12cv2396-ECF34.  Did reviewing this document refresh

1   your recollection as to the facts supporting AF

2   Holdings' allegation that Mr. Navasca is the

3   defendant -- is the actual defendant in this action?

4        A.    Yes, I did.  My recollection may still be

5   incomplete, but I will do my best to recall as much of

6   the information as I possibly can to describe the

7   process by which Joe Navasca was chosen as the defendant

8   in the instant action.

9        Q.    I'll try and save us some time.  Other than

10  rehash what's in this document, are there any other

11  facts other than the facts contained in this opposition

12  which support AF Holdings' position that Mr. Navasca is

13  the defendant in this case?

14       A.    I believe so.  Let me start -- I appreciate

15  the request for efficiency, but for the sake of my being

16  able to go through everything, it would be helpful for

17  me to just state the facts that I'm aware of because I'm

18  not sure which facts are in here and which facts aren't

19  in here.

20            So starting at the beginning, I guess we would

21  say that the first step that took place was -- maybe I

22  should ask a clarification question.  Are you asking me

23  post getting the subscriber name back?

24       Q.    I think that's a good idea.  Let's skip to the

25  point of the subpoena return.  So in other words, Prenda

1    has obtained a subpoena return.  What does it to do from

2    there?

3        A.   So in this particular instance the subpoena

4    return as identified -- I believe it was identified by

5    AT&T an account holder to be Jovino Navasca, who is not

6    the same person as the defendant Joe Navasca.

7             The standard process when we get back the

8    subpoena return is to think, now does this person seem

9    like the infringer, does this person seem not like an

10   infringer.  And I believe the first step that was taken

11   in this instance was to find out who all lives in the

12   household.  There are variety of services online that

13   one can use to determine who lives in the household.

14       Q.   Can I interrupt you.  Can you tell us which

15   particular services were used in this case?

16       A.   I believe the service that was used in this

17   particular case is a service called Accurint,

18   A-C-C-U-R-I-N-T.

19       Q.   And were there any other database searches

20   conducted on the ISP subscriber?

21       A.   To the extent you consider Google to be a

22   database.  The most formal database search and

23   background search of the household was done through

24   Accurint.

25       Q.   Who performed this search?

```
 1        A.   I could not tell who exactly performed this

 2   search.

 3        Q.   Was it Mark Lutz?

 4             MR. GIBBS:  Objection.  He just answered that

 5   question.  Objection.  Not one of the noticed deposition

 6   topics.

 7   BY MR. RANALLO:

 8        Q.   I was asking for a yes or no on Mr. Lutz.

 9        A.   The answer is I don't know.  I don't recall at

10   this time.

11        Q.   Well, leave a blank there for you to

12   supplement.

13        A.   I'll be glad to do so.

14        Q.   Okay.  Great.  Does AF Holdings ever use

15   licensed private investigators to conduct searches like

16   this?

17        A.   I believe we have in the past, yes.

18        Q.   And who are those investigators?

19        A.   I don't have the names of the investigators we

20   have retained.  We do those in circumstances where an

21   Accurint report, for example, is not yielding very much

22   useful information.

23        Q.   Do you know if a investigator was used in this

24   case?

25        A.   I don't believe an investigator was used in
```

1  this case.

2      Q.    So beyond the Accurint report what other facts

3  support naming Joe Navasca as the defendant?

4      A.    So then you take the Accurint report and you

5  look at the various people listed on it.  The Accurint

6  report provides quite a bit of information regarding,

7  you know, age, sometimes some other information,

8  criminal record.  I'm sure other information that I'm

9  not recalling at this time.  Then you go through and you

10  look at each person listed on the Accurint report.  I

11  believe in this particular instance the Accurint report

12  listed four or five people who potentially lived in the

13  household and the next step is then to investigate each

14  of those individuals.

15      Q.    How is that investigation performed?

16      A.    The investigation take a lot of different

17  forms.  ==An initial way to investigate someone is to talk==

18  ==to the account holder.==

19      Q.    Mr. Hansmeier, just to be clear.  I'm not

20  asking so much in terms of general practice here.

21      A.    I was going to get more specific as to this

22  case.

23      Q.    Right.  So what was the investigation in this

24  case?

25      A.    Sure.  I believe the next step in this case

1   was -- after running the Accurint report, we reached out

2   to Mr. Navasca.  And by Mr. Navasca I'm referring to

3   Jovino Navasca.

4       Q.   Can I stop you for some more clarification.

5   When you say we reached out, what do you mean?  Who was

6   doing the reaching?

7       A.   I might be --

8            MR. GIBBS:  Objection.  Calls for speculation.

9            THE WITNESS:  I'm trying to be as accurate as

10  possible here.  I believe that a letter was sent to

11  Mr. Navasca informing him of the litigation and asking

12  him if had any ideas about whether he did it or whether

13  someone else might have done it.

14  BY MR. PIETZ:

15      Q.   Who would have signed that letter?

16      A.   I would have to look at the specific letter in

17  question.  I don't remember who signed the letter.

18      Q.   Do you know what law firm letterhead it would

19  have been?

20      A.   Again, I know what the investigative process

21  was.  I don't know the particulars such as letterhead

22  and who signed what and those particulars.

23      Q.   So after the Accurint report we've got a

24  letter.  What else?

25      A.   I believe he also would have called to reach

1  out to him to see if he had any basis for knowing why

2  his IP address was used for infringing activity.

3         Q.   And who called Mr. Navasca?

4         A.   Again, I don't know who would have reached out

5  to him specifically.

6         Q.   Well, there's only one employee at AF

7  Holdings.  Was it Mr. Lutz?

8         A.   The assumption behind that question is that

9  only an employee of AF Holdings could have reached out

10  to him.  It could have been an attorney or it could have

11  been Mr. Lutz.

12         Q.   Could it have been anyone other than that?

13         A.   Theoretically possible.  I would say the most

14  likely scenario would be Mr. Lutz or an attorney.

15         Q.   Are there any other individuals who contact

16  plaintiffs -- strike that.

17              Are there any other individuals who contact

18  defendants in AF Holdings' cases other than Mr. Lutz and

19  attorneys of record?

20         A.   I guess I would have to think through every

21  person that has been ever been associated.  I don't

22  recall a comprehensive list of every individual who's

23  been associated with reaching out to punitive

24  defendants.

25              Would you like me to continue back to this --

1   to the investigation?

2       Q.   No.   What I might ask instead.   Have there

3   been individuals who are engaged specifically for the

4   purpose of making these kinds of phone calls?

5       A.   Just to be clear.   When you're referring to

6   these kinds of phone calls, you're referring to --

7       Q.   To answer your question.   Phone calls from AF

8   Holdings or its attorneys to John Doe defendants to

9   discuss the investigation that you're now describing.

10      A.   Well, again, AF Holdings uses a variety of law

11  firms and I can't tell you who works for every law firm

12  out there in the country.

13      Q.   Would it be primarily Mr. Lutz's

14  responsibility to perform the investigation or would it

15  be the attorney of record's responsibility to perform

16  the investigation?

17      A.   It could be either.   It's hard to make

18  generalizations about every single case that's out

19  there.

20      Q.   So what about this case.   Can you provide any

21  detail about who contacted the Navasca family?

22      A.   Again, I've already testified that I don't

23  know who -- what letterhead was used or what the

24  signature block said.   I am familiar with the -- I did

25  review information to allow me to be able testify as to

1   how Joe Navasca was chosen as a defendant in the instant

2   action.

3       Q.  I'm most interested in phone calls to

4   Mr. Navasca.  Who on behalf of AF Holdings has placed a

5   phone call to the Navasca family?

6           MR. GIBBS:  Asked and answered.  Can we move

7   on from this?

8           THE WITNESS:  I'm going to continue providing

9   you the same answer.  I have no recollection of who the

10  specific individual was from AF Holdings who made the

11  call to the Navasca family.

12  BY MR. PIETZ:

13      Q.  Well, in any event I guess that will be AF

14  Holdings' answer on that question.

15          Does Mr. Gibbs employ people who made phone

16  calls to the defendant in this case?

17      A.  That's a question for Mr. Gibbs.

18      Q.  I'm asking AF Holdings.

19      A.  AF Holdings has no specific position on

20  whether Mr. Gibbs employs third-party individuals or has

21  no knowledge of him doing so.

22      Q.  Here's what I'm trying to do, Mr. Hansmeier.

23  I'm trying to narrow down the universe of individuals

24  who might conceivably have placed the relevant telephone

25  calls in this case.  So we have Mr. Lutz.  You've also

1    stated that sometimes lawyers will also make these phone

2    calls.  What I'd like is the best possible list that you

3    can give me of the people who may have called

4    Mr. Navasca in relation to this case?

5         A.   Well, I would suppose the best possible list

6    would be Mr. Lutz, Mr. Gibbs -- I'm try to think if

7    there's any other parties who may be plausible.  I

8    suppose Mr. Duffy may have placed a call.

9         Q.   Why would Mr. Duffy have been calling on this

10   case?

11        A.   I should be careful here, because I was doing

12   that on the basis and assumption that I know Mr. Duffy

13   is filing a motion for substitution in some of these of

14   cases, maybe not this specific case.

15        Q.   Is your testimony then that perhaps Mr. Duffy

16   would have called recently, but probably not preparing

17   the first amended complaint?

18        A.   It would be unlikely that Mr. Duffy would have

19   been.

20        Q.   So far we only have two possibilities, which

21   are Mr. Lutz and Mr. Gibbs.

22        A.   Well, no --

23             MR. GIBBS:  Objection.  Misstates testimony.

24             THE WITNESS:  It's important to be precise in

25   your questions because if I say one thing and you say

```
 1   something different back to me, then we spend a lot of
 2   time just going back and forth having to correct what
 3   you're saying.
 4          You asked me to narrow down the field of
 5   possibilities and I said well two obvious possibilities
 6   would be Mr. Lutz, as the owner of -- forgive me -- the
 7   manager of AF Holdings and Mr. Gibbs who is the attorney
 8   of record in the underlying case.  Does that eliminate
 9   every possible third party, of course it doesn't.
10          I've tried to give you the best assistance I
11   could.  If you would like to move beyond the question,
12   we can or we can stand on it if you'd like.
13   BY MR. PIETZ:
14      Q.   Referring now to the deposition subpoena topic
15   No. 15.  Who did you confer with regarding preparing
16   your testimony on topic 15?
17      A.   I conferred with Mr. Lutz.
18      Q.   Anyone else?
19      A.   Then I reviewed the documents in the
20   underlying case, so the record.
21      Q.   I'm just interested in people.
22      A.   I'm trying to recall if I spoke to Mr. Gibbs
23   regarding what facts.  I believe the topic would have
24   come up in conversations with Mr. Gibbs.
25      Q.   So during the phone call to the Navasca
```

```
 1   family, what fact was revealed in your investigation
 2   that led Prenda to serve Joe Navasca rather than Jovino?
 3        A.   Well, you have to understand that every time
 4   you place a phone call to somebody doesn't necessarily
 5   mean they pick up.  I do not believe in this particular
 6   instance, Jovino picked up the phone call.  That's my
 7   recollection.
 8        Q.   Was it just one call?
 9        A.   I'm only aware of one call that was placed to
10   the residence.
11        Q.   How was it that you're sure of that?
12        A.   I think I just said that was my best
13   recollection.  I'm not entirely sure what the volume of
14   calls was.  It's difficult to track how many calls are
15   made to a particular residence.  It's not something
16   that's naturally recorded in any manner.
17        Q.   Does Mr. Lutz keep records of his phone calls?
18             MR. GIBBS:  Objection --
19             THE WITNESS:  Are you asking me if he keeps a
20   notebook of every call he makes?
21   BY MR. PIETZ:
22        Q.   I'm asking if there's any kind of records of
23   Mr. Lutz's phone calls.
24             MR. GIBBS:  Objection.  He'd have to speculate
25   on that.  He's not Mr. Lutz.
```

1    THE WITNESS:  I don't know what phone system

2    Mr. Lutz uses and what records are associated with those

3    systems.  I guess what is the ultimate goal here with

4    the phone calls?  I can't tell you exactly how many

5    phone calls were placed to Mr. Navasca.  I can tell you

6    that I do not -- I'm not aware of a phone call placed to

7    Mr. Jovino Navasca in the preceding investigation

8    process where Mr. Navasca answered the phone.

9    BY MR. PIETZ:

10       Q.   So far I've heard a fair bit about process,

11   but I would like to return to the question of facts.

12   What are the facts that justify serving Joe Navasca in

13   this case?

14       A.   All right --

15       Q.   I don't mean to recap what we have already

16   gone over.

17       A.   I understand, but I may need to restart my

18   discussion of this, just so I can go through point A to

19   Z and I'll try to be as efficient as possible.  And, of

20   course, just noting for the record that I'm not

21   discussing the pre-subpoena return investigation, so

22   there's all of that.  Post -- once we got Jovino's

23   subpoena return in our hands.  The facts that supported

24   naming him -- so, of course, the first thing we did was

25   run the Accurint search, which revealed information

1  about the people in the household and I believe that

2  certain people were eliminated from likely contention or

3  the likely infringer status right off the bat.  For

4  example, any females living in the household in the

5  light of the nature of our client's work were removed

6  from likely candidacy for being the infringer of this

7  work.

8       Q.  So it's essentially a demographic evaluation

9  of the Accurint report based upon age and sex; is that

10 correct?

11           MR. GIBBS:  Objection.  Misstates his

12 testimony.

13           THE WITNESS:  As what point did I say age?

14           MR. PIETZ:  You didn't.  I was asking.

15 BY MR. PIETZ:

16      Q.   I'm trying just to keep to the facts here, not

17 the process, right.  So I'm not so concerned about what

18 AF Holdings did.  What I'm more curious about is why it

19 named Mr. Navasca as the defendant?

20      A.   I'm trying to get through that discussion with

21 you right now.  So after we run the Accurint search, we

22 look at that and we can eliminate some people as likely

23 candidates.  Although I'm speaking generally, I'm also

24 trying to be specific as to this case.  The -- so the

25 Accurint report would have eliminated certain

1    individuals, particularly females, in the light of the

2    nature of the work.  Although -- please let me continue

3    if you want me to be able to get through this for you.

4    But that being said, we still do evaluate females,

5    because you can never definitively eliminate them at

6    that stage.

7            The next step would be to reach out to the

8    account holder and we did that in this case.  We reached

9    out to the account holder by placing a telephone call to

10    him and by sending him letters.

11        Q.  Was that more than one letter?

12        A.  I've only reviewed one letter that was sent to

13    him, to Mr. Navasca.  I believe it was not returned or

14    not responded to.

15        Q.  So far we've got one or maybe two letters and

16    probably one phone call.  And if I understand correctly,

17    nobody in the Navasca family responded to the letters or

18    the phone call; is that correct so far?

19        A.  That's my recollection, yes.

20        Q.  Moving beyond those.  What other facts are

21    there that Prenda relied upon in -- that AF Holdings

22    relied upon in naming and serving Joe Navasca?

23        A.  Again we ran the Accurint report, so beyond

24    the phone call and the letter, we ran the Accurint

25    report.  And then there's a pretty intensive process of

1   looking at everyone in the household who has technical

2   competency, because BitTorrent is not like playing

3   Freecell or Hearts on the computer.  It's a much more

4   technically intensive process.  By far and away the

5   experience of BitTorrent infringement suggests that

6   people who are associated with BitTorrent infringement

7   have some sort of technical competency.

8       Q.  Are you basing that on some kind of published

9   study or something?  Do you have a reference for that

10   process?

11       A.  Can you please clarify what you mean by or

12   something?

13       Q.  Well, in any event, can you please describe

14   for me this intensive process of evaluating the people

15   in the house?

16       A.  So the next step in the process -- or the

17   intensive process is doing significant research on these

18   individuals through subsequent reports through finding

19   out what these people do, what their educational

20   background is, what their hobbies are, what evidence

21   there is of them being involved in computer communities,

22   checking out handles online and seeing if there's some

23   way to link someone on one of these piracy sites to one

24   of these individuals and build as complete a profile as

25   possible to determine whether someone is the likely

1    infringer.

2         Q.   So, again, I would like to ask what

3    specifically of those things was done in this case?

4         A.   Well, the same thing.  Every one -- we built a

5    profile on everyone in the house.  And --

6         Q.   Can I clarify one thing.  Before you said

7    additional reports.  Were you referring to something

8    other than the Accurint report?

9         A.   I think in this case we ran Accurint reports

10   on the other individuals in the household to see what

11   their status was.  So I think, you know, the end result

12   of that investigation was that there were -- I want to

13   say -- again, it's the end of the day and my memory is

14   fading a little bit.  But there were -- I'll say three

15   males and I could be off by one or two -- because,

16   again, it's been a long day -- who were identified in

17   the household.  It may have been four.  We were able to

18   eliminate several of them by virtue of just everything

19   online -- every that we could find about them,

20   profile-wise suggested that they did not have a

21   technical background, they had no experience in this.

22             You made the mention of age before and

23   although that's not a dispositive factor.  It's

24   certainly a factor you would bring into consideration to

25   say someone who is 80 years old.  I'll use my grandma,

1  for example.  She can barely use the computer much less

2  use BitTorrent.  That's not to say that no one that old

3  can't do it, but it's a factor you bring into

4  consideration.

5          And then, of course, you -- we were looking at

6  the various backgrounds of the people in the household.

7  One person just popped out to us, which was Mr. Navasca,

8  the defendant Navasca, who does have a technical

9  background, who does have technical job now, who meets

10  all the criteria that fits into a plastic case at least

11  in the experience of people who have been prosecuting

12  these actions before as being very, very likely to be an

13  infringer.

14          And then further we do -- there's always the

15  question of maybe a neighbor is doing it or maybe

16  someone who is parking outside in the street or maybe a

17  guest is doing it.  Who knows.

18          In this case I believe that the data shows

19  that Mr. Navasca -- or the infringing activity that took

20  place over this IP address was not just on a single day

21  or a single two days, it was over an extended period of

22  time.  I don't know -- I can't recall the exact period

23  of time, but it wasn't one kind of glimpse of him and

24  that was it.

25          And then -- I mean, the follow-up I make to

1   that is that Mr. Navasca's deposition I think shows and

2   is a great illustration of the effectiveness of our

3   process. We had a guy there who uses technical -- or

4   who has a technical background, who does a lot of stuff

5   with computers. I think I remember reviewing the

6   transcript and seeing that he uses -- plays games two

7   hours a night. And further, frankly, the fact that he

8   had that program on his computer where he's destroying

9   the forensic evidence that we would need to prosecute

10  him.

11          And the fact that, Mr. Ranallo, with total

12  respect, but the fact that you misrepresented to the

13  court that he was actually maintaining the evidence.

14  It's shocking to me -- not shocking, but I think it's

15  quite illustrative that someone who needs to use a

16  forensic computer program to destroy evidence after he's

17  found out that he might be involved in one of these

18  lawsuits, who has the technical knowledge to do that and

19  who has testified that basically everyone else in his

20  household doesn't really use the computer very much. I

21  guess his dad used a little bit of Facebook, but that

22  was about it.

23      Q.   Mr. Hansmeier, I would like to return to just

24  a couple of question and I'll thank you for that

25  detailed answer. Who performed this intensive analysis

1  on the Navasca household in this case?

2      A.   Well --

3          MR. GIBBS:   Objection.   Asked and answered.

4  BY MR. PIETZ:

5      Q.   Go ahead.

6      A.   I got to be honest with you guys.   When I saw

7  this notice of deposition, Item No. 14, I was really

8  focused on the facts and the steps that were taken, not

9  by the people who actually took the steps.   I think we'd

10 be glad to supplement the testimony to give some more

11 color around those specific issues, but as I sit here

12 right now, I was not focused on acquiring as to who did

13 what.   I was focused on what was done.

14     Q.   I think at least right now you don't know who

15 performed this analysis; is that right?

16     A.   Yeah.   14 is a process --

17         MR. GIBBS:   Well, hold on a second.

18 Objection.   This is something that wasn't noticed in the

19 deposition is what he's saying.   He's not aware at this

20 point.

21         MR. PIETZ:   Duly noted and I'll note for the

22 record that I disagree.   This is very clearly within the

23 scope of 15.

24 BY MR. PIETZ:

25     Q.   I'm not necessarily opposed to giving you the

```
1   opportunity to fill that information in promptly

2   afterward.  But is the answer at least right now that AF

3   Holdings doesn't know who performed this investigation?

4           MR. GIBBS:  Objection.  If you look at 15,

5   it's talking about the facts upon which AF Holdings

6   based its identification.  It doesn't talk about the

7   persons that made the identification.

8           MR. PIETZ:  Yes, it does.  And the identify

9   and location of any individuals or documents supporting

10  such identification.

11          THE WITNESS:  If you want to know the

12  identities of the individuals who have -- I can tell you

13  who the individuals are.  It's Mr. Gibbs, it's Mr. Lutz,

14  and I would say that Mr. Duffy to the extent that any of

15  this work was outsourced to other individuals within

16  Prenda Law, so those are the three individuals who

17  have -- how is this phrased -- who -- those are the

18  identities of three individuals who would have -- who

19  could support the identification, the location of the

20  individuals.  To go out straight off your noticed topic.

21  Mr. Duffy is located at 161 North Clark Street, Chicago,

22  Illinois.  Mr. Gibbs is right here in the room and

23  Mr. Lutz is in Las Vegas.

24  BY MR. PIETZ:

25      Q.   Fair enough.  Were any records kept in
```

1    connection with this so-called intensive analysis?

2        **A.    The Accurint records would be available, are**

3    **kept.**   The notes regarding the background profiles on

4    everyone that more of a contemporaneous sort of process,

5    I don't know if those records are retained.  We do know

6    from my discussions with people that -- what the results

7    of those were.  And certainly I suspect we could pull up

8    the letter that was sent to Mr. Navasca or letters, if

9    there was more than one, not Mr. Navasca the defendant,

10   but Mr. Navasca the dad.  Those would be -- that's my

11   best recollection of what the documents would be.

12       Q.    Fair enough.  I'll note that the deposition of

13   Mr. Navasca took place after he was named as the

14   defendant in this case.  What in the analysis or the

15   investigation revealed the fact that Mr. Navasca, the

16   defendant, supposedly has a technical background or

17   technical job?  To put that simply, how did Prenda

18   uncover that fact, because that's the one specific fact

19   I heard that Prenda's hanging its investigation on.  How

20   was that fact uncovered?

21       A.    Well, first of all that's not the specific

22   fact which Prenda is hanging its investigation on.

23       Q.    Sorry.  Let me strike that part of that

24   comment.  In any event how did Prenda's investigation

25   determine that Mr. Navasca has a quote, technical

1  background or technical job?

2      A.   Well, it would have come up either in the

3  context of the Accurint report, which may have listed

4  his employer and his education or it also may have come

5  up just through the process of finding out different

6  places where Mr. Navasca has listed his employment and

7  his education, such as Linkedin or whether it's a

8  Facebook page.  Although I believe his Facebook page is

9  private.  That's where the facts would have been derived

10  from.

11      Q.   How do you know his Facebook page is private?

12      A.   I believe that's one of the items that was

13  checked.

14      Q.   So how do you know that was one of the items

15  that was checked?

16      A.   I spoke to Mr. Gibbs or Mr. Lutz or some other

17  person at Prenda regarding Mr. Navasca.  They noted the

18  fact that his Facebook page was private.  It may have

19  been listed in the deposition.

20      Q.   So you did speak to Mr. Gibbs and Mr. Lutz

21  regarding the investigation that was conducted, but

22  sitting here today you can't remember who it was that

23  conducted the investigation; is that correct?

24      A.   Well, I think it's important to note that it's

25  not just -- we don't just have a single person who sits

1  down and does an investigation.  It's a multipronged

2  process where some people may run the report, other

3  people may send out the letter, other people may try and

4  place a call.

5      Q.  Mr. Hansmeier, I ask you to please sign your

6  name on the piece of paper.

7          (Whereupon, the deponent signed his

8           signature on a blank piece of paper.)

9          MR. PIETZ:  We'll mark that as the next

10  exhibit.  Although, madam court reporter, don't we have

11  one that we still need to enter and mark?

12          THE REPORTER:  Yes.

13          MR. RANALLO:  I did mark the undertaking as

14  107.

15          (Whereupon Defendants' Exhibit No. 107

16           was marked for identification.)

17          MR. PIETZ:  The undertaking is now marked 107

18  and we'll mark for the record the document that I'll

19  just note that Mr. Hansmeier just signed here on the

20  table as 108.

21          (Whereupon Defendants' Exhibit No. 108

22           was marked for identification.)

23  BY MR. PIETZ:

24      Q.  Mr. Hansmeier, is this your usual signature?

25          MR. PIETZ:  Mark now Exhibit 109.  Nick,

1    you're going to have to explain what this is.  We've

2    only got that one copy.  What is that exactly?

3              (Whereupon Defendants' Exhibit No. 109

4               was marked for identification.)

5              MR. RANALLO:  Those are signatures exemplars

6    from a Mr. Peter Hansmeier's signature and a Paul

7    Hansmeier signature for comparison sake.

8              MR. PIETZ:  What is that from, Nick?

9              MR. RANALLO:  They are identified above them,

10   but they are from basically AF Holdings' file/Prenda

11   Law/Steele Hansmeier/Anti-Piracy Law filings.

12             MR. PIETZ:  So I'll note for the record, the

13   top signature says executed on September 2nd -- it says

14   1010, but I suspect it probably means 2010.  And it says

15   Paul Hansmeier and then the second signature says

16   executed on May 5th, 2011 and it says underneath the box

17   Peter Hansmeier.

18   BY MR. PIETZ:

19        Q.   Mr. Hansmeier, does the signature on top

20   appear to be your signature?

21        A.   It has less letters than I normally do, but

22   the first -- the first one looks like my signature,

23   yeah, the first name.  But you sign your signature

24   different ways at different times.  I'll agree that

25   that's my signature.

1    Q.   And the one below it, is that your brother's

2    signature?

3    A.   You'd have to ask him.

4    Q.   The fact that he's your brother and I'm

5    assuming you've seen him sign things before.

6    A.   I don't recall having seen him sign anything

7    specifically before and I don't know where that

8    signature came from, so I'm not prepared to say that

9    that's -- and verify that that's my brother's signature.

10    Q.   Does it look like you signing his name?

11    A.   No.

12    Q.   Now, just to be clear.  You have had your

13    brother sign various declarations in cases that you've

14    been involved with before --

15    A.   I will submit that I've not had a handwriting

16    expert review the signatures on the declarations that

17    he's submitted.

18    Q.   I understand that.  My question is, though,

19    you've seen your brother's signature before on

20    declarations in cases you've been involved with,

21    correct?

22    A.   There's a big difference between filing a

23    declaration that you verify that it's signed and

24    carefully analyzing the signature.

25    Q.   Sure.  I understand that.  Simple question,

```
 1    you know what your brother's signature looks like,

 2    correct?

 3         A.   I believe I could not reproduce my brother's

 4    signature from memory.

 5              MR. PIETZ:  We'll mark now for the record,

 6    Exhibit 110, a verified petition filed by Quava, LLC, in

 7    St. Clair County, Illinois.

 8              (Whereupon Defendants' Exhibit No. 110

 9               was marked for identification.)

10    BY MR. PIETZ:

11         Q.   Mr. Hansmeier, have you ever seen this

12    petition before or maybe not this copy but the

13    underlying document?

14         A.   I believe I've seen it, yes.

15         Q.   When did you see it?

16         A.   I believe I assisted -- oh, this isn't the one

17    that was filed in Minnesota?

18         Q.   This is a St. Clair County, Illinois.

19         A.   I worked with the one in Minnesota.

20         Q.   So am I right that -- or maybe you were

21    mistaken when you said you'd seen this before and you

22    were thinking of Minnesota?

23         A.   I was assuming this was the case that was

24    filed by Alpha Law Firm in Minnesota.

25         Q.   So Alpha Law Firm represented Guava, LLC in a
```

1   Minnesota case and you mistook this pleading for the one

2   that was in Minnesota; is that correct?

3       A.   Yes.

4       Q.   But on closer reflection, now having a chance

5   to look at it more carefully, I'll ask again, do you

6   recognize this pleading, which is from Illinois?

7       A.   I believe I saw it one or two times in the

8   past.  I can't --

9            (Whereupon, Mr. Gibbs left the room.)

10  BY MR. PIETZ:

11      Q.   So you have seen this pleading from Illinois

12  on one or two times in the past?

13      A.   I think my attorney should be present if

14  you're going to be questioning.

15           MR. PIETZ:  Fair enough.  We'll hold off.  Let

16  the record reflect that Mr. Gibbs is back in the room.

17  BY MR. PIETZ:

18      Q.   Let's go ahead and continue with the question.

19  Continuing now that everybody is settled.  So you have

20  seen this St. Clair County petition before, correct,

21  Mr. Hansmeier?

22      A.   I have seen it a couple of times in the past.

23  I'm familiar with it because I know that there was a

24  hearing on it recently.

25      Q.   And can you recall who showed this petition to

1  you?

2      A.   I don't recall who showed the petition to me.

3  I remember discussing this petition with Mr. Steele

4  quickly with some relation to the case.

5      Q.   I'll ask you to skip to the verification page,

6  which is like the seventh or eighth one in there.

7      A.   I see it here.

8      Q.   Can you read for me what it says there on the

9  signature line of the verification page?

10     A.   No.  I can read, but it's a little hard to

11 read.

12     Q.   To best of your ability what does it say?

13     A.   I don't want to speculate what it says.

14 Here's what it says.  It's a pretty rough copy.

15     Q.   I agree.

16          MR. GIBBS:  I have no idea.

17 BY MR. PIETZ:

18     Q.   I'm asking now for your best estimate.  What's

19 the name on the signature line there?

20     A.   You can ask as many times as you want.  I'm

21 telling you I can't read it.

22     Q.   Does it look like Alan Moay, A-L-A-N, M-O-A-Y?

23     A.   It doesn't look like that to me.

24          MR. GIBBS:  Objection.  Calling for

25 speculation.  He already told you he can't read it

1  because it's a poor copy of the paper, so he'd be

2  speculating as to what it says.

3  BY MR. PIETZ:

4       Q.   Go ahead and continue, please.

5       A.   I don't think it looks like that.  I don't

6  think it looks like anything.  I think it's a poor copy

7  and it's illegible.

8       Q.   It's so illegible that you can't read it at

9  all; is that correct?

10      A.   Me personally?

11      Q.   You personally.

12      A.   I'll take a second look at for the sake of

13 completeness.  So the first three letters of the first

14 name appear to be A-L -- I can't tell if it's N-A --

15      Q.   I'll tell you what.  Let's take it letter by

16 letter.  The first letter what does that look like?

17      A.   It looks like a capital A.

18      Q.   The next letter?

19      A.   Either an L or an I.

20      Q.   And then after that, not sure.  The fourth

21 letter?

22      A.   It could be an A, it could be an N.

23      Q.   Moving on to the next word.  What's the next

24 letter?

25      A.   That's pretty clearly an M.

1    Q.   And then the next letter?

2    A.   It's an N or an A.

3    Q.   And then the next letter?

4    A.   That appears to be a Y.

5    Q.   And then after that, can you make out the word

6    that it says after that?

7    A.   D -- let's go letter by letter.

8    Q.   Sure.  Why don't you just do it for me.

9    A.   So the first letter appears to be a D.  The

10   second letter appears to be a C.  The third letter

11   appears to be an E.

12   Q.   Mr. Hansmeier, let me just stop.  Do you think

13   that word says declarant perhaps?

14   A.   It could say defendant, declarant.  That would

15   conceivably fit within the letters.  Although,

16   obviously, it's pretty illegible.

17   Q.   Do you know anybody by the name of Alan Moay,

18   M-O-A-Y?

19   A.   Do I personally know anybody by the name of

20   Alan Moay?  I'd have to check my contact list and anyone

21   I've ever talked to in my entire life, but sitting here

22   right now, do I know anybody named Alan Moay, no, I do

23   not.

24   Q.   Do you know anyone who is a principal or an

25   officer or a corporate representative of Guava, LLC,

1    with a first name of Alan?

2         A.   Do I know anyone, principal or an officer --

3         Q.   Or a corporate representative.

4         A.   I'd to have check my records as to who does

5    what at Guava, LLC.  I couldn't tell you that answer for

6    most of my clients.

7         Q.   Do you know anybody by the name of Alan Mony,

8    M-O-N-Y?

9         A.   Again, I'd have to check my records to see who

10   I've corresponded with in the past.

11        Q.   Do you know anybody by the name of Alan

12   Mooney, M-O-O-N-E-Y?

13        A.   I have represented an Alan Mooney before, yes.

14        Q.   Is that the extent of your relationship to

15   Mr. Mooney, having represented him?

16             MR. GIBBS:  Vague and ambiguous.  Speculation.

17             THE WITNESS:  Can you ask me a more specific

18   question?

19   BY MR. PIETZ:

20        Q.   Let's start with this.  What case did you

21   represent him in?

22        A.   I couldn't tell you the caption of the case

23   right now.

24        Q.   Was it a single action?

25        A.   Can you tell me what you mean by a single

1   action?

2        Q.   Was it one litigation, whether in state or

3   federal court?

4        A.   I'm trying to think whether I represented him

5   in other capacities.

6             MR. GIBBS:  I need to take a one-minute break.

7             MR. PIETZ:  Let's finish this question.  Go

8   ahead.

9             THE WITNESS:  I can.  I represented him at

10  least in one action.  I've had -- I may have represented

11  him in more actions, but I'd have to check my records

12  very specifically to determine that.

13            (Off the record.)

14  BY MR. PIETZ:

15       Q.   Back on the record.  Mr. Hansmeier, was the

16  litigation you represented Alan Mooney in the Priceline

17  litigation?

18       A.   That sounds familiar.  I'd have to check my

19  records to be sure.

20       Q.   I'll represent to you -- I'm not sure that I

21  have a copy, but I will represent that I've seen a

22  pleading filed in Hennepin County, Minnesota where you

23  were counsel of record for one Alan Mooney, A-L-A-N,

24  M-O-O-N-E-Y.

25       A.   That sounds very inaccurate.  I don't believe

1    I filed a pleading in Hennepin County.

2       Q.   And then it was removed to federal.

3       A.   There was a federal court action that I

4    represented an Alan Mooney in.  That might be what

5    you're referring to.  I'm not going to accept your

6    representation as to what that case involved or didn't

7    involve.

8       Q.   All I'm after in any event, is whether or not

9    there may be other cases in which you have represented

10   this Alan Mooney.

11      A.   I believe I just testified and I'll testify in

12   this manner every time you ask me the question, that I

13   represented Mr. Mooney in the case that was -- in a case

14   that -- whether that's the one that you're referring to

15   or not -- it wasn't filed in Hennepin County, but was

16   removed to federal court and my other representations

17   statuses with respect to Mr. Mooney I would need to very

18   carefully check my past records and files to determine

19   whether or not I have represented him in the past.

20      Q.   Have you ever introduced Mr. Mooney to John

21   Steele?

22      A.   I don't recall if I have or not.

23      Q.   To best of your knowledge have your client

24   Alan Mooney and John Steele ever met?

25      A.   I do not believe so.

1    Q.   Have they ever corresponded?

2    A.   I guess you would have to ask the two of them

3  that.  I have not been party to correspondence between

4  the two of them, if that's what you're asking.

5    Q.   Do you have any other business dealing with

6  Alan Mooney?

7    A.   What do you mean by business dealings?

8    Q.   I mean, is the extent of your relationship to

9  Alan Mooney the fact that you represented him in

10  litigation?

11    A.   Well, again, you can continue asking the

12  question about my representation and I'll continue

13  giving you the same answer.  I've had potential

14  representation situations with respect to Mr. Mooney for

15  the past couple of years.  Some of them have -- I can't

16  think of any specifically that have turned into fruition

17  other than the case right there.  My memory is a bit

18  vague and unclear on that topic so I'd have to go back

19  and check my records.  It's in that capacity primarily

20  that I know Mr. Mooney.

21    Q.   So in other words, if I understand correctly,

22  you represented him in one case, and were the other

23  potential representations that may or not may come to

24  fruition were those litigation matters as well?

25    A.   It was primarily litigation matters.  There

1    may have been business dealings, but those were pretty

2    speculative.  But to the exact nature of whether there

3    was litigation or business matters or a hyper between

4    the two, I'd have to check my records to determine what

5    exactly I had to -- my relationship to Mr. Mooney was or

6    the nature of -- or how best to classify the potential

7    representation opportunities.

8        Q.   So what details can you give me about your

9    relationship with Alan Mooney without checking your

10    records?  And I recognize it may not be complete, but

11    can you do the best you can, please?

12        A.   Sure.  I'd be glad to.  The -- I first came

13    into contact with Mr. Mooney back -- I would say 2009

14    perhaps, give or take a year.  And he was -- I don't

15    think I can go into too much detail about the specific

16    facts and situation, but he had a litigation matter that

17    was pressing and so I discussed within the litigation

18    matter kind of -- how best to describe it.  The best way

19    to describe it.  I was an associate at a firm and the

20    partner was handling the matter.  So I met him and then

21    over the years we kept in contact and he has contacted

22    me regarding various matters.  Like any prospective

23    client, I socialize with him from time to time.  And

24    then in the one case that's a matter of public record I

25    represented him.

1    Q.   Has he ever hired you to do anything other

2    than the Priceline case or were they all prospective

3    representations that didn't pan out?

4    A.   You can continue to ask me about my

5    representations of Alan Mooney and I'll continue to --

6         MR. GIBBS:  Objection.

7         THE WITNESS:  -- to give the very same answer

8    which is, I would have to check my records to find

9    out -- to determine whether or not I was formally

10   retained with respect to matters that have occurred,

11   potential matter that have occurred over the past three

12   or four years.

13   BY MR. PIETZ:

14   Q.   Have you ever represented Mr. Mooney in a

15   nonlitigation matter?

16   A.   You can continue asking me about my past

17   representations of Mr. Mooney and I'll continue to give

18   you the very same answer.  I have to check my record to

19   see if I was formally retained or formally represented

20   Mr. Mooney in a matter.

21   Q.   Fair enough.  Seems like we're not getting

22   anywhere.

23        MR. PIETZ:  I'll introduce as Exhibit 110 --

24   and note that I only have this one copy.  This is

25   business records detail for the Minnesota business,

1 MCGIP, LLC.

2           (Whereupon Defendants' Exhibit No. 111

3             was marked for identification.)

4 BY MR. PIETZ:

5     Q.   Mr. Hansmeier, can you read me what it says

6 there where it identifies the manager?

7     A.   Alan Mooney.

8     Q.   And the rest of the information after where it

9 says Alan Mooney.

10     A.   80 South 8th Street, #900, Minneapolis,

11 Minnesota, 55402.

12     Q.   Could you read me what says under principal

13 executive office if for MCGIP, LLC?

14     A.   It identifies 80 South 8th Street, #900, care

15 of the Alpha Law Firm, Minneapolis, Minnesota, 55402.

16     Q.   Was this an additional representation of

17 Mr. Mooney?

18     A.   Quite clearly not.  It's a representation of

19 MCGIP.

20     Q.   So what does Mr. Mooney have to do with MCGIP?

21     A.   On this record he's listed as the manager.

22     Q.   Isn't MCGIP an entity on whose behalf Steele

23 Hansmeier and Prenda Law filed copyright infringement

24 lawsuits?

25     A.   Well, certainly not Prenda Law that I'm aware

1   of.

2       Q.   How about the Alpha Law Firm?

3       A.   Alpha Law Firm, no.

4       Q.   So Steele Hansmeier has never represented

5   MCGIP, LLC in litigation?

6       A.   I believe you're making a statement.

7       Q.   Maybe I'm misinformed.  What was MCGIP then?

8       A.   It's a limited liability company.

9       Q.   And what was the business of MCGIP?

10          MR. GIBBS:  Objection.  Outside the scope of

11  the deposition notice.

12  BY MR. PIETZ:

13      Q.   I'm asking now for personal knowledge.

14      A.   I guess I would have to review my records to

15  find out what the business of MCGIP was.  If we

16  represented them in the past, I would assume that it

17  was -- well, in fact, I think they held copyrights and

18  produce content.

19      Q.   Were you ever involved in a copyright

20  infringement lawsuit for MCGIP?

21      A.   I would have to check my records.  I don't

22  believe I was an attorney of record on a copyright

23  infringement lawsuit for MCGIP, but I believe Steele

24  Hansmeier did file cases on their behalf.  I'd have to

25  check my records.  It was quite a while ago.  So to that

1    extent then, yes.

2        Q.    Is Alan Mooney the person who executed the

3    petition in St. Clair County, Illinois?

4        A.    You'd have to ask Alan Mooney.

5        Q.    Returning now to your capacity as a corporate

6    representative.  Why did AF Holdings change from Media

7    Copyright Group to 6681 Forensic?

8              MR. GIBBS:  Hold on.  Objection.  Assumes

9    facts not in evidence.  Misstates prior testimony.

10             THE WITNESS:  What item are you referring to

11   just so I can refresh my recollection?

12             MR. PIETZ:  I think it's under a few

13   categories.

14             MR. GIBBS:  Objection.  Not in the deposition

15   notice.

16   BY MR. PIETZ:

17       Q.    In any event we'll look for it.  Without

18   resorting to the topics -- hold on.  Strike that.

19             No. 11.  So in any event please answer the

20   question.  Why did AF Holdings change from Media

21   Copyright Group to 6681 Forensics?

22             MR. GIBBS:  Objection.  I don't believe that

23   11 covers that.

24             THE WITNESS:  Sure.  I'll answer the question.

25   I guess, you know, looking at No. 11, I don't think that

```
 1   really -- I would not look at that and say I have to

 2   understand why it went from one to the other.  I

 3   can't -- I can't recall anything specifically in the

 4   course of preparing for this 30(b)(6) deposition that

 5   would have prepared me to answer a question of why they

 6   would decide to go with Media Copyright Group versus

 7   6681 Forensics.

 8            MR. GIBBS:  It almost seems like a state of

 9   mind question.

10   BY MR. PIETZ:

11       Q.  I'm asking if AF Holdings had a reason, why it

12   switched from one technical group to the other.  It's a

13   very simple question.  If the answer is that AF Holdings

14   doesn't know, that's fine.

15       A.  Well, the answer is that none of the

16   preparation that I would have done to prepare for this

17   deposition would have -- on any of the noticed topics --

18   would have led me to investigate why AF Holdings

19   switched from Media Copyright Group, LLC, to 6681

20   Forensics, LLC.

21       Q.  Is AF Holdings confident in the work that 6681

22   Forensics does logging IP address is accurate?

23            MR. GIBBS:  Objection.  Vague and ambiguous.

24   What do you mean by that?

25   ///
```

BY MR. PIETZ:

   Q.   Go ahead and answer it.

   A.   I'm a bit confused by the question.  How do
you mean confident?  Are you asking whether we believe
that they're doing a competent job of identifying
infringers?

   Q.   I mean, is the information accurate?

          MR. GIBBS:  Objection.  Calls for speculation.
He only knows what he knows.  He doesn't know what's
accurate.  It's kind of a vague question also.

          THE WITNESS:  I can only say that in the
course of AF Holdings' existence that we're not aware of
any instance where there's been any question or doubt to
the validity of the link between the infringing activity
and then the IP address and that's primarily what 6681
Forensics focuses on.

BY MR. PIETZ:

   Q.   Mr. Hansmeier, in preparing for today's
deposition, did you speak with anyone other than
Mr. Gibbs and Mr. Lutz?

   A.   Yes, I spoke with Mr. Steele.

   Q.   And when was that?

   A.   Some time in the past two, three weeks.

   Q.   Where did that meeting occur?

   A.   Over the phone.

```
 1        Q.    And were you in Minnesota when you placed that
 2   phone call?
 3        A.    Yeah.   I can't remember exactly, but I am
 4   pretty sure I was in Minnesota.
 5        Q.    Where was Mr. Steele?
 6        A.    Mr. Steele, he's been traveling a lot, so he
 7   could have been in a lot of different places, Illinois,
 8   Las Vegas or South Beach or Chicago.
 9        Q.    I'm curious to hear you say South Beach.  I
10   thought Mr. Steele practiced in Illinois.  Does he
11   reside in Florida?
12        A.    He currently resides in Florida, yes.
13        Q.    What is Mr. Steele's affiliation with Prenda
14   Law?
15             MR. GIBBS:  Objection.  Outside the scope of
16   the deposition notice.
17             THE WITNESS:  I would say that Mr. Steele --
18   first of all, I can't possibly know every last aspect of
19   the connection between Mr. Steele and Prenda Law.  I do
20   know that, for example, there's a case pending in the US
21   District Court in the District of Columbia, AF Holdings
22   names Does 1 through 1,058 where Mr. Steele entered an
23   appearance as of counsel to Prenda Law.  I believe is
24   title.  And I think there's another case pending in the
25   US District Court in the South District of Illinois
```

1    where Mr. Steele has identified as of counsel to Prenda

2    Law, but I'd have to double check.

3    BY MR. PIETZ:

4        Q.   Do you know if Mr. Steele is currently of

5    counsel to Prenda Law?

6        A.   I believe Mr. Steele is labeled as of counsel

7    to Prenda Law in those cases currently.

8        Q.   Is Mr. Steele affiliated at all with the Alpha

9    Law Firm?

10          MR. GIBBS:  Vague and ambiguous.  What do you

11    mean by affiliated.

12    BY MR. PIETZ:

13        Q.   Go ahead.

14        A.   He is not affiliated with the Alpha Law Group

15    {sic}.

16        Q.   Has he ever been affiliated with the Alpha Law

17    Group?

18        A.   He's never been affiliated with the Alpha Law

19    Group.

20        Q.   Has the Alpha Law Group ever compensated John

21    Steele for anything?

22        A.   The Alpha Law Firm has never compensated John

23    Steele for anything.  Although, I should say that

24    there's no such entity as the Alpha Law Group.

25        Q.   Is it Alpha Law Firm?

1      A.    Same answer to all the questions.

2      Q.    How about same question for Mr. Duffy.  Has

3  the Alpha Law Firm ever compensated Mr. Duffy for

4  anything at all?

5      A.    No.

6      Q.    Is your understanding -- well, strike that.

7            Can you explain to me how it is that Steele

8  Hansmeier became Prenda Law?  Let me back up.  Is that

9  accurate?  Is Prenda the successor of Steele Hansmeier?

10     A.    No.

11     Q.    So can you explain to me how it was that

12  Steele Hansmeier was wound down and Prenda was formed?

13     A.    Well, to answer your question specifically --

14  although, I don't know if this is the thrust of your

15  question.  The process of Steele Hansmeier winding down

16  was accomplished through filing with the Secretary of

17  State of a notice of dissolution filed by, I believe,

18  articles of dissolution.  I don't remember the second

19  part of your question.

20     Q.    So Steele Hansmeier was formally dissolved and

21  then as soon as you dissolved Steele Hansmeier, did you

22  at that point work for Prenda Law at all?

23     A.    Not as an employee, no.

24     Q.    In what capacity?

25     A.    Part of my role -- I guess I had no formal

1   affiliation with Prenda Law.  I don't believe I can

2   point to any specific affiliation.  Part of it we wanted

3   to aid Prenda Law in transitioning from, you know,

4   Steele Hansmeier operating the cases and whatnot.

5   Prenda Law was appearing in a lot of the cases, so

6   there's a natural, you know, kind of aid them, help them

7   facilitate the transfer.

8       Q.   So would it be a correct characterization that

9   Prenda Law took over Steele Hansmeier cases?

10      A.   Well, the precise characterization, of course,

11  is that they filed substitutions of counsel in cases

12  that Steele Hansmeier was counsel, I believe, across the

13  board.

14      Q.   And what happened to the money?  Presumably

15  there was money in trust at Steele Hansmeier.  Was that

16  money liquidated out of Steele Hansmeier accounts and

17  paid into new Prenda accounts?

18      A.   I was not part of the handling of the

19  financial part of the --

20      Q.   Transition, if you will; is that correct?

21      A.   It's your word, but I understand what you're

22  getting at.

23      Q.   So who was responsible for handling the

24  financial aspect of the transition?

25      A.   I believe Mr. Steele would have been in charge

1    of managing -- the handling of funds.

2        Q.    And was Mr. Duffy also involved in the

3    transition of Steele Hansmeier cases to Prenda cases?

4        A.    I believe he was the attorney who appeared as

5    counsel of record in those cases.

6        Q.    What about Mr. Gibbs.  I note that he appeared

7    on the various pleadings as of counsel to Steele

8    Hansmeier.  Did you hire Mr. Gibbs to Steele Hansmeier?

9            MR. GIBBS:  Objection.  Outside the scope of

10   the --

11           THE WITNESS:  I would have to check the

12   records with respect to Mr. Gibbs' relationship with

13   Steele Hansmeier.

14   BY MR. PIETZ:

15       Q.    Well, I'll represent to you that on various

16   pleadings he listed himself as of counsel to Steele

17   Hansmeier.  Does that mesh with your relationship?

18       A.    Again, I don't want to make any specific

19   statements regarding Mr. Gibbs' with Steele Hansmeier.

20   I assume that if he labeled something on a pleading,

21   that it was accurate.

22       Q.    So while you were one of the two named

23   partners in Steele Hansmeier, do you personally recall

24   Mr. Gibbs doing work for the firm?

25       A.    Again, you're asking me to characterize the

1    nature of his relationship with Steele Hansmeier.  For

2    every time you ask it -- like a few other topics

3    today -- I'm sure you're going to come back and ask the

4    same question many times.  Once and again and again and

5    again.

6            I'm sorry, Mr. Pietz, is my deposition

7    testimony funny to you?

8        Q.   No, I'll just note that it's not quite the

9    same question.

10       A.   Mr. Pietz, this is a serious matter.

11       Q.   I agree.

12       A.   You and your client and you personally

13   Mr. Pietz nationwide, have accused AF Holdings of fraud

14   and of criminal activity.  I believe you've used the

15   word criminal in a few of your pleadings.  With all due

16   respect, I don't believe that an officer of the court

17   should take such humor and take such levity with respect

18   to matters that are of such gravity and importance.  So

19   if this is a comedy show to you, we can go that route.

20   But if this is something you want to take seriously, we

21   can go that route too.

22       Q.   I'll note that I don't want to get drawn into

23   a long back and forth on this.  I'll just assure you

24   that I do indeed take the allegations of fraud in Prenda

25   cases very seriously.  I anticipate and look forward to

1    getting to the bottom of it.

2           MR. PIETZ:  In any event here's what I might

3    propose.  Unless Nick has anything else, maybe we'll

4    turn it over to Mr. Gibbs for redirect.  I'm sorry,

5    Nick, do you have a few things?  Let's go off the record

6    for a moment.

7           (Off the record.)

8           MR. PIETZ:  Back on the record in the 30(b)(6)

9    of AF Holdings.  I will mark as the Exhibit 112 and hand

10   the deponent a copy of the declaration prepared by

11   Mr. Ranallo.  And refer the deponent to paragraph 5.

12   I'm going to ask Mr. Ranallo to play the recording.

13   It's an audio recording for the deponent.  Mr. Ranallo

14   if you would, please.

15          (Whereupon, a recording was played in

16           reference to Exhibit 112, bullet point

17           5, of a February 8th voice mail

18           recording.)

19   BY MR. PIETZ:

20       Q.   Is that Mark Lutz?

21       A.   Well, if I don't recognize the voice that's on

22   the voice mail, I can't make an identification of who it

23   is.

24       Q.   How many times would you say you have spoken

25   to Mr. Mark Lutz in the course of your life?

1      A.    Too many to count.

2      Q.    How many times would you say you've had phone

3 calls with Mark Lutz?

4      A.    I can't answer the question, but several

5 times.

6      Q.    Several or lots?

7      A.    I would say several to mean many times.

8      Q.    And you're telling me that you can't

9 definitively say that the voice we just heard is Mark

10 Lutz?

11      A.    That's correct.

12      Q.    Who might it be if it's not Mr. Lutz?

13      A.    I guess anyone in the world.

14      Q.    Well, I would note for the record that it's

15 somebody calling the defendant in this case -- calling

16 the defendant's father in this case, citing the Prenda

17 Law reference number for this case and discussing this

18 case.  So I would ask again.  Who might that be if it's

19 not Mr. Lutz?

20      A.    You're asking me to speculate as to the

21 identity of the person.  I can't tell you who it is.

22      Q.    Is it Mr. Gibbs?

23      A.    I don't recognize the voice.  I can't identify

24 the person on the call.

25      Q.    How many times have you spoken with Mr. Gibbs

```
 1    in the course of your life?

 2         A.   Many times.

 3         Q.   Is the voice on the recording Paul Duffy?

 4         A.   I can't identify the individual who is on the

 5    phone call.

 6         Q.   How many times have you spoken with Paul Duffy

 7    in the course of your life?

 8         A.   Many times.

 9         Q.   Is it your brother, Peter Hansmeier?

10         A.   I can't identify the individual on the phone

11    recording and I've spoken to my brother many times.

12         Q.   You're telling me as you sit here in that

13    chair that you can't tell me whether the voice message

14    you just heard was your brother; is that correct?

15         A.   That's correct.  I can't identify the person

16    who's on the voice recording.

17         Q.   Fair enough.  Does the content of that message

18    sound like the kind of thing that Mr. Lutz says when he

19    calls people about AF Holdings' litigation?

20              MR. GIBBS:  Objection.  Vague and ambiguous.

21    Also calls for speculation.

22              THE WITNESS:  I don't know what he does when

23    he calls people in AF Holdings' litigation.

24

25
```

| | |
|---|---|
| 1 | FURTHER EXAMINATION BY MR. RANALLO |
| 2 | Q. Does have AF Holdings have any intention of |
| 3 | amending the complaint to add any other individuals? |
| 4 | A. I don't know what AF Holdings' intention is at |
| 5 | this time in this litigation. |
| 6 | Q. Whose decision is that then? |
| 7 | A. Well, it's Mr. Lutzs' decision. |
| 8 | Q. Would you say that your investigation |
| 9 | regarding the infringer in this case identified Jovino |
| 10 | Navasca? |
| 11 | A. Our investigation to date has made it pretty |
| 12 | clear that Joe Navasca is the infringer. |
| 13 | Q. So is it AF Holdings' position then that they |
| 14 | do not believe that Jovino Navasca is the infringer? |
| 15 | A. I believe AF Holdings' position is that Joe |
| 16 | Navasca is the infringer. |
| 17 | Q. Can you explain to me why someone would be |
| 18 | calling from Anti-Piracy Law Group in connection with |
| 19 | this case? |
| 20 | MR. GIBBS: Calls for speculation. |
| 21 | BY MR. RANALLO: |
| 22 | Q. Is Anti-Piracy Law Group affiliated with this |
| 23 | case in any way? |
| 24 | A. I guess I'd have to review the specific |
| 25 | documents. Obviously, there's some relationship if -- |

1    let me refer to the declaration -- if Anti-Piracy Law

2    Group is calling Jovino.

3        Q.    So this call is in relation to this

4    litigation?

5        A.    All I know is that a person identified who

6    they called as Jovino.  Now, obviously, there's a

7    Jovino, someone related to this case.  But I assume

8    there's several Jovinos out there in the world.  I don't

9    know what his reference number is, if that's the

10   reference number he was assigned.  There's quite a bit

11   of a record here that's missing to make that

12   determination.  If you're going to represent that this

13   is this guy's dad who was called and that's where you

14   got the file from, then I'll take your word as an

15   officer of the court that's the case.  I'm sorry.  What

16   was the question?

17       Q.    Does AF Holdings intend to move forward and

18   modify the complaint to add Mr. Jovino Navasca's name?

19       A.    Well, I think that depends on facts and

20   circumstances that could be revealed as the case

21   proceeds forward.  I would say, though, that right now

22   it seems like there's an undertaking issue that may

23   prevent any case from going forward.

24       Q.    Let's just go ahead and reask that question.

25   Does AF Holdings -- on February 8th, did AF Holdings

1  have any intention of moving forward and modifying the

2  compliant to add Jovino Navasca?

3  　　　　　MR. GIBBS:  Asked and answered.

4  　　　　　THE WITNESS:  You know, I guess I just refer

5  back to my prior answers.

6  BY MR. RANALLO:

7  　　　Q.   Could you say yes or no please whether as of

8  February 8th, to your knowledge as an AF Holdings'

9  corporate representative here, on February 8th, did AF

10  Holdings intend to move forward and modify the complaint

11  to add Jovino Navasca's name as a defendant?

12  　　　　　MR. GIBBS:  Objection.  Compound question and

13  also he's already talked about this.  It's already been

14  stated on the record.  Asked and answered.

15  　　　　　MR. PIETZ:  You can go ahead and answer it.

16  　　　　　THE WITNESS:  I would have to know what the

17  timeline was with respect to the undertaking issue.  Was

18  the undertaking issue -- did Judge Chen enter his

19  undertaking order prior to February 8th in your

20  recollection?

21  BY MR. RANALLO:

22  　　　Q.   Yes.

23  　　　A.   At that point -- I guess, you know, the bottom

24  line is that, you know, AF Holdings' general approach is

25  to stay flexible with respect to, you know, who to name

1     and what to do in a case depending on the facts and

2     circumstance as they occur.  For example, in this case

3     there's the undertaking issue, which may make it

4     prohibitively difficult to proceed forward with the case

5     and then that would pretty much resolve the case right

6     there.  However, I do believe Judge Chen indicated he

7     would entertain a motion for reconsideration, whether

8     that's something that happens or not, whether that's a

9     plausible result or not, is something that's a little

10    bit beyond my expertise.

11            At this point there's certainly some potential

12    liability for Jovino.  If he's the account holder and he

13    was aiding or assisting someone else doing the

14    infringement, maybe there's a claim.  I can't say

15    whether or not we were specifically planning to move

16    forward and name Jovino as a defendant in this case, but

17    I know there's certainly a lot of -- his relationship to

18    this case isn't resolved until the case is resolved.  I

19    think that is pretty obvious.

20    Q.   Is it AF Holdings' standard practice to call

21    individuals who they do not necessarily intend to name

22    in the complaint and attempt to get settlements from

23    them?

24            MR. GIBBS:  Objection.  Compound.  Objection

25    speculation.

```
 1          THE WITNESS:  I would say that AF Holdings
 2  does not have a standard practice in its cases.  I know
 3  that the popular opinion among some members of the
 4  Internet, that this is just a one-size fits all thing,
 5  that there's not much nuance in the cases and that it's
 6  not something where -- or that it's something that can
 7  be reduced to a simple straightforward formula, but I
 8  can tell you from the other side of the argument that
 9  these cases are -- they're all individual, they're all
10  unique.  This idea that it's a standard practice of AF
11  Holdings to do anything in any case is not a very --
12  it's a great oversimplification that loses a lot of the
13  truth.
14          So to answer your question, I would say, no
15  it's not a standard practice of AF Holdings to do the
16  conduct that you described in your question.
17  Q.   Based on that answer would you say then, if AF
18  Holdings or its agents are calling and basically
19  saying -- strike that.
20          In light of your last answer, if AF Holdings
21  did indeed call Jovino Navasca on February 8 and say
22  that they intend to move forward and modify the
23  complaint to add his name, is it your position they
24  would have some factual basis for doing so?
25          MR. GIBBS:  Objection.  Calls for speculation.
```

1   Objection.  Compound question.

2           THE WITNESS:  To clarify your question, would

3   they have the basis for calling him or would they have

4   the basis for moving forward and amending the complaint

5   to add his name.

6   BY MR. RANALLO:

7       Q.   Moving forward to modify the complaint to add

8   his name.

9       A.   Sure.  We would have a factual basis prior to

10  amending some -- amending the complaint to add someone's

11  name to it.

12      Q.   If you called him on February 8 and said that

13  you intended to move forward and modify the complaint,

14  is it your position that there is some factual

15  background to indicate that he might be liable for

16  something in this case?

17      A.   See, now my concern is you had me answer the

18  question of whether -- if we actually went ahead and

19  amended the complaint would we have a factual basis for

20  doing so.  Now, you're changing what you're asking me

21  about this notion of calling him.  Which one?  Do you

22  want me clarify my answer to your prior question to

23  actually fit the circumstances of what you're trying to

24  ask about now?

25      Q.   You previously stated that it's not AF

1  Holdings' policy to call individuals and threaten

2  settlement if they don't have a factual basis for

3  believing they're infringer; is that true?

4          MR. GIBBS:  No.  Objection.  Misstates prior

5  testimony.

6          THE WITNESS:  Why you don't make that

7  statement in the form of a question and I can answer the

8  question.

9  BY MR. RANALLO:

10     Q.   Is it AF Holdings' policy before threatening

11 someone with a copyright lawsuit to have some factual

12 basis to support such a threat?

13         MR. GIBBS:  Objection.  Mischaracterizes prior

14 testimony.

15         THE WITNESS:  It would be AF Holdings' policy

16 to -- it's not going to move forward and amend the

17 complaint and name someone without having a factual

18 basis for doing so.  If you want to interpret this as a

19 threat -- I mean, I would have to read the exact text.

20 I mean, I guess you're reading this as a threat.  I'm

21 reading him as making a factual statement as, Prior to

22 moving forward and modifying the complaint to add your

23 name, we would want to give you a quick call.  So this

24 is -- to interpret this call, this could have been a

25 fact-finding call.  You may have characterized it as a

1    threat.  I would characterize it as a fact-finding call.

2    I would say that we always like to do a fact-finding

3    call to get more facts to determine whether it would be

4    appropriate to name someone in a complaint.

5                    FURTHER EXAMINATION BY MR. PIETZ

6         Q.   Did you do a fact-finding call in this case?

7         A.    I believe we did do a fact-finding call.  I

8    believe we talked about that extensively in terms of the

9    identity -- the people who could have done it.  The

10   people in the world who could have done it.  I think

11   that we covered that exhaustively today.

12        Q.    Well, I know you testified earlier that

13   somebody had called and left the Navasca home a message.

14   My question is whether that constitutes a fact-finding

15   call, calling up and leaving a message without a

16   response.  Is that a fact-finding --

17        A.    First of all, you are very loose of the facts.

18   My testimony was not that they left a message.  My

19   testimony was that they gave a call and I wasn't aware

20   if anyone picked up.  Was there a message or not, I

21   don't know.

22        Q.    I stand corrected.  That's a good point.

23        A.    Second, I think I explained pretty

24   exhaustively to you that there are multiple avenues of

25   inquiry.  We can reopen this whole thing up if you want.

1    There are multiple avenues of inquiry that can go into

2    an investigation.  A call is one of the methods that we

3    attempt to use, not every method is going to be

4    successful in every instance.  Certainly attempting to

5    reach out and talk to someone is a part of the process.

6    Is it always successful, do people always answer, of

7    course not.

8         Q.   But in any event, a fact-finding call means a

9    phone call whether anybody picks up or not?

10        A.   If you want to -- if that's what you're

11   personally defining as a fact-finding call, that's your

12   definition.  I'm not going to define a fact-finding call

13   in one way or the other.

14        Q.   I'm just trying to clarify what you meant when

15   you just said a moment ago that we always like to

16   attempt a fact-finding call.  And what I'm trying to

17   clarify is whether that means that -- in your

18   fact-finding call -- you actually try to get a response

19   from somebody or if just calling constitutes as far as

20   AF Holdings is concerned a fact-finding call.

21             MR. GIBBS:  Objection.  First of all, this is

22   a compound question.  But we're talking about -- he just

23   mentioned that he's trying to make a fact-finding call.

24   And then he's saying -- and then you go on to say --

25             MR. RANALLO:  This is a speaking objection.

1   State your grounds for the objection and we'll move on.

2            MR. GIBBS:  Objection.  Compound.  Objection

3   not a clear-cut question.  Objection.  Vague and

4   ambiguous, however, you want to put it.

5            THE WITNESS:  My answer to your question would

6   be that you're mischaracterizing what I was saying.

7   When I said we always like to attempt a fact-finding

8   call I was simply making the point that in that case to

9   do a fact-finding call is not uncommon and it's -- you

10  know, if it yielded information, then that would be, you

11  know, better grounds for litigation, a better basis,

12  just improving the whole picture.

13  BY MR. PIETZ:

14       Q.   Is it AF Holdings' policy to only move forward

15  if the fact-finding call results in obtaining some kind

16  of information?

17       A.   I can restate AF Holdings' corporate policy

18  for investigation again and again and again.  We may

19  have to do it again and again and again.  The corporate

20  policy is that we try many avenues of gaining as much

21  information as possible before moving forward.  If we

22  are able to get enough information to move forward, then

23  we move forward.  If we're aren't able to move

24  forward -- or if we don't gather enough information to

25  move forward, then we don't move forward.

```
 1            And the notion that someone has to always pick

 2   up, would not be a very good corporate policy because,

 3   frankly, no one would ever pick up and if every

 4   infringer who would never pick up would just never be

 5   sued because they just decided not to pick up the phone.

 6       Q.   Mr. Hansmeier, last serious of question from

 7   our side as least at this time.  Referring back to the

 8   deposition notice and the copyright assignment agreement

 9   attached thereto as Exhibit A.  What compensation was

10   paid to Heartbreaker Digital, LLC in this copyright

11   assignment agreement?

12       A.   What topic are you referring on the subjects

13   of examination?

14       Q.   It's a number of topics which include

15   distributions of revenues, as well as -- there's

16   something about interests in the litigation, so --

17       A.   Can you refer to one specifically so I can

18   refresh my recollection?

19            MR. GIBBS:  Objection.  Outside the scope of

20   the deposition noticed topics.

21   BY MR. PIETZ:

22       Q.   Well, I'll tell you what, let's do this based

23   on your personal knowledge now and then after we have a

24   topic for you, we'll come back to AF Holdings.

25            To the best of your personal knowledge has
```

1    Heartbreaker Digital been paid any compensation in

2    connection with the copyright assignment agreement?

3         A.   What I know about this particular assignment

4    it there was consideration and the precise nature of it

5    I'm not clear.

6         Q.   When AF Holdings sells cases is any

7    compensation paid to Heartbreaker Digital?

8         A.   No.  The sole nature of the assignment between

9    Heartbreaker Digital and AF Holdings is set forth here.

10        Q.   So AF Holdings has no interest whatsoever in

11   the BitTorrent litigation that AF Holdings brings on

12   copyrights -- strike that.

13             So to ask it again.  Heartbreaker Digital, LLC

14   has no pecuniary interest or any other kind of interest

15   in the litigation that AF Holdings brings on the

16   copyrighted issue in this agreement?

17        A.   Yes.  This agreement and similar assignment

18   agreements are the only agreements between AF Holdings

19   and Heartbreaker Digital, so they don't have, for

20   example, equity in AF Holdings.

21        Q.   Settlements are achieved -- there's no portion

22   of the settlement proceeds that would be paid to

23   Heartbreaker Digital?

24        A.   That's correct.

25        Q.   So why is it that Heartbreaker Digital entered

```
 1   into this agreement then?  What's the consideration?

 2           MR. GIBBS:  Objection.  This is same theme

 3   we've been going over for the last --

 4           THE WITNESS:  You can ask this question.

 5           MR. GIBBS:  -- for the last seven hours.

 6           THE WITNESS:  You can ask this question a

 7   dozen times.  The precise nature of the consideration

 8   that Heartbreaker Digital receives is not a noticed

 9   topic.  I do note that the -- there may have been a

10   document request.  I don't know.

11           MR. GIBBS:  That's not an issue.

12             FURTHER EXAMINATION BY MR. RANALLO

13       Q.  Let me ask you this.  You previously stated

14   that AF Holdings' BitTorrent revenue was used for

15   lawsuits going forward or past, I guess, costs for past

16   lawsuits; is that correct?

17           MR. GIBBS:  Objection.  Mischaracterizes

18   former testimony.

19           THE WITNESS:  Generally speaking, yes.

20   BY MR. RANALLO:

21       Q.  Does any of AF Holdings' BitTorrent litigation

22   revenue go towards securing future assignments or

23   additional assignments?

24           MR. GIBBS:  Objection.  Asked and answered.

25           THE WITNESS:  I guess I can't speculate what
```

1 will be done with the proceeds of the AF Holdings'

2 BitTorrent revenue.

3 BY MR. RANALLO:

4     Q.   Were any of the AF Holdings' BitTorrent

5 revenues from the initial round of suits prior to the

6 assignment in this case, were any of those revenues used

7 to acquire the assignment in this case?

8     A.   Not that I'm aware of.

9     Q.   Are you aware whether money was paid for the

10 assignment in this case?

11     A.   You can ask me the --

12          MR. GIBBS:  Objection.  Asked and answered.

13              FURTHER EXAMINATION BY MR. PIETZ

14     Q.   I'm going jump in here and note for the record

15 that Topic No. 1 on the deposition notice is,

16 Circumstances surrounding the execution of the

17 assignment attached hereto as Exhibit A and Topic No. 12

18 is, Financial, in all caps, and contractual

19 relationships between AF Holdings and Heartbreaker.  So

20 my question to you is what was the consideration

21 underlying the copyright assignment agreement attached

22 to the Exhibit A to the complaint?

23          MR. GIBBS:  Objection.  Outside the scope of

24 the noticed topics in the deposition subpoena.

25          THE WITNESS:  I can tell you that the sole

1  financial contractual relationship between AF Holdings

2  and Heartbreaker Productions -- which isn't even the --

3  I guess I should modify any answers regarding

4  Heartbreaker this whole time if it relates to -- because

5  that's not even the entity -- that's the assignor on

6  this thing.

7  BY MR. PIETZ:

8      Q.    This agreement contains the sole -- if it's

9  not the sole agreement as to the financial arrangement

10  between AF Holdings and Heartbreaker, point me to the

11  part of the agreement that deals with the financial

12  relationship.  Because I don't see a dollar figure or

13  any indication anywhere in this agreement that there's

14  any kind of consideration paid.  And I think you

15  testified earlier that some kind of consideration was

16  indeed paid; is that correct?

17          MR. GIBBS:  Objection.  Compound question.

18          THE WITNESS:  What is your question?

19  BY MR. PIETZ:

20      Q.    What money was Heartbreaker paid in connection

21  with the copyright assignment agreement?

22          MR. GIBBS:  Asked and answered.  Objection.

23          THE WITNESS:  I think this is the sixth time

24  you've asked the exact same question and I will refer

25  you again -- and again I will note for the record that

1  your noticed topic doesn't even have the correct entity

2  identified on the assignment agreement.  The entity

3  identified in the noticed topics is Heartbreaker

4  Productions.  The entity identified in the assignment

5  agreement is Heartbreaker Digital, LLC.

6  BY MR. PIETZ:

7      Q.  Mr. Hansmeier, did that confuse such that you

8  spent time preparing to answer the question for

9  Heartbreaker Productions?

10     A.  Yes, I find it very confusing that

11 Heartbreaker Productions is misidentified and it's

12 extremely frustrating to me that I would spend time

13 preparing on a variety Of Heartbreaker entities and then

14 find out that not even the correct one is identified in

15 the notice of deposition.  It's very frustrating and

16 very confusing.

17     Q.  Mr. Hansmeier, I can sympathize with your

18 frustration.  But I'm going to keep asking the question

19 until I get what I deem is an appropriate answer from a

20 30(b)(6) --

21         MR. GIBBS:  No.  It doesn't work like that.

22 You don't keep asking a question until you get the

23 answer that you want.

24         MR. PIETZ:  Well, I'm going to keep asking the

25 question different ways until --

```
 1            MR. GIBBS:  You can do whatever you want.

 2            MR. PIETZ:  -- I get an appropriate answer.

 3   BY MR. PIETZ:

 4       Q.   You said earlier that the sole financial and

 5   other arrangement between Heartbreaker and AF Holdings

 6   was memorialized in this agreement.  There's nothing

 7   financial about this agreement.  What's the financial

 8   relationship?

 9            MR. GIBBS:  Again.  Objection.  Asked and

10   answered about 20 times now.

11            THE WITNESS:  I think --

12            MR. GIBBS:  You're badgering him at this

13   point.

14            THE WITNESS:  I will state for the record that

15   I'm beginning to feel badgered.  I feel like I've

16   answered your question I want to say about seven or

17   eight times now.  And you're really not asking it in a

18   different way.  You're just asking the same question

19   over and over again, for the ninth time now, although

20   the record will reflect how many times I've actually

21   been asked this.

22            The agreement stands on its own.  It says for

23   good and valuable consideration the receipts and

24   sufficiency of which are hereby acknowledged.  The party

25   agrees as follows.  And I'm also testifying that this is
```

```
 1   the sole -- this and the other assignment agreement

 2   relating to another work -- is the sole -- and I'm

 3   giving you the benefit of the doubt here that you

 4   actually meant to put the correct entity here in the

 5   30(b)(6) deposition notice -- is the sole financial and

 6   contractual relationship between AF Holdings and

 7   Heartbreaker Productions Inc.

 8           MR. GIBBS:  Hold on a second.  I think also

 9   we're approaching the seven-hour mark on this

10   deposition.

11           MR. PIETZ:  Well, in any event we'll be done

12   shortly.  However --

13           MR. GIBBS:  I think that's what you said about

14   an hour ago.

15           MR. PIETZ:  Well, in any event I was hoping to

16   get a straight answer on this question.

17           MR. GIBBS:  He just gave you a bunch of

18   answers --

19           MR. PIETZ:  Here's the bottom line --

20           MR. GIBBS:  It's just not the answer you want

21   and therefore you're not accepting it.

22           MR. PIETZ:  Here's the bottom line and I don't

23   want to get into a long colloquy on this.  I view that

24   the money --

25           MR. GIBBS:  We don't need to hear your views.
```

```
 1          MR. PIETZ:  -- the money that AF Holdings paid

 2   to Heartbreaker as a material issue and I'm not getting

 3   a straight answer.  And if your position is that you're

 4   not answering the question about the financial

 5   relationship between those two entities because it's not

 6   properly noticed, then I want you to say that right now.

 7   Alternatively, if your position is that there is no

 8   relationship other than what's on this agreement and

 9   what that means is that no money was paid because it's

10   not memorialized in this agreement, then AF Holdings

11   needs to stand on that answer.

12          MR. GIBBS:  Mischaracterization of what's in

13   the assignment agreement, period.  Objection.

14          MR. PIETZ:  Here's the bottom line.  You can

15   stand on your objection that it's not correctly noticed

16   and not answer is the question or you can say that this

17   is the whole agreement and that there's no financial

18   relationship other than what's in this agreement.

19          MR. GIBBS:  You're forcing him into one or two

20   situations and he's not going to be forced into one or

21   two situations.

22          MR. PIETZ:  This my last opportunity for a

23   straight answer on the question and this will be it and

24   if the answer not right, I'm going to suspend this

25   deposition and we're going to get the court involved.
```

1   Last chance.  All right.  Last chance.

2              MR. GIBBS:  You have about two minutes here

3   left in this deposition by the way, just FYI.

4              MR. PIETZ:  In any event it's one of the more

5   important questions, so --

6              MR. GIBBS:  You're badgering him at this

7   point.

8   BY MR. PIETZ:

9       Q.   Last chance.  What's the financial

10  relationship between AF Holdings and Heartbreaker?

11      A.   For the last time and I will state for the

12  record that I have felt very badgered here and I feel

13  very flustered.  I would respectively object to --

14             MR. GIBBS:  Mr. Ranallo, smiling about this

15  whole thing --

16             THE WITNESS:  And Mr. Ranallo -- I would note

17  for the record that Mr. Ranallo just sneered and grinned

18  and he's continuing to sneer and grin and I believe he's

19  behaved very inappropriately and I believe Mr. Pietz --

20  although in this particular area has been deeply

21  disconcerting and distressing for my testimony.

22             I will say again that this is -- this

23  agreement constitutes the financial and contractual

24  relationship between AF Holdings and Heartbreaker

25  Digital, LLC with respect to this assignment.

BY MR. PIETZ:

Q.   I'm going to note for the record one final
time that this agreement does not mention any money
being paid and ask this final question.   Was there any.

       MR. GIBBS:   He already -- he's been asked this
question about 20 times.   He answered it already.

BY MR. PIETZ:

Q.   He hasn't answer the simple question.   Money
paid, yes or no?

A.   This --

       MR. GIBBS:   He answered the question.

       THE WITNESS:   To the extent --

       MR. GIBBS:   He doesn't have to be forced into
a yes or no question.   He can explain his answer.

       THE WITNESS:   I'm really surprised that this
is so difficult of a answer for you to accept.   This is
the deal right here.   This the full deal, the whole
deal.   This is the financial and contractual
relationship between AF Holdings and Heartbreaker, LLC
with respect to the assignment.   That answer could not
be more clear and more straightforward.   And the simple
fact that you don't like the answer, I don't know what
to do about it.

       MR. GIBBS:   We started this deposition at
10:00 o'clock in the morning.   It is 6:00 p.m.   We took

1  less than an hour-long lunch.  We've gone basically over

2  seven hours at this point.  So how --

3          MR. PIETZ:  Let's go off the record and

4  perhaps we can work out a resolution here.

5          (Off the record at 6:00 p.m. and back on

6          the record at 6:03 p.m.)

7          FURTHER EXAMINATION BY MR. RANALLO

8      Q.  Back on the record.  Does AF Holdings maintain

9  financial records of payments made for assignment

10  agreements?

11      A.  It maintains financial records.

12          MR. GIBBS:  Vague and ambiguous.  Objection.

13          THE WITNESS:  Sure.  To the extent a payment

14  was made it would keep the record.

15  BY MR. RANALLO:

16      Q.  So if any payment was made for the

17  assignment -- as the good and valuable consideration

18  recited in the assignment -- AF Holdings would have a

19  record of that?

20      A.  Yes.

21          FURTHER EXAMINATION BY MR. PIETZ

22      Q.  Would those records be produced in a document

23  production three days from now?

24          MR. GIBBS:  First of all, objection.  Legal

25  conclusion.  I think we can talk about that later.  But

1    there's an objection based on the fact that I was -- I
2    took the deposition.  We've already been released from
3    that obligation under this deposition.  That was not a
4    separate document request, just to let you know.
5              MR. PIETZ:  I'm just going to note for the
6    record that if the problem here is that the deponent
7    doesn't know the financial relationship and the deponent
8    is willing to supplement that information with the
9    document disclosure that comes in three days, the
10   defendants are amenable to that.
11             MR. GIBBS:  Hold on a second.  He just said he
12   can do that with an interrogatory.  What is wrong with
13   that?
14             MR. PIETZ:  Thirty days is what's wrong with
15   it.  We noticed a deposition on the topic today --
16             MR. GIBBS:  No, you didn't.  The document
17   request was not a proper document request in and of
18   itself.  It was not a topic.
19             MR. PIETZ:  I'm proposing one of two solutions
20   here.  If the deponent -- rather if AF Holdings is
21   willing to explain the financial arrangement with the
22   document request three days from now, that's fine.
23   We'll agree to wind this deposition down today.  If on
24   the other hand, AF Holdings is standing on its objection
25   that disclosing the financial arrangement is not a

```
 1   proper subject because it wasn't properly noticed today,

 2   then I'm suspending the deposition and we're going to

 3   get the court involved about whether AF Holdings should

 4   be compelled to answer that question.  It's one of the

 5   two options and it's your choice.

 6           MR. GIBBS:  It's not one of the two options.

 7           MR. PIETZ:  So which is it?  I'm asking

 8   counsel, I'm asking AF Holdings and I'll ask my

 9   co-counsel if he concurs --

10           MR. GIBBS:  You have no more minutes left in

11   this deposition, so you're basically holding us captive

12   here until you get this answer from him.  This is

13   ridiculous.

14           MR. PIETZ:  That's not true.

15           THE WITNESS:  Could we go off the record?

16           MR. PIETZ:  Sure.

17           (Off the record at 6:06 p.m. and back on

18            the record at 6:09 p.m.)

19           MR. PIETZ:  We're back on the record.  I think

20   we had a proposal on the issue that had held us up here

21   that's amenable to both sides.

22           Mr. Hansmeier, why don't you outline it as you

23   saw it?

24           THE WITNESS:  I'll have my attorney outline

25   it.
```

1          MR. GIBBS:  When you get us an interrogatory

2  as to this issue of whether money was paid to

3  Heartbreaker, we'll have two weeks to answer that

4  interrogatory.  That's the stipulation.

5          MR. PIETZ:  And you're agreeing to doing some

6  kind of substantive response about the money, it's just

7  not going to be objections?

8          MR. GIBBS:  What do you consider a substantive

9  response?

10         MR. PIETZ:  X dollars were paid is a

11  substantive response to the question that we're going to

12  be asking.

13         MR. GIBBS:  If we can give you a substantive

14  response, we will give you that substantive response.

15         MR. PIETZ:  Fair enough.  So stipulated.  At

16  least as far as we're concerned.

17         Brett, I note that you were raising issues

18  about time.  Would you like to do redirect?  I'm

19  certainly amenable to powering through.

20         MR. GIBBS:  Hold on a second.  If I don't do

21  redirect, are you opening up the floor for me to do

22  redirect or not?  If I do redirect, you can go back and

23  cross-examine him again, but if I don't do it, you're

24  shut down from that.  Want do you want to do at this

25  point?

```
 1              MR. PIETZ:  I'm fine ending the deposition

 2    right now.  It's really your choice in what you would

 3    like to do.

 4              MR. RANALLO:  Good with me.

 5              MR. GIBBS:  I just want to make sure that I

 6    have the right to review this within 30 days according

 7    the rules.

 8              MR. RANALLO:  And if I could also go ahead on

 9    the record and serve Mr. Hansmeier with a copy of the

10    complaint, again, summons and complaint against AF

11    Holdings by Alan Cooper.

12              THE WITNESS:  On the record I would like to

13    note that I'm not authorized to accept service on behalf

14    of any of these entities and that Attorney Ranallo has

15    been notified of this fact and he should notify Attorney

16    Godfread on whose behalf he is serving this of this fact

17    and if he does not do so we will make a motion -- I

18    assume the plaintiffs in that case will make a motion

19    to -- make Mr. Ranallo's fraud {sic} if goes to that --

20    notice the court.

21              MR. PIETZ:  Can we do a stipulation of

22    relieving the court reporter of her duties.

23              MR. GIBBS:  That's fine.

24              THE REPORTER:  Would you like to order?

25              MR. PIETZ:  The defendant will take one
```

1   electronic copy and paper.

2           MR. GIBBS:  We will as well.  Just electronic.

3           (Whereupon, the deposition was

4           adjourned at 6:15 p.m.)

5

6           I declare under penalty of perjury that the

7   foregoing is true and correct.  Subscribed at

8   _____, California, this _____ day of

9   _____, 2013.

10

11

12

13                              _____

14                              PAUL HANSMEIER

15

16

17

18

19

20

21

22

23

24

25

```
 1                    CERTIFICATE OF REPORTER

 2

 3         I, ANGIE M. MATERAZZI, a Certified Shorthand

 4   Reporter, hereby certify that the witness in the

 5   foregoing deposition was by me duly sworn to tell the

 6   truth, the whole truth and nothing but the truth in the

 7   within-entitled cause;

 8              That said deposition was taken down in

 9   shorthand by me, a disinterested person, at the time and

10   place therein stated, and that the testimony of the said

11   witness was thereafter reduced to typewriting, by

12   computer, under my direction and supervision;

13              I further certify that I am not of counsel or

14   attorney for either or any of the parties to the said

15   deposition, nor in any way interested in the events of

16   this cause, and that I am not related to any of the

17   parties hereto.

18

19

20         DATED:  _____

21

22                 _____

23                 ANGIE M. MATERAZZI
                   CSR 13116
24

25
```